UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DARRIN L. FERGUSON,

        Plaintiff,                          Case No. 04-C-0181

   vs.

MEDICAL COLLEGE OF WISCONSIN,

        Defendant.

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In December 2001, Allen Cowley, Jr., Ph.D., the Chairman of the Department of Physiology at the Medical College of Wisconsin, Inc. ("MCW"), and his team of scientists hired Darrin Ferguson (African-American) as the Lab Manager of a new, large-scale research lab studying the genetic basis of bodily function and disease (the "PGA Lab" or the "Lab"). (DPFOF 51, 52; Cowley Dep. at 164, 313-14; Ferguson Dep. at 244; Kunert Dep. at 147-48, 153.) Dr. Cowley's team selected Ferguson over other Caucasian applicants because they thought that he was best qualified to act as the "go to" person for the day-to-day operations of the Lab. (DPFOF 47, 81; Dwinell Decl. ¶ 13; Cowley Dep. at 164; Ferguson Dep. at 267.) They thought they picked the right person for the job. They were wrong. After six months of struggling to bring Ferguson's performance to an acceptable level, Dr. Cowley and his team terminated Ferguson, based upon their conclusion that he could not do the job. (DPFOF 294, 302, 303; Cowley Decl. ¶ ¶ 31, 38; Cowley Dep. at 298; Dwinell Decl. ¶ 70-71; Kunert Decl. ¶ 23.)

Ferguson now attempts to deflect blame for his professional failure by asserting claims of

race discrimination, racial harassment, retaliation, and negligent supervision pursuant to Title VII of the Civil Rights Act of 1964, 2000e - 2000e-17 ("Title VII") and 42 U.S.C. § 1981. The undisputed facts, however, preclude an inference that MCW had any unlawful motivation in its dealings with Ferguson. Indeed, Ferguson cannot establish the fundamental elements of his race discrimination, harassment, and retaliation claims as set forth by controlling authority. Ferguson's common law claims for defamation and invasion of privacy similarly fail as a matter of law. The Court should grant MCW summary judgment and dismiss this action.

## STATEMENT OF UNDISPUTED FACTS

A full statement of material facts in this case is set forth in Defendant's Proposed Findings of Fact, which accompany this Motion.[1]

## ARGUMENT

### I. FERGUSON CANNOT PREVAIL ON HIS TITLE VII CLAIMS.

MCW understands Ferguson's Amended Complaint to assert the following claims under Title VII: (a) a claim for discriminatory discharge based upon race; (b) a claim for racial harassment; (c) a claim for retaliatory discharge; (d) a claim for "negligent supervision." None of these claims can survive summary judgment for the reasons that follow.

#### A. The Record Defeats Ferguson's Claim That MCW Terminated Him Because Of His Race.

Starting first with Ferguson's discriminatory discharge claim, Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff seeking to avoid summary judgment on a Title VII claim must successfully utilize either

---

[1] For purposes of this Motion, references to Defendant's Proposed Findings of Fact will be designated "DPFOF ____."

the direct or indirect method of proof, a task that Ferguson cannot accomplish.

        1.      <u>Ferguson Does Not Have A Direct Case Of Discriminatory Discharge.</u>

As explained by the Seventh Circuit, "[u]nder the direct method, the plaintiff must show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." <u>Adams v. Wal-Mart Stores, Inc.</u>, 324 F.3d 935, 938-39 (7th Cir. 2003). Direct evidence "is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer *without reliance on inference or presumption.*" <u>Cerutti v. BASF Corp.</u>, 349 F.3d 1055, 1060 (7th Cir. 2003) (emphasis added). In essence, direct evidence amounts to an admission of discriminatory intent by the defendant, the classic example of which is a statement by a decisionmaker relating to the contested employment decision that reveals the decision was based on illegal criteria. See <u>Miller v. Borden</u>, 168 F.3d 308, 312 (7th Cir. 1999).

Circumstantial evidence can create a triable issue of fact under the direct method only if it "compos[es] a convincing mosaic of discrimination against the plaintiff." <u>Adams</u>, 324 F.3d at 939 (quoting <u>Troupe v. May Dep't Stores Co.</u>, 20 F.3d 734, 737 (7th Cir. 1994)). This circumstantial evidence "must point <u>directly</u> to a discriminatory reason for the employer's action. Otherwise the plaintiff must proceed by way of the well-known indirect route." <u>Adams</u>, 324 F.3d at 939 (emphasis added).

Ferguson lacks the evidentiary ammunition to make out a direct case of discrimination. By his own admission, there is no "smoking gun" in the record, <u>i.e.</u> direct evidence, linking his termination to his race. (DPFOF 317; Ferguson Dep. at 65, 72.) He can point to no comment by any of the decisionmakers (Dr. Cowley, Dr. Dwinell, or Dr. Kunert) making such a link. (DPFOF 316; Ferguson Dep. at 64, 66-72.) He similarly has no document that draws any connection between his race and the conclusion of MCW that he could not do his job. (<u>Id.</u>)

The undisputed facts in this case also preclude Ferguson from demonstrating a "convincing mosaic of discrimination" based upon circumstantial evidence. To the contrary, the undisputed facts in this case establish an inference of <u>nondiscrimination</u> for one simple reason: Ferguson was fired by the same set of individuals who hired him six months before. Dr. Cowley, Dr. Kunert, and Dr. Dwinell chose Ferguson over the other Caucasian applicants because they thought he was the most qualified for the job. (DPFOF 47, 51, 52; Dwinell Decl. ¶ 13; Cowley Dep. at 164, 313-14; Ferguson Dep. at 244; Kunert Dep. at 147-48, 153.) Common sense dictates that if Dr. Cowley and his team did not like African-Americans, they would not have chosen Ferguson to be the Lab Manager, particularly when they had several Caucasians applicants interested in the job. (DPFOF 46, 47; Dwinell Decl. ¶ 12, 13; Ferguson Dep. at 245.) Embracing common sense, the Seventh Circuit and numerous courts across the nation have recognized that a rebuttable inference or presumption of nondiscrimination exists when the same actor hires and then later takes an adverse action against the complaining party within such a short period of time. <u>See</u> <u>Steinhauer v. DeGolier</u>, 359 F.3d 481, 488 (7th Cir. 2004); <u>Roberts v. Separators, Inc.</u>, 172 F.3d 448, 452 (7th Cir. 1999); <u>EEOC v. Our Lady of Resurrection Med. Ctr.</u>, 77 F.3d 145, 152 (7th Cir. 1996); <u>Rand v. CF Indus., Inc.</u>, 42 F.3d 1139, 1147 (7th Cir. 1994); <u>see also</u> <u>Grady v. Affiliated Central, Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997); <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270-71 (9th Cir. 1996); <u>Buhrmaster v. Overnite Transp. Co.</u>, 61 F.3d 461, 463-64 (6th Cir. 1995); <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 847 (1st Cir. 1993); <u>Lowe v. J.B. Hunt Transport, Inc.</u>, 963 F.2d 173, 174-75 (8th Cir. 1992); <u>Proud v. Stone</u>, 945 F.2d 796, 797 (4th Cir. 1991).

In this case, the same-actor doctrine has reach well beyond Ferguson. Indeed, although Ferguson's Amended Complaint suggests some crusade against African-Americans in the Lab,

the undisputed facts reveal quite a different picture. William Hutchins, a former Lab Technologist and an African-American, was uniformly praised by Dr. Cowley and Dr. Kunert, and Hutchins testified that he viewed Dr. Cowley as a mentor. (DPFOF 324-326; Kunert Decl., Ex. F; Cowley Dep. at 124; Hutchins Dep. at 26.) Candace Jones, also an African-American Technologist, similarly received high marks from her supervisors – with Dr. Kunert gushing that she would "hire her all over again" if she could, and Dr. Cowley characterizing her as a "terrific" member of the Lab team. (DPFOF 329, 330; Kunert Decl., Ex. G; Cowley Dep. at 118.) Both Hutchins and C. Jones left the Lab voluntarily to pursue other interests. (DPFOF 323, 328; Dwinell Decl. ¶ 77; Kunert Decl. ¶ 31, Ex. H.) Austin Brill and Maurice Jones, whom Ferguson contends were subjected to race discrimination, also were hired into their position by Drs. Kunert and Dwinell. (DPFOF 331, 340; Jones Dep. I at 6; Kunert Decl. ¶ 32; Brill Dep. at 4, 185.) The record also demonstrates that Drs. Kunert and/or Dwinell disciplined one Caucasian Technologist and terminated another when they failed to meet their job expectations. (DPFOF 343; Kunert Decl. ¶ 34.)

Ferguson has labeled Dr. Cowley, Dr. Kunert, and Dr. Dwinell as racists. He can hardly create a convincing mosaic of discrimination when those same alleged racists hired him and other African-Americans, showered praise and support on African-Americans in the Lab who excelled in their positions, and "lowered the boom" on Caucasian staff who did not make the grade. On this point, the Court of Appeals' decision in Steinhauer v. DeGolier, 359 F.3d 481 (7th Cir. 2004) is instructive. In Steinhauer, the Seventh Circuit relied upon the same-actor inference in finding that the plaintiff could not make out a direct case of reverse sex discrimination, notwithstanding evidence of an assortment of anti-male comments and conduct.

As the Court of Appeals reasoned:

> [E]ven if these comments were sufficient to create an inference of anti-male bias, to avoid summary judgment [plaintiff] must still present sufficient evidence that would allow a reasonable jury to find that the defendants discriminated against him because of his sex, and the record, as a whole, prevents such a finding. Rather, the record shows that [plaintiff] was hired less than six months before his termination by DeGolier, based on Stevens' recommendation, and that the same two individuals later decided to fire him. Under these circumstances, it is unreasonable to infer that DeGolier and Stevens decided to terminate Steinhauer based on his sex, since they had just decided to hire him notwithstanding his sex.

Id. at 488 (internal citations omitted). This reasoning applies with full force on the facts presented here. The direct method, in Ferguson's case, is a dead end.

> 2. Ferguson's Discriminatory Discharge Claim Also Fails Under The Indirect Method Of Proof.

To avoid summary judgment on his discriminatory discharge claim, therefore, Ferguson must successfully utilize the "indirect" methodology established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas paradigm, Ferguson must first establish a prima facie case of discrimination. See Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002) (citations omitted). If he succeeds in establishing a prima facie case, the burden shifts to MCW to articulate a legitimate, non-discriminatory reason for its actions; Ferguson then has the ultimate burden to prove that the offered reason is a pretext for unlawful discrimination. See Cerutti, 349 F.3d at 1055.

"Pretext," as the Seventh Circuit has explained, "means a dishonest explanation, a lie rather than an oddity or an error." Peele v. Country Mutual Ins. Co., 288 F.3d 319, 326 (7th Cir. 2002); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002) ("A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." (internal quotations omitted)). To establish pretext, Ferguson must produce competent evidence showing either that MCW's proffered

reason did not actually motivate the action in question, or that it was insufficient to motivate that action. See Wells, 289 F.3d at 1006.

As the Seventh Circuit repeatedly has emphasized, in conducting this analysis, "We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). On pretext, "[t]he focus . . . is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Id. That an employer's decision was foolish, mistaken, unduly harsh, or wrongheaded is of no concern to the court in analyzing a retaliation or discrimination claim. See Millbrook v. IBP, Inc., 280 F.3d 1169, 1175 (7th Cir. 2002). Rather, the Seventh Circuit "adheres to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." Little v. Illinois Dep't of Revenue, 369 F.3d 1007, 1012 (7th Cir. 2004). Ferguson's discharge claim suffers from fatal failures of proof both on the elements of his prima facie case and on the issue of pretext.

> a. Ferguson cannot make out a prima facie case of race discrimination in his termination.

The elements of the prima facie case of race discrimination are as follows: (1) the plaintiff was a member of a protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably. Little, 369 F.3d at 1011. Ferguson's prima facie case comes up short on elements (2) and (4), as set forth below.

> (1) Ferguson Was Not Performing His Job To The Satisfaction Of MCW.

"If a plaintiff fails to demonstrate that []he was meeting her employer's legitimate employment expectations at the time of [his] termination, the employer may not be put to the

burden of stating the reasons for [his] termination." Peele v. Country Mutual Ins. Co., 288 F.3d 319, 328 (7th Cir. 2002). The undisputed facts here demonstrate that Ferguson did not perform his job to the satisfaction of his employer. More specifically, Dr. Cowley, Dr. Kunert, and Dr. Dwinell brought Ferguson on board with the expectation that he would run the day-to-day activities of the Lab and act as the "go to" person for the Lab staff. (DPFOF 41, 81; Kunert Dep. at 105, Ex. 1; Cowley Dep. at 164; Ferguson Dep. at 267.) Over the course of his six-month employment, however, Ferguson failed to demonstrate to his supervisors that he could manage the Lab proactively and effectively, as they desired. (DPFOF 294; Cowley Decl. ¶ 31; Dwinell Decl. ¶ ¶ 70-71; Kunert Decl. ¶ 23.)

The specific instances that contributed to this failure are numerous. At the beginning of his employment, Ferguson's supervisors expressed to him that he needed to learn the protocols performed by the technicians. (DPFOF 92; Ferguson Dep. at 298; Kriegel Dep. at 112.) Ferguson was told that he should get his "hands dirty" by doing the protocols himself, a task Ferguson himself recognized could establish good rapport with his team. (DPFOF 88, 91; Cowley Dep. at 203-04; 281-82; Ferguson Dep. at 299.) Ferguson's supervisors did not see him taking their advice in the early part of his employment, an observation that greatly troubled and disappointed Dr. Cowley, in particular. (DPFOF 96, 97; Kunert Decl.¶ 3; Dwinell Decl. ¶ 23; Cowley Dep. at 285.) After failing to do so on his own initiative, in March 2002, MCW directed Ferguson to spend time on each protocol. (DPFOF 190, 206; Ferguson Dep. at 367; Cowley Decl., Ex. B; Ferguson Dep. at 484-86, Ex. 26.) He spent one week on one protocol, and then largely abandoned the task. (DPFOF 219; Ferguson 559-60.) Almost a month later, he still had not completed the entry of the data for the work he did on that protocol, despite repeated reminders. (DPFOF 264; Kunert Decl. ¶ 12, Ex. D; Kunert Dep., Exs. 58, 64.)

Ferguson angered the Lab staff by attempting to reorganize equipment and materials before he actually had performed any of the protocols. (DPFOF 99; Cowley Dep. at 218; Ferguson Dep. at 458-60.) He made uninformed representations about the possibility of getting raises for the staff almost from the minute he walked in the door. (DPFOF 103; Brill Dep. at 194; Kriegel Dep. at 112.) Ferguson failed to inform Dr. Kunert of a mishap with the L-NAME conditioning of a group of rats, even after spending almost an entire day with her. (DPFOF 129, 132, 133, 134; Ferguson Dep. at 322; Kunert Dep. at 153-55, 185-86.) This incident greatly diminished Ferguson's credibility in Dr. Kunert's eyes. (DPFOF 127, 143; Kunert Dep. at 153-58; Ferguson Dep. at 322; Cowley Dep. at 314.)

Ferguson appeared to his superiors to be unable to manage a simple protocol that involved obtaining blood samples for a thyroid study being performed at the University of Chicago. He did not obtain the samples by the initial deadlines, and he sought the assistance of two other Lab employees for what Dr. Cowley considered a very basic task of drawing blood from rats. (DPFOF 156-159, 167; Messinger Decl. ¶¶ 6-8; Kunert Dep. at 190; Cowley Dep. at 168.) Months later, MCW received a report from the University of Chicago that they had not yet obtained any useable samples for the study, despite Ferguson's representation that he would provide them. (DPFOF 283, 284; Messinger Decl. ¶¶ 9, 10, Ex. A.) The outside collaborator even offered to come up to obtain the samples himself. (DPFOF 285; Messinger Decl., Ex. A.)

Ferguson knew that a full-staffed Lab was essential to the success of the PhysGen Project. (DPFOF 80, 208; Ferguson Dep. at 265, 470.) He had been instructed in March 2002 to work to fill known vacancies as soon as possible, yet it took him weeks to get to the point of even bringing anyone in for an interview. (DPFOF 212, 222, 225; Ferguson Dep. at 485-86, 499, 547-48, 554, 560, Ex. 26; Dwinell Decl. ¶ 45.) Dr. Kunert and Dr. Dwinell had to continually

ask Ferguson for updates, and once an offer of employment was finally extended, Ferguson missed a known deadline for filing the paperwork necessary to get the new employee on the payroll. (DPFOF 220, 273-274; Dwinell Decl. ¶ 43; Ferguson Dep. at 563-64, Ex. 28; Kunert Dep., Exs. 38, 41; Brennan-Nelson Decl. ¶ ¶ 11, 13, Ex. B.)

Ferguson knew that MCW expected him to handle personnel issues in the Lab. (DPFOF 80; Ferguson Dep. at 265.) Ferguson did not successfully resolve personnel disputes and procedural issues brought to his attention. (DPFOF 230, 244-245; Ferguson Dep. at 561-63; 570-572.) These issues were resolved after the intervention of his supervisors. (Id.) Ferguson admits that he did not have a good relationship with a number of the staff in the Lab, and he does not blame these poor relationships on race. (DPFOF 231-232; Ferguson Dep. at 578-79.) Ferguson also concedes that the staff made valid criticisms of his performance. (DPFOF 233; Ferguson Dep. at 603.)

Ferguson was expected to oversee the operations of the Lab. During a brief absence of his supervisors, however, several groups of rats did not receive necessary conditioning. (DPFOF 261; Dwinell Decl. ¶ 59.) He later did not ensure that someone provided basic care to a group of rats during a technologist's scheduled absence, a failure that jeopardized the well-being of the animals. (DPFOF 281-282; Kunert Decl. ¶ ¶ 21, 22; Kunert Dep., Ex. 83.) He claimed to be unaware that a technologist was significantly behind in his data. (DPFOF 172; Ferguson Dep. at 579, Ex. 6.) He had to be reminded to provide regular production schedules. (DPFOF 288; Messinger Decl. ¶ 18, Ex. C.) He required repeated prompting to issue operational policies to the group, a task he never completed. (DPFOF 287; Dwinell Decl. ¶ 64, Ex. F.)

Ferguson's supervisors met with him on March 22, 2002 and provided him with a detailed description of each element of his job description. (DPFOF 198-200; Ferguson Dep. at

422, 426, Exs. 23, 24.) They met with him weekly to ensure that he understood his priorities and to provide him with necessary direction. (DPFOF 204; Ferguson Dep. at 484.) When he did not follow those priorities, he received a final written warning detailing his deficiencies. (DPFOF 254; Ferguson Dep. at 555, Ex. 35.) Even after this written warning, Ferguson's supervisors continued to remind Ferguson of their directives and request updates on his progress. (DPFOF 272, 278, 280; Dwinell Decl. ¶ 60; Dwinell Decl. ¶ 64, Ex. F; Kunert Decl. ¶ 20; Kunert Dep., Ex. 83.)

The cumulative effect of these events led Ferguson's supervisors to conclude that he could not perform the job as they had envisioned it, and as they had communicated it to Ferguson. Per the Seventh Circuit, a plaintiff "is out of luck if he can't show that he was meeting his employer's legitimate expectations." Peele, 288 F.3d at 328 (quoting Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir. 1997)). Given the undisputed facts in this case, when it comes to the question of whether Ferguson satisfied his employer's legitimate expectations of him, Ferguson ran out of luck long ago.

> (2) The Record Contains No Evidence Of Preferential Treatment Of Similarly Situated, Non-African-American Employees.

On element (4) of the prima facie case, the Seventh Circuit requires evidence that "[a] similarly situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on plaintiff." Little, 369 F.3d at 1012. Ferguson admits that he has no idea of how managers of his level have been treated within the PhysGen Project, the Department of Physiology, or elsewhere in the institution. (DPFOF 318; Ferguson Dep. at 644.) The absence of a valid comparator, who received preferential treatment under similar circumstances, dooms his prima facie case and his Title VII discrimination claim. See Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 861-63 (7th Cir. 2005) (upholding dismissal of

race discrimination claims because plaintiff presented no evidence of preferential treatment of similarly situated white employees); Little, 369 F.3d at 1012 (same).

"If a plaintiff is unable to establish a prima facie case of employment discrimination under McDonnell Douglas, an employer may not be subjected to a pretext inquiry." Peele v. Country Mutual Ins. Co., 288 F.3d 319, 327 (7th Cir. 2002). As Ferguson cannot make out a prima facie case, the Court need not proceed any further on his discriminatory discharge claim.

> b. MCW had legitimate, nondiscriminatory reasons for terminating Ferguson's employment.

Nonetheless, should the Court take up the issue of pretext, the record readily establishes the legitimate, nondiscriminatory reasons for MCW's decision to terminate Dr. Ferguson's employment. For the reasons set forth above, by June 2002, Dr. Kunert, Dr. Dwinell, and Julie Messinger, the Program Coordinator, had no confidence that Ferguson could competently direct the activities of the Lab without their constant, close supervision. (DPFOF 294, 296; Cowley Decl. ¶¶ 31, 33; Dwinell Decl. ¶¶ 70-71; Kunert Decl. ¶ 23.) They advised Dr. Cowley of this opinion. (Id.) Dr. Kunert's frustration with Ferguson's performance was so great that she tendered her resignation, citing his incompetence as one of the reasons for her decision. (DPFOF 291; Cowley Decl., Ex. C.)

Dr. Cowley himself perceived a fundamental failure on Ferguson's part to immerse himself in the activities of the Lab, such that he could understand, facilitate, and improve its operation. (DPFOF 301; Cowley Dep. at 313.) In Dr. Cowley's view, the nature of the PhysGen Project, a multi-million dollar project with set timelines and production schedules, required that he take action. (DPFOF 300; Cowley Dep. at 288.) Based upon these considerations, Dr. Cowley, Dr. Kunert, and Dr. Dwinell decided to terminate Ferguson's employment. (DPFOF 302-303; Cowley Decl. ¶ 38; Cowley Dep. at 298.) This performance-based rationale

unquestionably represents a legitimate, nondiscriminatory reason for terminating Ferguson's employment.

           c.      The record precludes a finding of pretext with respect to the reasons for Ferguson's termination.

The task then falls on Ferguson to show that MCW's stated reasons for his termination are a lie, and that Drs. Cowley, Kunert, and Dwinell did not honestly believe that he was an ineffective and incompetent Lab Manager. He cannot possibly make this showing.

As an initial matter, Ferguson admitted in his deposition that his supervisors were dissatisfied with his performance both at the time of his written warning and thereafter. (DPFOF 218, 259; Ferguson Dep. at 560-61, 642, Ex. 35.) Dr. Kunert's notice of resignation starkly portrays her own level of frustration with Ferguson's performance. (DPFOF 291; Cowley Decl., Ex. C.) Ferguson concedes that his performance was criticized almost from the beginning of his employment, and that at least some of these criticisms were valid. (DPFOF 150-151; Ferguson Dep. at 605-606.) He recognizes that the Lab staff had legitimate criticisms of him that had nothing to do with his race. (DPFOF 233; Ferguson Dep. at 603.) He also has admitted the truth of the facts that led his supervisors to be dissatisfied with him, from his resistance to actually performing the protocols, to his oversight of the hiring process, to his poor management of the thyroid protocol, to the degree and detail of oversight provided from his supervisors. (DPFOF 219, 225, 174, 151; Ferguson Dep. at 499, 554, 559-60, 605-606, Ex. 6.) By conceding the factual basis of his supervisors' concerns, he cannot then ask a jury to find that those concerns were a lie. Traylor v. Brown, 295 F.3d 783, 791 (7th Cir. 2002) ("[A] plaintiff cannot avoid summary judgment by merely claiming a jury could disbelieve the employer's reason."); see also Giannopoulos v. Brach & Brack Confections, Inc., 109 F.3d 406, 411 (7th Cir. 1997) (same).

A review of the record as a whole similarly debunks Ferguson's notion that racial bias

motivated his termination. As discussed above, this case presents a textbook "same actor" scenario. The same set of decisionmakers weighed in on both the decision to hire Ferguson and the decision to fire him six months later. (DPFOF 51, 302, 303; Cowley Dep. at 298, 313-14; Ferguson Dep. at 244; Kunert Dep. at 147-48, 153; Cowley Decl. ¶ 38.) Those same decisionmakers supported and praised other African-American employees who excelled in their work. (DPFOF 324-325, 329-330; Kunert Decl., Exs. F, G; Cowley Dep. at 118, 124.) Those same decisionmakers sided with Ferguson when, within the first month of his employment, he was confronted with accusations of inappropriate conduct by his subordinates. (DPFOF 115, 120; Ferguson Dep. at 103; Ferguson Dep. at 106.) Those same decisionmakers encouraged Ferguson to stay in his position when he indicated he might resign because of those complaints. (DPFOF 116; Ferguson Dep. at 104.) Those same decisionmakers went to considerable lengths to ensure that Ferguson understood their expectations of him, utilizing regular meetings, a detailed job description, repeated written direction, and formal discipline. (DPFOF 204, 199, 213, 254; Ferguson Dep. at 426, 484, 555, Exs. 24, 26, 35.)

And what of Ferguson's proof of discriminatory intent on the part of Dr. Cowley, Dr. Kunert, and Dr. Dwinell? He can point to no racial remarks. (DPFOF 316; Ferguson Dep. at 64, 66-72.) He has produced no "smoking gun" documents. (DPFOF 317; Ferguson Dep. at 65, 72.) He has no evidence that his supervisors treated similarly situated, non-African-American managers in a preferential manner. (DPFOF 318; Ferguson Dep. at 644.) He has nothing. To borrow from the Seventh Circuit, Ferguson's "problems were not related to his race – they were related to him. The fact that he is a member of a protected class does not transform them." Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004). Whether the Court considers the elements of the prima facie case or question of pretext, the result is the same.

Ferguson's race discrimination claim fails as a matter of law.

**B.      Ferguson Has No Claim For A Racially Hostile Work Environment.**

MCW does not understand Ferguson to be asserting a disparate treatment claim based upon any event other than his termination.  Indeed, none of the events set forth in his Amended Complaint, other than his termination, constitute material adverse employment actions.  See Ribando v. United Airlines, 200 F.3d 507, 510 (7th Cir. 1999) (holding that only material adverse employment actions are actionable under Title VII); Sweeney v. West, 149 F.3d 550, 555, 556 (7th Cir. 1998) (noting that material adverse action requirement "exclude[s] instances of different treatment that have little or no effect on an employee's job").  As such, Ferguson cannot assert an independent claim based upon those events unless they constitute actionable harassment.

1.      Ferguson's Racial Harassment Claim Is Untimely.

As a threshold matter, the Court must determine whether Ferguson's harassment claim is timely.  Title VII mandates that an employee seeking relief under the statute must file a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") within 180 or 300 days after the alleged unlawful employment practice occurs.  See 42 U.S.C. § 2000e-5(e)(1).  Ferguson did not file his charge until March 25, 2003.  The three hundredth day before this filing was May 29, 2002 – approximately a week before his termination.

The United States Supreme Court addressed the operation of the 300-day limitation period in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  In the Morgan decision, the Court distinguished between "discrete acts of discrimination," such as a termination, and "hostile work environment" claims.  Id. at 122.  The Court held that a claim for a discrete act of discrimination must be brought within the 300-day time period or it will be time-barred.  See id.  "A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment

practice and at least one act falls within the time period." Id.

Clearly, the discrete act of Ferguson's termination falls within the 300-day time period, making Ferguson's discriminatory discharge claim timely. In contrast, the acts of alleged harassment of which Ferguson complains – the complaints to Human Resources, Dr. Kunert's remark that Ferguson had "no integrity," the events listed in Ferguson's March 7, 2002 Complaint, the list of complaints created by Kriegel – all occurred before May 29, 2002. (DPFOF 181-184; Ferguson Dep. at 363, Ex. 7.) Ferguson has not identified any alleged act of harassment that occurred in the last nine days of his employment. As such, his hostile environment claims are time-barred. See Wallin v. THC-Chicago, Inc., 2004 WL 2535283, at *7 (N.D. Ill. Sept. 23, 2004) (dismissing hostile work environment claims because all acts of harassment, as opposed to discrete act of termination, occurred outside 300-day limitations period).

2.      Ferguson Cannot Establish The Elements Of Racial Harassment.

Even assuming that Ferguson did what he needed to do to pursue his racial harassment claim, no reasonable jury could conclude that he actually experienced such harassment. "Title VII does not create a remedy against harassment as such . . . ." Twisdale v. Snow, 325 F.3d 950, 953 (7th Cir. 2003). Rather, to be actionable, any harassment based upon a protected characteristic, such as race, must rise to the level of "discrimination" with respect to the terms, conditions, or privileges of employment. Id.

The bar for establishing such discrimination is set high. Any claim for racial harassment will fail absent proof that "(1) [the plaintiff] was subject to unwelcome harassment; (2) the harassment was based on [the plaintiff's] race; (3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." Mason v. Southern Illinois Univ. at

Carbondale, 233 F.3d 1036, 1043 (7th Cir. 2000). The undisputed facts make plain that Ferguson lacks the proof to satisfy these elements.

> a. The Alleged Harassment Lacks A Racial Character Or Purpose.

The harassment alleged by Ferguson must have a "racial character or purpose to support a Title VII claim." Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discriminat[ion] [based upon a protected characteristic]."). Although "harassment need not be explicitly racial in order to be probative of a hostile environment . . . it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." Beamon, 411 F.3d at 863 (internal citations omitted). None of the harassing conduct claimed by Ferguson has the required racial underpinning.

Consider Ferguson's leading examples with respect to his supervisors: Ferguson complains about his orientation to his job, but the record shows that MCW introduced him to the relevant personnel, gave him the opportunity to attend an educational series about the PhysGen Project, and provided him with a desk and computer within the customary time frame. (DPFOF 56-59, 67; Ferguson Dep. at 279-282, 287-88.) Indeed, any delay Ferguson experienced in getting his desk and computer was no different than that encountered by his boss Dr. Dwinell, a Caucasian, when she first joined the institution. (DPFOF 77; Dwinell Decl. ¶ 4.) Dr. Kunert told Ferguson that he had no integrity, but she made this remark after he failed to tell her about a mistake in conditioning a group of rats, despite having ample opportunity to do so. (DPFOF 133, 141; Kunert Dep. at 154, 181, 185-86; Ferguson Dep. at 122.) When Ferguson (who supposedly had years of laboratory experience) asked Dr. Kunert in a meeting what she meant by "tabulate," she responded "Tabulate. It means to count." (DPFOF 182; Ferguson Dep., Ex. 7.)

Shortly thereafter, Dr. Dwinell commented that a histogram was a "chart with bars on it." (DPFOF 183; Ferguson Dep., Ex. 7.) Dr. Kunert made critical remarks of Ferguson's performance, but those comments had no racial component. (DPFOF 218, 251; Ferguson Dep. at 560-61, 558-61, Ex. 35.) She asked Allison Kriegel to write down her concerns about Ferguson after she broke down in tears trying to articulate her feelings, but Ferguson was present at the time of this request, and made no objection at the time. (DPFOF 236-237; Ferguson Dep. at 506, 508; Kriegel Dep. 145.)

Where does race appear in this picture? Ferguson's supervisors may have been blunt, and they certainly were frustrated with Ferguson's lack of competence, but where in the record is any evidence that their treatment of Ferguson had a racial component? The record contains no such evidence. See Shannon v. Advocate Health Centers, Inc., 2002 U.S. Dist. LEXIS 6341, at * 14 (N.D. Ill. Apr. 4, 2002) ("[E]ven rudeness that is tantamount to harassment is not actionable unless an inference of discrimination . . . can be drawn . . . .")

The same is true with respect to any alleged harassment by Ferguson's subordinates. Ferguson takes great issue with the complaints made about him to Human Resources concerning his undressing in the locker room. The record contains no evidence, however, that white employees engaged in similar conduct in front of the female lab staff without complaint. He similarly took offense at the list of complaints Kriegel made about him. None of the items on the list reference race or race-related issues. (DPFOF 238; Kriegel Dep., Ex. 2-4.) He makes reference in his Amended Complaint to pictures left on his desk that referenced litter. The meaning behind these pictures (beyond a general "don't litter" admonition) is anyone's guess. He claims that a subordinate called him "Carlton," in a reference to an African-American character from the television program "Fresh Prince of Bel Air." (DPFOF 344; Ferguson Dep. at

606.) Ferguson testified that he would not have construed that remark as racial if it had not been made about him. (DPFOF 346; Ferguson Dep. at 608-09.)

Again, none of these incidents had any overt racial component, as required. Lacking any racial component to the alleged harassment he experienced at the hands of his supervisors or subordinates, Ferguson's hostile work environment claim must fail. See Beamon, 411 F.3d at 864 (rejecting hostile work environment claim because critical performance review, provision of insufficient mentoring, and determination that plaintiff did not "have what it takes" to be manager lacked any inherently racial component); Herron, 388 F.3d at 303 (upholding dismissal of racial harassment claim because "this case involves no racial component at all").

### 3.    Ferguson Did Not Experience An Objectively Hostile Work Environment.

The Supreme Court has cautioned that in addressing harassment claims, courts must take care not to transform Title VII into a "general civility code" for the American workplace. Oncale, 523 U.S. at 1002. In a similar vein, the Seventh Circuit has instructed that Title VII "does not protect the hypersensitive employee . . . from the irritations endemic to the employment relation." Twisdale, 325 F.3d at 953.

Instead, Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Oncale, 523 U.S. at 1003. A plaintiff claiming racial harassment must present evidence of a workplace "permeated with discriminatory intimidation, ridicule, and insult" sufficiently "severe or pervasive" to create an objectively hostile or abusive work environment. Id. Per the Supreme Court, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position . . . ." Id. (internal quotations omitted).

The examination of whether an objectively hostile or abusive work environment exists requires a consideration of all of the attendant circumstances. See Harris v. Forklift Sys., Inc.,

510 U.S. 17, 23 (1993); <u>Oncale</u>, 523 U.S. at 82 ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries" to identify actionable harassment). In conducting this inquiry, a court may examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23. In the end, "[t]he workplace that is actionable is the one that is 'hellish.'" <u>Logan v. Kautex Textron North America</u>, 259 F.3d 635, 641 (7th Cir. 2001).

    No reasonable person could look at the incidents of racial harassment alleged by Ferguson and conclude that he worked in a "hellish" environment. At best, all Ferguson has to offer in support of his claim are instances reflecting a blunt management style from his supervisors, and the dissatisfaction of his subordinates with him as a manager. (DPFOF 165, 233; Cowley Dep. at 169; Ferguson Dep. at 603.) These incidents – from the "no integrity," "tabulate," and "histogram" comments, to the Human Resources complaints -- represent the definition of innocuous, isolated occurrences that courts refuse to find actionable. (DPFOF 141, 182, 183; Ferguson Dep. at 122; Kunert Dep. at 181; Ferguson Dep., Ex. 7.) See <u>Luckie v. Ameritech Corp.</u>, 389 F.3d 708, 713-14 (7th Cir. 2004)(finding no actionable harassment based on criticisms of management style, use of term "dunce" in relation to African-American employee, and other events); <u>Herron</u>, 388 F.3d at 303 (holding that plaintiff failed to establish an objectively hostile work environment because transfers, late payment, salary, and difficulties with managers represented "normal workplace friction"); <u>Hardin</u>, 167 F.3d at 345-46 (finding that plaintiff did not establish severe or pervasive harassment based upon supervisor's cursing and use of abusive language, closing a door in plaintiff's face, startling plaintiff from behind, and cutting plaintiff off in the parking lot).

Indeed, the Court need only consider those cases in which the Seventh Circuit has found an actionable racial hostile work environment to recognize just how far short of that standard Ferguson's allegations fall. In Cerros v. Steel Technologies, Inc., 288 F.3d 1040 (7th Cir. 2002), for example, the Court of Appeals held that the plaintiff had established a hostile work environment based upon allegations that his supervisors and co-workers endorsed the "if it ain't white it ain't right" philosophy and frequently subjected plaintiff to racial slurs such as "brown boy," "spic," "wetback," "Julio," and "Javier." Id. at 1042. The plaintiff also had to endure racist graffiti painted on the bathroom walls, such as "spic," "Go Back to Mexico, "[plaintiff] is a Spic," "KKK," and "White Power." Id. The plaintiff also had the tires of his car slashed. See id. The Cerros case, with its record of repeated racial epithets by supervisors and co-workers, is consistent with other decisions in which the Court of Appeals has found actionable harassment, and entirely distinguishable from the record presented here. See, e.g., Hrobowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004) (finding that plaintiff established objectively hostile work environment based upon evidence showing he frequently heard the word "nigger" and was even told to talk to another employee "nigger to nigger"); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 673 (7th Cir. 1993) (concluding that plaintiff presented sufficient evidence of a racially hostile work environment in supervisor's repeated use of word "nigger," his statement that "you black guys are too fucking dumb to be insurance agents," a remark by an executive that the company should not hire any more black agents, and the supervisor's statement that "[plaintiff] must think [he's] back in Arkansas chasing jackrabbits"). As Ferguson cannot establish a racially hostile work environment, his racial harassment claims must be dismissed.

**C.**      **MCW Did Not Retaliate Against Ferguson.**

Ferguson's retaliation claim suffers the same fate as his discriminatory discharge and

racial harassment claims. First and foremost, although Ferguson makes vague allegations of retaliation in his Amended Complaint, he testified at his deposition as follows: "I am not willing to say that their [the alleged bad actors'] motivation for doing the things that they did was because I made a complaint. While I am confident that they were engaging in discriminatory and harassing behaviors, I don't know that it's specifically because I made a complaint, or it's just because I'm black" (DPFOF 348; Ferguson Dep. at 88.) If Ferguson himself is not sure that MCW retaliated against him, he should not have the opportunity to present such a claim to a jury.

Indeed, a review of the record confirms that Ferguson has no basis for asserting a retaliation claim. He failed to satisfy the conditions precedent to bringing suit on such a claim and he cannot make out the essential elements of retaliation.

1.    Ferguson Failed To Satisfy The Statutory Conditions Precedent To Suit On His Retaliation Claim.

As noted above, Title VII requires that a plaintiff file a charge with the EEOC before seeking relief in federal court. See 42 U.S.C. § 2000e-5(e)(1). The charge-filing requirement exists to afford the EEOC the opportunity to investigate and attempt to conciliate the dispute, and to provide the employer notice of the allegations against it. See Peters v. Renaissance Hotel Operating Company, 307 F.3d 535, 550 (7th Cir. 2002).

The Seventh Circuit has held that "a plaintiff may not bring claims under Title VII that were not originally brought among the charges to the EEOC." Id.; see also Alexander v. Gardner Denver Co., 415 U.S. 36, 47 (1974) (explaining that only those matters that were brought before the EEOC and investigated by it may form the basis of a complaint under Title VII). The Court of Appeals has recognized an exception to this general rule, however, that allows a plaintiff to proceed on claims that are not contained in the charge, but that are "like or reasonably related" to

those in the charge, such that the unasserted claims "reasonably [could] be expected to grow out of an EEOC investigation of the charge[]." Peters, 307 F.3d at 550 (internal citations omitted).

Ferguson did not assert a retaliation claim in his Wisconsin Equal Rights Division Complaint (which was cross-filed with the EEOC), and he cannot contend that his current retaliation claim is "like or reasonably related" to the allegations he did assert. In specifying the cause for his Complaint, he stated that he believed he was discriminated against on the basis of his "race" and "color," but he left the "retaliation" box blank. (DPFOF 307, 308; Jones Decl., Ex. J.) Of note, Ferguson's Complaint was submitted by his attorney.

Ferguson attached a statement to his Complaint, in which he referenced his March 7, 2002 "formal complaint" and conduct that followed that complaint. (DPFOF 306; Jones Decl., Ex. J.) He never asserted in his Administrative Complaint that this "formal complaint" articulated a claim of race discrimination. (Id.) In describing the conduct that followed his March 7, 2002 complaint, he stated, "I believe that the motivation [for that conduct] was my race." (Id.) Again, he made no reference to retaliation. (Id.)

Not surprisingly, the ERD's Initial Determination of "no probable cause" did not reference or make a finding on a claim of retaliation. (DPFOF 309; Jones Decl. Ex. K.) The EEOC adopted these findings, without expanding them to include a retaliation claim. (DPFOF 310; Jones Decl., Ex. L.)

The Seventh Circuit stressed the critical nature of identifying claims on an administrative complaint in Peters, 307 F.3d 535 (7th Cir. 2002). Noting that "one of the purposes of the charge is to alert the employer to the offending behavior," the Court of Appeals held that, "[the plaintiff's] failure to mention any type of protected activity and his failure to identify retaliation as a basis for his charge preclude him from relying on the original charge of discrimination as a

basis for his retaliation claim." Id.; see also Steffen v. Meridian Life Ins. Co., 859 F.2d 534, 544-45 (7th Cir. 1988) (holding that plaintiff could not pursue retaliatory discharge claim because EEOC charge only asserted claim of age discrimination and "[plaintiff's] retaliation claim injects an entirely new theory of liability into the case").

Peters and Steffen control here. Since Ferguson did not fulfill the charge-filing requirements of a retaliation claim, and a retaliation claim is not "like or reasonably related" to the discrimination claim in his ERD Complaint, he cannot assert retaliation in this action.

2.     Ferguson Cannot Meet His Burden Of Proof On His Retaliation Claim.

Ferguson's retaliation claim also fails on the merits. Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). As with a discrimination claim, a plaintiff asserting retaliation must utilize either a "direct" or "indirect" method of proof. Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640 (7th Cir. 2002)

Under the "direct" route, a plaintiff can present "direct evidence" that he engaged in protected activity and as a result, suffered an adverse action. Id. at 644. "[M]ere temporal proximity between the [protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." Stone, 281 F.3d at 644 (citing cases). Even if a plaintiff produces direct evidence of retaliation, he cannot avoid summary judgment if "the defendant can produce uncontradicted evidence that [it] would have fired the plaintiff anyway, in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm." Id. at 643; see also Speedy v. Rexnord Corp., 243 F.3d 397, 401-02 (7th Cir. 2001).

The "indirect" route set forth in Stone adopts the familiar McDonnell-Douglas burden-shifting framework. Under this method, a plaintiff must demonstrate that "after [engaging in

protected activity] only he, and not any similarly situated employee who did not [engage in protected activity], was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." Stone, 281 F.3d at 644 (emphasis added). A failure to establish any element of the prima facie case requires dismissal of the claim. See Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002).

If a plaintiff makes a prima facie showing of retaliation, the burden shifts to the defendant to proffer a nonretaliatory reason for the employment action. See Stone, 281 F.3d at 644; Hilt-Dyson, 282 F.3d at 465. If the defendant makes this showing, the burden then shifts back to the plaintiff to demonstrate pretext. Hilt-Dyson, 282 F.3d at 465.

     3.     Ferguson Does Not Have A Direct Case Of Retaliation.

Ferguson cannot get out of the starting blocks under the direct method of proof. To begin, he has no evidence that he actually engaged in activity protected by Title VII. At his deposition, Ferguson identified four instances in which he allegedly made a complaint of race discrimination. (DPFOF 350; Ferguson Dep. at 183, 205.) In the first such instance, a conversation with Dr. Cowley about the complaints to Human Resources, Ferguson is "absolutely certain" that he did not blame the conduct at issue on race. (DPFOF 351; Ferguson Dep. at 106-07, 187-88, 354.) The next supposed complaint occurred at the meeting concerning Ferguson's written warning. Ferguson does not recall making any express reference to race in that meeting, and in fact, he does not recall any remarks made at that time. (DPFOF 356; Ferguson Dep. at 176-177.) Ferguson claims to have discussed race discrimination with his African-American subordinates, but none of his supervisors were present for these conversations. (DPFOF 360; Ferguson Dep. at 197-98.) Finally, Ferguson blamed his termination on race in his exit interview, but only after being informed that his employment had ended. (DPFOF 359; Ferguson Dep. at 184.)

Ferguson put it best when he admitted that he "simply would not have said race, or whatever" in bringing his concerns to his employer. (DPFOF 356; Ferguson Dep. at 176-177.) He never did. Even his March 7, 2002 "harassment" complaint against Dr. Kunert never referenced race, or any conduct with an overtly racial character. (DPFOF 180; Ferguson Dep., Ex. 7.) Ferguson's employer is not expected to read his mind. Title VII does not protect every complaint an employee may make about his working conditions. At a minimum, an employee must communicate that he or she is complaining about conduct that is prohibited by Title VII. See Gleason v. Mesirow Financial Inc., 118 F.3d 1134, 1146-47 (7th Cir. 1997) (holding that employees' generalized complaints about supervisor's management style did not constitute protected opposition because she never characterized issues as sexual harassment). Ferguson's inability or unwillingness to articulate a complaint of race discrimination through express words leaves his conduct outside the scope of Title VII's protections. See Salamanca v. Robert Half Corp., 2003 WL 1825561, at *8 (N.D. Ill. Apr. 4, 2003) (holding that plaintiff's complaint to employer did not constitute protected opposition because she never suggested that she believed she had experienced differential treatment based upon race or national origin); Rachel-Smith v. FTData, Inc., 247 F. Supp.2d 734, 747-748 (D. Md. 2003) (finding no protected activity in plaintiff's requests that supervisor stop sexual advances because she did not communicate belief that advances were illegal); Rhodes v. Illinois Dept. of Trans., 243 F. Supp.2d 810, 821 (N.D. Ill. 2003) (finding that plaintiff did not engage in protected activity simply by complaining about job responsibility and alleged threat, because she did not show that she had opposed unlawful employment practice); Joens v. John Morrell & Co., 243 F. Supp.2d 920, 950 n.5 (N.D. Iowa 2003) ("[Defendant] could not have known that [plaintiff's] complaints were 'protected activity,' until [plaintiff] notified [defendant] that she believed harassing or disparate treatment were

because of sex.")

Even if Ferguson had engaged in protected activity, he has no evidence establishing a direct causal link between that activity and any adverse action taken against him.[2]  None of his superiors made any comment to the effect that he should not complain about racial issues. (DPFOF 361; Ferguson Dep. at 222, 231-32.)  He further has no competent proof that any of his subordinates knew of his complaints.  Moreover, Ferguson testified that criticisms of his performance started almost immediately after he started and continued throughout his employment.  (DPFOF 150, 218, 250, 259; Ferguson Dep. at 605, 560-61, 546-547, 642, Exs. 33, 35.)  He concedes that at least some of these criticisms and concerns were valid.  (DPFOF 151, 233; Ferguson Dep. at 605-06, 603.)  Finally, MCW maintains that regardless of whether Ferguson brought complaints to its attention, it would have terminated him based upon his performance shortcomings.  (DPFOF 302; Cowley Decl. ¶ 38.)  Again, the record contains no evidence that MCW gave greater latitude to a manager who never complained, but who had performance deficiencies of the same kind and degree as Ferguson.  (DPFOF 318; Ferguson Dep. at 644.)  Ferguson's evidence comes nowhere near the level of proof necessary to set forth a direct case of retaliation.

> a.  Ferguson Does Not Have An Indirect Case Of Retaliation.

Ferguson's indirect case of retaliation merits little comment.  His failure to engage in protected activity, his inability to perform his job to the satisfaction of his employer, and the lack

---

[2]  Again, Ferguson's termination represents the only adverse employment action upon which he could base a retaliation claim.  MCW is unclear if Ferguson is asserting a claim for a retaliatory hostile work environment.  To the extent he asserts such a claim, no reading of the facts could support a finding that the events leading up to his termination were objectively hostile or were motivated by his alleged complaints.  See Silk v. City of Chicago, 194 F.3d 788, 795-97, 808 (7th Cir. 1999) (holding that verbal harassment regarding medical condition, ridicule from fellow officers, threats of physical violence, lowered performance evaluations, loss or modification of earned days of leave, and denial of officers and patrol cars for plaintiff to supervise did not suffice to make out claim for retaliatory harassment for complaining of disability discrimination).

of any evidence that MCW gave preferential treatment to a valid comparator who did not

complain, preclude him from establishing a prima facie case of retaliation. Moreover, as set

forth at length above, Ferguson cannot demonstrate pretext with respect to the legitimate,

nondiscriminatory reasons for his termination. Ferguson's retaliation claim must be dismissed.

4.     Ferguson Has No Independent Cause Of Action For "Negligent Supervision" Under Title VII.

In his Fifth Cause of Action, Ferguson asserts a claim for "negligent supervision" under

Title VII, in which he faults MCW for failing to "supervise plaintiff's superiors in the prevention

of race discrimination against him." (Am. Compl.) MCW is unaware of a separate claim for

"negligent supervision" under Title VII that is not subsumed under that statute's general

prohibitions against discrimination. To the extent Ferguson intends to assert a common law

claim for negligent supervision in connection with the prevention of race discrimination,

moreover, that claim is barred by the exclusive remedies provided by Wisconsin's workers'

compensation statute, Wis. Stats. § 102.03(2), and/or the Wisconsin Fair Employment Act, Wis.

Stats. § 113.31 – 113.395. See Johnson v. Hondo, Inc., 125 F.3d 408, 418 (7th Cir. 1997)

(holding that district court properly dismissed negligent supervision claim brought by employee

against employer based upon workers' compensation exclusivity); Bourque v. Wausau Hosp.

Ctr., 145 Wis.2d 589, 599, 427 N.W.2d 433, 437 (Wis. Ct. App. 1988) (holding that exclusive

remedy in WFEA required dismissal of common law causes of action based upon allegations that

fell within scope of Act's prohibitions).

## II.     FERGUSON'S SECTION 1981 RACE DISCRIMINATION CLAIM FAILS FOR THE SAME REASON AS HIS TITLE VII CLAIMS.

Ferguson also asserts claims for race discrimination under 42 U.S.C. § 1981. As the

Seventh Circuit analyzes § 1981 claims under the same rubric as Title VII claims, Ferguson's

section 1981 claims fall with his Title VII claims. See Herron, 388 F.3d at 299.

### III.    FERGUSON CANNOT MAINTAIN A DEFAMATION CLAIM AGAINST MCW.

Ferguson's belief that he can assert a defamation claim based upon remarks of his subordinates is ill-founded.  (DPFOF 364, 365; Ferguson Dep. 644-645.)  Wisconsin's Workers' Compensation Act ("WCA") provides the exclusive remedy for an employee's injuries in the workplace.  Wis. Stats. § 102.03(2).  In <u>Becker v. Automatic Garage Door Co.</u>, 156 Wis.2d 409, 418, 456 N.W.2d 888 (Ct.App.1990), the Wisconsin Court of Appeals extended the WCA to cover an employee's claim of defamation, holding that "defamation claims by an employee against an employer and its employees are preempted by the WCA."  <u>See also</u> <u>Wolf v. F&M Banks, et al.</u>, 193 Wis.2d 439, 455-456, 534 N.W.2d 877 (Ct. App. 1995)(affirming summary judgment in favor of employer on employee's defamation claims due to preemption by the WCA).  Ferguson bases his defamation claim on the complaints made to Human Resources by the Lab Technologists and the list of complaints about him created by a Lab Technologist (Kriegel).  (DPFOF 364; Ferguson Dep. at 644.)  As this claim rests upon statements by his subordinates that were made during his employment, it is preempted by the WCA.

### IV.    FERGUSON'S INVASION OF PRIVACY CLAIM ALSO FAILS.

Ferguson alleges that the Medical College invaded his privacy, in violation of Wis. Stats. § 895.50.  Presumably, Ferguson asserts his claim under Wis. Stats. § 895.50(2)(a), which defines "invasion of privacy" as "intrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a manner which is actionable for trespass."  The only allegation in the Amended Complaint that even touches upon this provision is Ferguson's claim that had no privacy because his "office" was in the center of the laboratory in which he worked, and that someone rifled through his desk. (Am. Compl. ¶ 35.)

Ferguson cannot prove the elements of an invasion of privacy claim with these slim and unsubstantiated allegations. As a threshold matter, MCW knows of no authority construing Wis. Stats. § 895.50 to require that every employee in Wisconsin has the right to his or her own secluded office. Moreover, the desk Ferguson used was the Medical College's property; it was never "his." (DPFOF 362; Pl.'s Reqs. to Admit (21)-(26); Ferguson Dep. at 287-88.) Ferguson did not have a legitimate expectation of privacy in the Medical College's property. (Id.) Therefore, even if Ferguson's desk was rifled through, this action is insufficient to sustain an invasion of privacy claim. See also Munson v. Milwaukee Bd. of School Directors, 969 F.2d 266 (7th Cir. 1992)(finding that school district employee's claim of invasion of privacy was frivolous where the district placed employee under surveillance); Hillman v. Columbia County, 164 Wis.2d 376, 474 N.W.2d 913 (Ct. App. 1991)(determining the plain meaning of "place" under Wis. Stats. § 895.50 is geographical, such that "place" does not include a file containing records). Ferguson cannot prove the elements of an invasion of privacy claim. Therefore, this claim should be dismissed.

## CONCLUSION

For the foregoing reasons, MCW respectfully requests that the Court grant summary judgment and dismiss Ferguson's Amended Complaint in its entirety.

Dated this 18th day of November, 2005.

**MICHAEL BEST & FRIEDRICH LLP**

By:   s/ Amy Schmidt Jones
    Amy Schmidt Jones, SBN 1032274
    John A. Busch, SBN 1016970
    Kristi Nelson Foy, SBN 1052439
    100 East Wisconsin Avenue, Suite 3300
    Milwaukee, WI  53202-4108
    Telephone:  414-271-6560
    Fax:  414-277-0656
    E-mail:  asjones@michaelbest.com
    E-mail:  jabusch@michaelbest.com
    E-mail:  knfoy@michaelbest.com

Attorneys for Defendant
Medical College of Wisconsin

X:\clientb\092222\0047\A1367946.1