# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

DARRIN L. FERGUSON,

    Plaintiff,

                                  Case No. 04-C-181

    v.

MEDICAL COLLEGE OF WISCONSIN,

    Defendant.

---

**PLAINTIFF'S BRIEF
IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

LARRAINE MCNAMARA-MCGRAW, S.C.
LARRAINE MCNAMARA-MCGRAW
State Bar Number 1003970
1319 N. Dr. Martin Luther King, Jr. Dr
(In Bucketworks)
Milwaukee, WI 53212
Phone: 414-273-4036
Email: Lmacmac@execpc.com

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone    608 283 6001
Fax    608 283 0945
e-mail    jsolson@scofflaw.com

# Table of Contents

**STATEMENT OF FACTS** ....................................................................................... 1

**ARGUMENT** ............................................................................................................. 7

I.   THE PROTOCOL FOR DECIDING A MOTION FOR SUMMARY JUDGMENT IS

WELL SETTLED. ................................................................................................ 7

II.  A REASONABLE JURY COULD FIND THAT THE DEFENDANT TERMINATED

MR. FERGUSON BECAUSE OF HIS RACE. ...................................................... 9

   A.  *A Reasonable Jury Could Find that Mr. Ferguson has Established a Prima Facie Case*

   *of Race Discrimination.* ........................................................................................ 12

      1.  Mr. Ferguson was a member of a protected class. ........................................... 12

      2.  Mr. Ferguson was meeting his employer's legitimate performance

      expectations. ...................................................................................................... 12

      3.  Mr. Ferguson suffered an adverse employment action. .................................. 18

      4.  The Plaintiff need not identify similarly-situated employees not in his

      protected class who were treated more favorably; his burden is to show that

      white employees continued to perform his duties after he left. ........................... 19

   B.  *A Reasonable Jury Could Find that the Defendant's Stated Reasons for Terminating*

   *Mr. Ferguson are Pretextual.* ............................................................................... 20

   C.  *The Record Discloses a Pattern of Suspicious Events Affecting Mr. Ferguson as Well*

   *as a Pattern of Discrimination Against other African-Americans.* ....................... 24

III.    A REASONABLE JURY COULD FIND THAT THE DEFENDANT SUBJECTED

MR FERGUSON TO A RACIALLY HOSTILE WORK ENVIRONMENT. ..................... 26

   A.   *Mr. Ferguson's Racial Harassment Claim is not Time-Barred.*.................................. 26

   B.   *MCW is vicariously liable to Mr. Ferguson for the actionable hostile environment in*
   *the PGA that culminated in his termination* ....................................................... 27

   C.   *A Reasonable Jury Could Find that Mr. Ferguson Has Established Each Element of A*
   *Racial Harassment Claim.* ................................................................................ 29

       1.   Racial Motivation. .................................................................................. 30

          a.   the workplace was subjectively hostile. .......................................... 30

          b.   The workplace was objectively hostile. .......................................... 31

          c.   Even if no tangible employment actions were taken, MCW has no right to
          an affirmative defense. .......................................................................... 32

          d.   No affirmative defense is available as there was tangible employment
          action ....................................................................................................... 33

IV.    THE PLAINTIFF'S RETALIATION CLAIMS MAY BE DISMISSED. ................. 34

V.    THE PLAINTIFF DOES NOT ASSERT NEGLIGENCE CLAIMS INDEPENDENT

OF HIS TITLE VII CLAIMS. ................................................................................. 34

VI.    THE PLAINTIFF'S DEFAMATION CLAIMS MAY BE DISMISSED. ................. 35

VII.    THE PLAINTIFF'S INVASION OF PRIVACY CLAIM MAY BE DISMISSED... 35

**CONCLUSION** ................................................................................................. **36**

## STATEMENT OF FACTS

The parties have submitted the facts in great detail in their proposed findings and responses and it would be redundant to simply repeat them in detail here, but it might be useful to summarize the salient facts from the standpoint of a trier of fact bound to resolve credibility conflicts and to draw inferences in the Plaintiff's favor.

The defendant in this case, the Medical College of Wisconsin (MCW), is a huge operation that is more than a training facility for M.D.'s, as its faculty members do a lot of government-funded research as well. (PPF[1] ¶¶1-2.) It has a number of scientific laboratories where studies are carried out. (PPF ¶¶ 6-8.) The chairman of the MCW Department of Physiology, Dr. Allen Cowley, has set up a laboratory under the auspices of the National Institute of Health's Program for Genomic Applications, called the PGA lab, or the PhysGen lab, for the purpose of performing various research "protocols" on rats, some living, and some recently killed. (*See*, PPF ¶ 9.) For example, the lung protocol requires lab technicians to inflate a rat's lungs, first while they are in the rat and then also after they have been surgically removed, and to make several measurements. *Id.* Sometimes the performing of a protocol upon a subject rat is successful in the sense that valid, accurate, measurements are obtained, but sometimes a protocol is unsuccessful because of equipment problems or, perhaps, because a mistake is made by the technician. (PPF ¶ 129.) The ultimate aim of this research is to determine

---

[1] References to the Plaintiff's Proposed Findings of Fact will be shown as "PPF."

which particular chromosomes, and, eventually, which particular genes, are associated with certain good or bad reactions to "environmental stressors" such as a high-salt diet. (DPF[2] ¶¶ 9-15.)  In practice, the research program in the PhysGen lab requires performing high numbers of protocols on high numbers of rats, and obtaining a good percentage of valid results.  (DPF ¶ 17.)

The PGA lab was funded in 2000 (DPF ¶ 11) and was producing results in 2001, under the supervision of project supervisors Drs. Mary Pat Kunert and Mindy Dwinell. (DPF ¶¶ 26-29.)  A handful of lab technicians did the actual protocols and reported to them.  (DPF ¶¶ 32, 35, 87.)  The lab fell behind its production goals (Cowley dep. 175.), though, and in 2001 Drs. Cowley, Kunert and Dwinell decided to hire a lab manager, who would serve as the immediate supervisor of the lab technicians, in the hope that progress could be made in improving output.  (DPF ¶¶ 37-41.)  The position was advertised and after a competitive application process, Plaintiff Darrin Ferguson, a black man with relevant experience and training, was hired. (Kunert Dep. at 147.)

Mr. Ferguson was brought, in December of 2001, into a situation where not a few of the people he was expected to supervise were more or less openly racist.  While he was there, there were some black workers in the lab; Austin Brill, Maurice Jones, and Candace Jones, as well as another black worker, William Hutchins, who had moved seized an opportunity to transfer to an adjacent lab prior to Mr. Ferguson's arrival. White lab technician Kevin Wollenzien told Mr. Brill, who is African-American and

[2] References to the Defendant's Proposed Findings of Fact will be shown as "DPF ¶1."

Sicilian, that he should not worry about a social function because they would be serving "chicken and noodles," and when Mr. Brill objected to this, Wollenzien, red-faced, called him a "mutt." (Brill Dep. Exh. 1, Aff. ¶7; Brill Dep. at 205.)

Mr. Jones was called "boy"[3] a lot by Mr. Wollenzien, and later Mr. Jones was called "mutt" by him after Mr. Wollenzien found out that Mr. Jones was Samoan, Native American and black. (Jones dep. 55.) Mr. Wollenzien called Mr. Jones a "pineapple totin' spearchucker," after Mr. Wollenzien learned about Mr. Jones' heritage. (Jones dep. 56.) Mr. Jones also heard Mr. Wollenzien refer to Mr. Ferguson as being a Carlton, (a character from the television show "Fresh Prince of Bel Air") (Jones dep. 32) a pejorative that he understood to be just like calling any black man an Uncle Tom. (Jones dep. 31.)

After Mr. Ferguson began his employment, Mr. Jones overheard heard white lab technician Jennifer Ms. Labecki, talking with white lab technicians Kathryn Privett, and Alison Kriegel, say that she didn't want to work *with* a black man and she shouldn't have to work *for* one, either. (Jones dep. 27, 32.) This last phrase clearly referred to Mr. Ferguson, who had recently been installed as these women's supervisor.

Mr. Ferguson's superiors chose to ignore their own Human Resources policies, which prohibited this sort of thing, and permitted the expression of racial prejudice to continue unabated. (Dilday dep. Exh. 1.) When Jones, for example, reported Labecki's remarks to her friends and co-workers about not wanting to work with or for any black

man, Dr. Kunert flatly refused to even entertain the possibility that Labecki had said this and accused Jones of lying to her. (Jones dep. 32-33.) She ignored her duty under the MCW's Human Resources to report such al allegation to the Human Resources Department so it could be investigated by the proper persons. (Dilday dep. Exh. 3.)

The record invites the inference that these white lab technicians tried to get Mr. Ferguson fired, so they would not have to, as Labecki had said, work for a black man. They did this by complaining about him, falsely and incessantly, to his superiors. (See, e.g. PPF PP 167-216, 277-280, 292-332.) Mr. Ferguson's superiors assisted in this effort by believing everything they said, not reserving judgment for a second to obtain and consider Mr. Ferguson's side of the story (or that of the other African-American staff). Id. During Mr. Ferguson's first couple of weeks on the job, Ms. Kriegel, Ms. Trevett, and Ms. Privett, all went to Human Resources to falsely report that Mr. Ferguson had been undressing in the lab and had continued to do so after being told to stop by Dr. Kunert. (Kriegel dep. Exhs. 6-8.) Privett told Human Resources, "I am afraid to come to work every day not knowing what he might do next." *Id.* Ms. Kriegel said that Mr. Ferguson had been "changing his clothes in front of all the women in the department." *Id.* These reports were false; Mr. Ferguson had done nothing wrong, but reports of sexual misconduct by a black man in relation to white women are inevitably highly charged with racial overtones, and rumors and gossip about these reports were

---

[3] The term "brown boy" was denominated a "highly offensive racial epithet" in *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002) ("*Cerros I*").

permitted by Mr. Ferguson's superiors to flourish throughout his employment at MCW. (Jones dep. 62.)

Although MCW Human Resources policies required an investigation, neither the human resources department nor Mr. Ferguson's superiors in his chain of command investigated the undressing allegations and Mr. Ferguson was never shown the reports generated from the Human resources interviews of the complainants. MCW now tries to portray its having swept these complaints under the rug as a good thing for Mr. Ferguson, but this violation of MCW policy was anything but that. Since the allegations were never investigated, and no action was taken, the white technicians learned that there would be no penalty for circumventing the chain of command to fabricate utter falsehoods about Mr. Ferguson, and, at best, they might advance their interests in establishing their independence from his authority. (PPF ¶¶ 208-210.)

The white technicians established a pattern of complaining directly to Drs. Kunert and Dwinell whenever they did not care for anything Mr. Ferguson, or one of the other black employees said, and they were consistently rewarded by seeing one of these project supervisors come into the lab and give the black man just complained about a dressing down in front of the staff. (PPF ¶¶ 327-332.) Ms. Kriegel and Ms. Labecki went on to compile a long list of complaints, many of which had been previously the subject of this sort of oral report. (Kriegel Dep. Exhs. 2-4.) The net effect was the destruction of Mr. Ferguson's ability to exercise his authority in the lab, which prevented significant potential gains in productivity. (PPF ¶ 321.)

In a position to choose between Mr. Ferguson (and the other black victims of the lab's racially charged atmosphere), and the prejudiced white lab technicians who were lying about them, Mr. Ferguson's superiors chose to take the word of and to support the white lab technicians, and to believe the worst about Mr. Ferguson, every time. (PPF ¶¶ 218-227.) In February, Dr. Kunert accepted the veracity of white staffer Sherri Hahn without hesitation when Hahn conveyed information to her from which she concluded that Mr. Ferguson had given some rats the wrong water to drink, and had not disclosed this glitch in the experiment to Dr. Kunert. Id. Without even discussing the facts with Mr. Ferguson, based on this report, Dr. Kunert branded him as a person devoid of integrity. Id.

After this, it was clear that there was nothing Mr. Ferguson could do to save his job. Dr. Cowley had little opportunity for direct observation of what was going on in the PGA lab (PPF ¶ 252), relied almost exclusively on Drs. Kunert and Dwinell for his information (Cowley dep. 192.), and effectively ceded to them the authority to decide Mr. Ferguson's fate. (Cowley dep. 289-290.) Mr. Ferguson complained about Drs. Kunert and Dwinell to Dr. Cowley in writing, but again, this complaint was never investigated by Human Resources, as MCW policy required. (PPF ¶ 263-270.) Its only result was the fashioning of a new job description for Mr. Ferguson, assigning duties previously reserved to the technicians and cementing the authority of Drs. Kunert and Dwinell. (PPF ¶ 270-273, Kunert dep. exh. 2.)

Beginning with this "Addendum" to his job description in March of 2002, duties were assigned to Mr. Ferguson in such a way that it became inevitable that Drs. Kunert

and Dwinell could document a track record of failure .(See, e.g. PPF ¶ 352.)  For example, in April, after Mr. Jones had been fired for missing work during a medical emergency, Drs. Dwinell and Kunert assigned Mr. Ferguson to take over Mrs. Jones's duties in the vascular protocol.  This required Mr. Ferguson to perform a discrete task every six minutes for six hours per day, four or five days a week, but he was also formally charged with assessing and recommending persons to fill vacancies in the staff at that time. (PPF ¶ 353.)

In spite of the obstacles he faced, Mr. Ferguson was able to successfully address a number of the factors that had slowed production in the lab prior to his arrival, for example, equipment problems were eliminated. (Ferguson decl. ¶ 46.)  Nevertheless, the writing was on the wall, and he was given a "final warning" in April and discharged in June.  By a bit later in the year, every single black face was gone from the PGA lab.  (Cowley dep. 247.)

## ARGUMENT

### I.  THE PROTOCOL FOR DECIDING A MOTION FOR SUMMARY JUDGMENT IS WELL SETTLED.

A district court must grant summary judgment where the record before it shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56 (c).  The primary purpose of summary

judgment is to "isolate and dispose of factually unsupported claims." *Alberio v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir. 2001).

  "[A] party seeking summary judgment always bears the initial responsibility of *informing the district court of the basis for its motion,* and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)(emphasis supplied). The defendant, as the party seeking summary judgment, has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322-23. The Court must "consider the evidentiary record in the light most favorable to the plaintiff and draw all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

  This standard "is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 370-71 (7th Cir. 1992). See also, *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) ("'Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.'") (quoting *Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976), and *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 660 (7th Cir. 1991)). Since this case involves issues of intent, summary judgment precepts holding that the plaintiff is entitled to prevail at every point where the evidence is in conflict and that the plaintiff is entitled

to have all available inferences drawn in his favor, even if a trier of fact might choose

not to draw such inferences, should be scrupulously observed.

Courts must be quite circumspect in evaluating the movant's factual averments

"when evidence bearing on a particular matter lies within the exclusive possession of

the party seeking summary judgment." *Avery v. Mapco Gas Prods., Inc.,* 18 F.3d 448, 452

n.4 (7th Cir. 1994); see also *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971

F.2d 37, 42 (7th Cir. 1992).

The Court should be cognizant that circumstantial evidence from which an

inference of unlawful intent can be drawn is sufficient to create a triable issue of fact

even in the face of the actor's declaration that no unlawful intent was present.  See, e. g.,

*Corrugated Paper Prods. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989).


## II.    A REASONABLE JURY COULD FIND THAT THE DEFENDANT TERMINATED MR. FERGUSON BECAUSE OF HIS RACE.


A plaintiff may prevail on his discrimination claims either through the "direct

method" — showing intentional discrimination — or through the burden-shifting

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792 (1973).  See *Blise v. Antaramian,* 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*); *Bennett

v. Roberts,* 295 F.3d 687, 697 (7th Cir. 2002) (same standard in a Title VII case applies to a

Section 1981 claim). The direct method of proving discrimination requires the

introduction of direct or circumstantial evidence of discrimination. Direct evidence requires essentially an admission by the defendant that the action was based on a prohibited animus. See *Blise*, 409 F.3d at 866. The plaintiff does not contend here that he can prove his case through this sort of direct evidence.

A plaintiff may also proceed by constructing a "convincing mosaic" of circumstantial evidence that a jury would infer to be intentional discrimination. The circumstantial evidence must point directly to a discriminatory reason for the adverse action. See *Blise,* 409 F.3d at 866.  The concept of proving discrimination via a "convincing mosaic" of circumstantial evidence originated in the Seventh Circuit's opinion in *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) where the court acknowledged that a Plaintiff could prove discrimination through presenting circumstantial evidence of one or more of three distinct species:

> Three types of circumstantial evidence of intentional discrimination can be distinguished. The first consists of ***suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.*** This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. . . . Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

(Emphasis supplied, citations omitted.)

The plaintiff here argues that he has established a case of race discrimination under the *McDonnell Douglas* framework sufficient to survive a summary judgment motion and entitle him to a trial. To establish a prima facie case of discriminatory termination under the *McDonnell Douglas* paradigm, a plaintiff is required to demonstrate that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees not in the protected class were treated more favorably. *Lalvani v. Cook County,* 269 F.3d 785, 789 (7th Cir. 2001) (*Lalvani*).

If a plaintiff demonstrates a prima facie case, the burden shifts to the defense to come forward with "a legitimate, nondiscriminatory reason for the action." *Blise,* 409 F.3d at 867. If the defense meets this burden, the burden shifts back to the plaintiff to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.,* 153 F.3d 390, 395 (7th Cir. 1998) (Debs). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs,* 153 F.3d at 396.

**A. A Reasonable Jury Could Find that Mr. Ferguson has Established a Prima Facie Case of Race Discrimination.**

**1. Mr. Ferguson was a member of a protected class.**

There is no dispute that Mr. Ferguson is an African-American, and is thus a member of a protected class under both § 1981 and Title VII.

**2. Mr. Ferguson was meeting his employer's legitimate performance expectations.**

The courts have "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). Thus,

> To show "qualification" sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff "need not show perfect performance or even average performance." Id. at 1155 (quoting *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977)). Instead, she need only make the "minimal showing" that "<u>she 'possesses the basic skills necessary for performance of [the] job.'</u>" *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (quoting Powell, 580 F.2d at 1155) (emphasis added); accord *de la Cruz v. New York City Human Res. Admin. Dep't of Social Servs.*, 82 F.3d 16, 20 (2d Cir. 1996).

*Gregory*, 243 F.3d at 696. Where an employee has been terminated, "the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Id.*

As in many cases, the employer here employs the same evidence to argue that the Plaintiff was not meeting its expectations as it does to articulate the reason for terminating him and as it does to try to show that those reasons were not pretextual. When this sort of overlap occurs, the issue for summary judgment simply becomes whether a jury could reasonably disbelieve the employer's stated criticisms of the employee were really its actual reasons for his termination. See, e,g,, *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 and n. 9 (7th Cir. 2001)("this issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext.")(citing cases). The point is that it would be logically contradictory for a court to hold that a a jury might reasonably find an employer's stated criticisms of an employee to have been pretextual, but to also hold that the employee has not made out a prima-facie case because the employer's stated criticisms of him preclude him from showing that he was performing his duties up to the level of the employer's expectations.

At this stage, the court is required to accept the testimony of Mr. Ferguson and his witnesses on this point, and it is sufficient to permit a reasonable jury to find for the Plaintiff as to this element. For example, Mr. Jones testified that Mr. Ferguson was well spoken and always quick to respond to problems that were reported to him. (Jones dep. 35.) Mr. Jones was pleased to have Mr. Ferguson as a manager. (Jones dep. 36.)

Mr. Ferguson and his witnesses have successfully contradicted the several theories advanced by the defense to support its argument that Mr. Ferguson wasn't meeting standards. For example, the defense would have the court believe that Mr.

Ferguson was out of his lab and unavailable a good deal, and did not keep regular hours, but Mr. Ferguson's evidence is that he had been keeping regular work hours, although his duties took him to a number of different locations around the College, often on short notice, several times a day.  (Ferguson decl. ¶ 49.)  Ordinarily, Mr. Ferguson left notes at his work station as to where he was going when he left, and he was always available by pager, so even when he was working outside the lab, staff were never forced to confront problems on their own.  (Ferguson decl. ¶ 49.)

Similarly, all of the supposed faults the Defendant lists for Mr. Ferguson at pp. 7-11 of its brief are disputed in the Plaintiff's Responses to the Defendant's Proposed Findings, in the Plaintiff's own Proposed Findings and in the record evidence cited in them.

The defense brief says: "Ferguson's supervisors expressed to him that he needed to learn the protocols performed by the technicians." (Defense Brief at 8.)  Mr. Ferguson says nobody told him this at the outset of his employment (Ferguson decl. ¶ 12) but he had nonetheless performed several of the protocols before the March 22, 2002, meeting at which the subject was discussed.  (Ferguson decl. ¶ 32)  Mr. Ferguson, moreover, had a job to do of his own so that the technicians could do their job of performing the actual protocols on a production basis. He had to make sure that people had the supplies and the functioning equipment they needed, and he was dong these things well.  (Ferguson decl. ¶¶ 46, 47.)

The defendant says, "Ferguson angered the Lab staff by attempting to reorganize equipment and materials before he actually had performed any of the protocols. "

(Defense brief at 9.) He did nothing more nor less than a lab manager should do: He took an inventory and found that redundant ordering of supplies was not uncommon, and he tried to arrange things such that each supply would be stocked in a single location, so staff could tell how much they had on hand and when orders had to be made. His aim was to reduce the incremental costs created by rush ordering and small-quantity ordering. (Ferguson decl. 47.) A reasonable jury might reasonably believe that unbiased supervisors would have backed him up on this, rather than toting the staff's inevitable dissatisfaction with change as a black mark on his record.

The defense brief claims, "Ferguson failed to inform Dr. Kunert of a mishap with the L-NAME conditioning of a group of rats, even after spending almost an entire day with her. This incident greatly diminished Ferguson's credibility in Dr. Kunert's eyes." (Defense brief at 9.) A reasonable jury could believe that Dr. Kunert jumped to the worst possible conclusion about Mr. Ferguson – a conclusion she would not have drawn about a white man on the same flimsy information -- based on a report by a white staffer, and never asked him about the incident before branding him angrily as a person of low integrity. (Ferguson decl. ¶¶ 20-24.) He didn't do anything wrong in the incident, and was, in fact, the only one involved to make a full written report of it to Dr. Cowley. (Cowley dep. Exh. 38.) Indeed, the only hard evidence about the incident is an elegant, careful, scientifically written evaluation (id.,) of the observations Ferguson made of the treatment of animals used by the PGA but cared for by the ARC staff. Dr. Kunert says she is still furious at Mr. Ferguson for not candidly telling her he had

miswatered the rats in the L-NAME project (Kunert dep. 155), but he states he did not miswater them, (Ferguson dec. ¶ 21).

The defense argues, "Dr. Kunert and Dr. Dwinell had to continually ask Ferguson for updates, and once an offer of employment was finally extended, Ferguson missed a known deadline for filing the paperwork necessary to get the new employee on the payroll." (Defense brief at 9-10.) These were the same persons who, in the name of getting Mr. Ferguson's hands dirty in technicians' work, had assigned him to do Maurice Jones's job in the vascular protocol after he was fired, an assignment which required him to perform a task every six minutes for six hours at a stretch, four or five days a week. (Ferguson decl. ¶ 54.) A reasonable jury would not have to stretch too far to infer that by this time Mr. Ferguson's superiors were getting into the paper-hanging business in the vicinity of Mr. Ferguson's personnel record, bent on justifying their planned termination of his employment, for the nature of the assignments he was given made it child's play to find fault with anyone's performance. Yet he continued to respond positively and constructively to the e-mails he received on this subject. (Kunert dep. Exhs. 27, 28, 33,38,39, 40,41,42,45, 49,51, 52,54, 55, 56, 59, 60, 61,62, 63, 65, 66, 67, 71, 72.)

The defense claims: "Ferguson admits that he did not have a good relationship with a number of the staff in the Lab, and he does not blame these poor relationships on race." (Defense brief at 10.) It is interesting to look at the actual testimony upon which this brief-writing is based:

> Q Would you agree with -- is that at least with respect to some of the lab technologists you did not have a good relationship with them as of the date of this letter?
> A I would say that with specific ones, that is correct.
> Q Who were those specific ones?
> A Lisa Gottschalk, Kathryn Privett, Allison Kriegal,and Jennifer Labecki.
> Q Now, is it fair to say those are all white women?
> A That's reasonable.
> Q And is it going to be your position in this case that the reason you didn't have a good relationship with them is because they're all racists?
> A No.

Ferguson Dep. 8/10/05, at 578-79.

In the defense brief, "specific ones," becomes "a number of staff in the lab." More tellingly, a refusal to assert that "the reason you didn't have a good relationship with them is because they're all racists," becomes "he does not blame these poor relationships on race." The court should simply note that Mr. Ferguson is a man who is careful with his words, and that one need not be a "racist," in the sense of holding the "belief that race is the primary determinant of human traits and capabilities. . ." (Webster's Seventh New Collegiate Dictionary, 704 (1967), defn. of "racisim") to be capable of biased perceptions and judgments or discriminatory decisions. Mr. Ferguson's opinion about their motivation is probably not even competent evidence; it wouldn't be if he had the unsupported opinion that they were racists. But more centrally, it is hardly a personal failure on the part of a black man when his white subordinates don't like him because of his race, and there is plenty of evidence from which a jury could belief that in this case.

Finally, some of the assertions the defense makes in its brief about Mr. Ferguson's performance are just outright contradicted by his evidence. He denies

(Ferguson decl. ¶ 35) that "During a brief absence of his supervisors, however, several groups of rats did not receive necessary conditioning."  (Defense brief at 10.)   He denies (Ferguson decl. ¶ 41) that "He later did not ensure that someone provided basic care to a group of rats during a technologist's scheduled absence, a failure that jeopardized the well-being of the animals." (Defense brief at 10.)   While he admits that "He claimed to be unaware that a technologist [Maurice Jones] was significantly behind in his data," (Defense brief at 10) he says this was because Mr. Jones was *not* significantly behind in his data (Ferguson decl. ¶¶ 26-27) .

The long and short of it is that if a jury believes the Plaintiff's evidence in this case, the Defendant's ostensible reasons for claiming he was not meeting expectations will be in tatters.  Space does not permit the destruction of every criticism in this brief, but they are all addressed squarely in the Plaintiff's responses to the Defendant's Proposed Findings.

### 3.   Mr. Ferguson suffered an adverse employment action.

The parties concur that Mr. Ferguson was discharged on June 7, 2002.

**4. The Plaintiff need not identify similarly-situated employees not in his protected class who were treated more favorably; his burden is to show that white employees continued to perform his duties after he left.**

The first Seventh Circuit opinion to adapt the *McDonnell Douglas* paradigm to the discharge context was *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir. 1977), where the Court said:

> Plaintiff asserts that a prima facie case of racial discrimination was established by the following facts appearing in the record: (1) that the plaintiff was a member of a racial minority; (2) that he was qualified for the job he was performing; (3) that he was satisfying the normal requirements in his work; (4) that he was discharged; and (5) that after his discharge the employer assigned white employees to perform the same work. There is sufficient evidence in the record to support a finding with respect to each of these facts, and **we agree that they create an inference of racial discrimination.** The inference is not vitiated by evidence that certain other bricklayers at the site were black. Reducing the number of black employees in favor of white employees is no less unlawful than eliminating all black employees from a work force. See *Wallace v. Debron Corp.*, 494 F.2d 674 (8th Cir. 1974). (emphasis supplied.)

In the present case, the Plaintiff was the only lab manager in the PGA lab, so it is impossible for him to identify any employees who were precisely similarly situated to him, and the law does not require that he do so. No new lab manager has been hired, and the work that Mr. Ferguson did reverted after his departure either to his white supervisors, Drs. Kunert and Dwinell, or to his white former subordinates; there were no more black employees in the lab.

The formulation of a McDonnell prima facie case of discriminatory discharge is flexible: In *Pioneer Life Insurance Co. v. Woodard* (1987), 152 Ill. App.3d 236, 242-43, 504 N.E.2d 230, 235, the court stated:

No court has stated that each element must be   proved to establish a prima facie case. 'This, of   course, was not intended to be an inflexible rule . . .   "[t]he facts necessarily will vary . . . and   the specifications . . . of the prima facie proof   required . . . is not necessarily applicable in   every respect to differing factual situations." '   *Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 575-76, 57 L.Ed.2d 957, 966, 98 S.Ct.   2943, 2949, quoting *McDonnell Douglas Corp. v.   Green* (1973), 411 U.S. 792, 802 n.13, 36 L. Ed. 2d   668, 677-78 n.13, 93 S.Ct. 1817, 1824 n.13.

### B.    A Reasonable Jury Could Find that the Defendant's Stated Reasons for Terminating Mr. Ferguson are Pretextual.

Searching the record for the reasons the defense proffers for Mr. Ferguson's termination is somewhat difficult.  The defense brief contends that Mr. Ferguson was terminated "for the reasons, set forth above," (Defense Brief at 12) presumably referring to the four pages of Mr. Ferguson's alleged faults at pp. 7-11 of the Defense Brief.  Yet, many of the things that were significant to Dr. Kunert were not significant to Dr. Cowley.  As the Seventh Circuit observed, reversing summary judgment for an employer in *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001), the defendant "has not spoken with one voice."   For example, The L-NAME incident was not a huge incident from Dr. Cowley's perspective but it was a huge incident from Dr. Kunert's perspective.   (Cowley dep. 257.)  Dr. Cowley similarly had no difficulty with Mr. Ferguson's role in the catheter changeover,   (Cowley dep. 308-309) but Dr. Kunert had a large problem with it. (Ferguson Decl. ¶ 48.)

Dr. Cowley was the ranking decisionmaker in Mr. Ferguson's termination, but his own stated reasons for the decision are somewhat skeletal.  Dr. Cowley explains Mr.

Ferguson's termination based on his not learning the lab protocols (Cowley dep. 291)

based on the lab staff not liking him (Cowley dep. 292) and by explaining:

> This was a multimillion dollar program. We had very finite time lines. The
> federal government was expecting the results. We had a grant renewal
> coming up with millions of dollars at stake for the medical center and all
> the employees whose jobs were at stake with that renewal. And so I had to
> be -- I had to make some very difficult decisions to keep this program
> running. And when it wasn't running, I had to try to find people that
> could run it and keep it up to speed, and it wasn't happening with Darrin
> in charge down there.

(Cowley dep. 288.)

Dr. Cowley faults Mr. Ferguson for not turning around the poor rate of production of

the PhysGen lab, and that he seems to think Mr. Ferguson had not done this because

Mr. Ferguson had not sufficiently learned the protocols in a hands-on fashion to make

improvements in them in terms of their efficiency and reliability. *Id.*

In fact, Mr. Ferguson had learned and performed many of the protocols

(Ferguson Decl. ¶ 32.) – he had been assigned, for example, to take over Maurice

Jones's role in the vascular protocol – and he had contributed to the lab's increasing

efficiency in more fundamental ways as well. By the time Mr. Ferguson was

terminated, the lab staff and Mr. Ferguson had not yet arrived at the point where we

could start trying to tweak functioning procedures to achieve incremental

improvements because they had been required to focus their efforts available for

improvements on solving existing problems just to make sure the existing procedures

could function reliably as they were originally designed. (Ferguson decl. ¶ 46.) For

example, when Mr. Ferguson arrived, the lung protocol was beset with a high failure

rate.  (Ferguson decl. ¶ 46.)  This protocol involved putting air into the lungs of dead rats, both while the lungs were in the rats and after the technicians had cut them out, and making various measurements.  (Ferguson decl. ¶ 46.)  Often, proper measurements could not be obtained by the technicians because of problems with the equipment intended to inflate the lungs, and in order to obtain sufficient numbers of reliable results, the technicians had to come in on the weekends.  (Ferguson decl. ¶ 46.) Mr. Ferguson ascertained that these problems were due to the equipment the technicians were required to use.  (Ferguson decl. ¶ 46.)

Mr. Ferguson brought in the principal investigator and the Department of Physiology biomedical engineer and together they found the sources of the equipment problems and solved them.  (Ferguson decl. ¶ 46.) Thereafter, the failure rate was much lower, the technicians did not have to come in on weekends, and further, following conversations with them, Mr. Ferguson even found that he could change their workweek to four 10-hour days.  (Ferguson decl. ¶ 46.)

They began to catch up on their backlog of data entry.  (Ferguson decl. ¶ 46.) The lung protocol was still behind in terms of overall quantity of data, though, because during the time of the equipment problems many rats had not produced usable data, and it took six weeks to bring a new group of rats to the point where measurements were appropriate.  (Ferguson decl. ¶ 46.) The rate of production in the lung protocol was, however, more than satisfactory when Mr. Ferguson left.  (Ferguson decl. ¶ 46.)

It was only when Mr. Ferguson and his staff had solved problems like this, so that the protocols would function at least as well as they had been originally designed

to function, that it would have been appropriate for Mr. Ferguson to start looking for ways to improve the original designs of the protocols to increase the workers' efficiency still further without compromising the integrity of the scientific data.

A reasonable jury could find that the decision of Mr. Ferguson's superiors to focus on his level of immersion in the hand-on protocols while ignoring his real achievements that really improved production represents a pretextual justification for his termination by people who wanted to get rid of him for reasons having nothing to do with his job performance at all. As the Seventh Circuit said in *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001):

> Our cases therefore have acknowledged that we need not take an employer at its word. For instance, we have held that when an employee provides "[a] detailed refutation of events which underlie the employer's negative performance assessment," the employee demonstrates "that the employer may not have honestly relied on the identified deficiencies in making its decision." *Day v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994). Furthermore, "[i]f the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." *Day*, 28 F.3d at 1461. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation. . . ." *Adreani*, 154 F.3d at 395 (citations omitted).

See also, *id.*, at 892-3:

> We note that in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-46 (2000), the Supreme Court, reinstating a jury verdict in favor of the employee, engaged in a similar factual analysis to ours in the present action to determine that a company's explanation for its employment decision was suggestive of intentional discrimination. In *Reeves*, the employer contended that its discharge of the employee was

due to a non-discriminatory reason: the employee's failure to maintain accurate attendance records of those under his supervision. See id. at 138. Reviewing in detail the record before it, the Court determined that, contrary to the employer's assertion, the evidence permitted the jury to conclude that the employee did maintain proper records and was **not responsible for any failure** to discipline late or absent employees. See *id.* at 144-47. As a result, the Court determined that sufficient evidence existed to sustain a jury's determination that the employer's asserted justification was not true. See *id.* at 154-55.

Although United certainly ought to be permitted to argue . . . managerial ineptness to the jury, on summary judgment we must remember that Mr. Gordon suggests another, and equally plausible, characterization of the record. Our faithful adherence to the Supreme Court's holding in Reeves will tolerate no other conclusion. A reasonable jury could conclude . . . that United's stated reason was a pretext for discrimination. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation." *Adreani*, 154 F.3d at 395 (citations omitted). Summary judgment is therefore inappropriate.

(footnote and facts unique to case omitted, emphasis supplied.)

> C. **The Record Discloses a Pattern of Suspicious Events Affecting Mr. Ferguson as Well as a Pattern of Discrimination Against other African-Americans.**

If he were not going to investigate the PhysGen lab on an in-depth basis himself, Dr. Cowley had no choice but to rely on the evaluations of Mr. Ferguson that he got from Drs. Kunert and Dwinell. All he knew was that the labs production was still not what he wanted it to be and his grant monies were potentially at stake. He had no first-hand information about whether the fact that lab production had not improved to the extent that he had hoped was the fault of the project supervisors, Drs. Kunert and Dwinell, the fault of the lab manager, Mr. Ferguson, the fault of the lab technicians who

actually performed the protocols, or nobody's fault. He chose to trust the information

from Drs. Kunert and Dwinell that any friction between Mr. Ferguson and the lab

technicians was his fault and that he had failed in his efforts to improve lab production.

They, in turn, acted regularly and frequently on the false reports of Mr. Ferguson's

alleged missteps they received from the white lab technicians. When white technician

Sherri Hahn told Dr. Kunert that Mr. Ferguson had miswatered the rats in the L-NAME

incident, Dr. Kunert never doubted her and never investigated before forming her

adverse view of Mr. Ferguson's integrity, and she remained furious with him after that.

Yet, when black technician told Dr. Kunert that he had overheard white technician

Jennifer Labecki say to white technicians Kriegel and Privett that she did not want to

work either with or for a black man, Dr. Kunert rejected his report out of hand and

accused him of lying to her. The only explanation for the fact that Dr. Kunert accepted

Hahn's report but not Jones's is race. The only explanation for the fact that Dr. Kunert

and Dr. Dwinell regularly accepted as gospel the reports of the white technologists

about Mr. Ferguson and never even sought out or considered his side of the story

before acting on them is race, or at least a reasonable jury could certainly find that race

is the *most probable* determinant of this differential treatment.

This inference is strengthened by the pattern of what happened to the other black

employees in the PhysGen lab. From the Fall of 2001 to the Fall of 2002, all five black

employees, Austin Brill, Maurice Jones, Candace Jones, William Hutchins, and Mr.

Ferguson, were either terminated directly, or left under suspicious circumstances. From

that time to this one, no other black employees have been hired, despite continuing high

staff turnover. Maurice Jones was fired by voice mail while he was off work for severe headaches that required emergency room treatment, after having properly called in. Austin Brill was terminated as a no-call, no-show while on an approved vacation. Mr. Ferguson was fired. Candace Jones resigned, after having received harassing e-mails (Kunert dep. 187) and having gone with Austin Brill and Mr. Ferguson to see Dr. Dwinell to complain about their white co-worker Lisa Gottschalk's unprofessional and disrespectful behavior. (Brill Dep., Exh. 1, ¶ 31.) William Hutchins went to a neighboring lab, and told Mr. Ferguson it was to get away from Dr. Kunert. (Ferguson decl. ¶ 68.)

## III.    A REASONABLE JURY COULD FIND THAT THE DEFENDANT SUBJECTED MR FERGUSON TO A RACIALLY HOSTILE WORK ENVIRONMENT.

### A.    Mr. Ferguson's Racial Harassment Claim is not Time-Barred.

The plaintiff merely notes that his racial harassment claims fall squarely within the ambit of 41 U.S.C. § 1981, which comes with at least a four year statute of limitations. *Dandy v. United Parcel Service, 388 F3d 263 (7ᵗʰ Cir. 2004).* It follows that all of the actions constituting Mr. Ferguson's hostile environment claim, starting from the first complaint against him in January, 2002, are timely and subject, in general to the same proofs required under Title VII. *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277 (7th Cir. 1977).

### B.    MCW is vicariously liable to Mr. Ferguson for the actionable hostile environment in the PGA that culminated in his termination

The United States Supreme Court has abandoned the prior distinction, for vicarious liability purposes, between so-called *quid pro quo* harassment and hostile environment harassment, in favor of a test that distinguishes between cases in which a supervisor takes a tangible employment action against the subordinate and those in which she does not.  *Molnar v. Booth*, 229 F3d 593, 597 (7th Cir. 2000).

An employer's liability in all kinds of cases, is determined under agency principles.  In general, employers bear vicarious liability for the harassment committed by a supervisor in accordance with the following rules: an employer is subjected to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.

Dr. Kunert's actions -- or purported actions -- were the gasoline set to the flames of the ill-will and distrust that greeted Mr. Ferguson's arrival in the PGA, by several white staff, in December, 2001.  For, no sooner did Mr. Ferguson set out for a holiday party, with festive and professional good cheer at the ready, than he was attacked verbally and in writing, for saying and doing sexually offensive things.  This first overt act of hostility was Alison Kriegel's alleged complaints to Drs. Kunert and Dwinell and then on to someone in the MCW H.R. department, that Mr. Ferguson had disrobed, not just in front of her, but in front of all of the females on the staff.  Added to their written

complaints were several suggestions that Ferguson had said sexually or racially offensive things at the holiday party.

Nothing that was done in this matter comported with MCW's alleged policies against harassment or discrimination. First, the reported disrobing was never investigated, either by Kunert, or by the H.R. department, or by Dr. Cowley, all of whom had successively higher authority, all of whose duty it was to investigate these complaints-from Mr. Ferguson's perspective, if not from the perspective of the white women who claimed they were now afraid of him.

Moreover, Mr. Ferguson was so stunned and disturbed by these allegations, coming just after his holiday introduction to his new co-workers, that he considered quitting then and there. He explained privately to Dr. Cowley that such complaints by the white women on the staff threatened his ability to function effectively. Dr. Cowley told him he leant no credence to these complaints. Mr. Ferguson chose to trust his superiors, and to trust H.R. who told him *there were no written reports*, or who, in any event, failed to turn the reports over to him when they were made.

These allegations occurred in early January, 2002. The rumors persisted in the PGA till the end. In late January, early February, Dr. Kunert told Mr. Ferguson that "he had no integrity." Dr. Kunert claims to be *furious* to this day with Mr. Ferguson for not telling her he had made a certain mistake with some rats under his care. It doesn't matter, to this day, to Dr. Kunert, that the hearsay report she claims to have received about Mr. Ferguson's alleged wrongful actions were unsubstantiated. She was

completely convinced that Mr. Ferguson's integrity was lacking and, based on her belief, Mr. Ferguson's path was doomed.

Dr. Kunert quickly ascertained that Mr. Ferguson was to be demoted, in effect, to the role of a laboratory technologist, and she insisted that Mr. Ferguson not just manage the PGA lab, with its many problems, but that he be required to do each and every one of the protocols to her satisfaction. Dr. Kunert herself had never done the protocols in question. Dr. Kunert had never before been a supervisor of people. Dr. Kunert had never managed a high throughput lab,. Dr. Kunert had never seen the policies and procedures under which she was expected to operate as a manager. Dr. Kunert admitted that having Mr. Ferguson "at the bench" was not part of his original job description. Dr. Kunert had never worked with an African American man, had never written a recommendation for an African American man, had never supervised an African-American man. It did not matter. Ultimately, everything that Dr. Kunert believed-whether true or evidently lacking in scientific or ethical veracity -- everything that she believed was wrong with Mr. Ferguson became the certainty upon which he was fired from his job by June, 2002.

###        C.      A Reasonable Jury Could Find that Mr. Ferguson Has Established Each Element of A Racial Harassment Claim.

To be actionable, harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Hostetler v. Quality Dining, Inc.,* 218 F 3d 798, 806-807 (7th Cir. 2000) "whether the harassment rises to this level turns on a constellation of factors that include the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Hostetler*, 218 F.3d at 806-807.

### 1.    Racial Motivation.

The fact that many hostile environment claims involve a plaintiff's disparate treatment claims does not disqualify them from supporting their racially hostile environment claims. *Roberts v. Wal-Mart Stores, Inc.* 1996 U.S.m Dist Lexis 10056 ((U.S. Dist. Ct. for the Western Dist of VA). A plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive. *Rogers v. City of Chicago*, 320 F3d 748, 752 (7th Cir. 2003); *Hostetler,* 218 F3d at 807.

### a.    the workplace was subjectively hostile.

A workplace is subjectively hostile when the plaintiff actually perceives it as such. *Hostetler*, 218 F 3d. at 807. Besides Mr. Ferguson's expressed concern to Dr. Cowley very early on about the "undressing" accusations, he saw that none of his supervisors "got it" about the accusations of undressing: that this was not about not believing the accusations; it was about their not taking action to quell the false accusations of perversion by white employees against the only black manager anywhere in the Physiology department at MCW. It was about the synergistic response that attended each and every new accusation: if he "undressed", he did all of the other things that Alison Kriegel and Jennifer Labecki put on their "bill of particulars" to give to Dr. Kunert.

In good faith, Ferguson continued to meet with Dr. Cowley weekly about other discrete matters that made his assimilation into the job difficult. He soldiered on despite Dr. Kunert's February accusation that he had no integrity. Again, Dr. Cowley disregarded Dr. Kunert's opinion -- to Mr. Ferguson, but he was willing to let Dr. Kunert continue to accuse him of new acts of "incompetence," until Dr. Cowley took it all for true. Ultimately, Dr. Cowley decided that Ferguson couldn't "multitask."

Mr. Ferguson did his job under mounting pressure from Dr. Kunert and her bevy of young white women, led by Alison Kriegel. In early March, Mr. Ferguson perceived that Dr. Kunert's hostility was aimed also at the only other African American men in the PGA lab, Austin Brill and Maurice Jones. In a pointed letter, dated March 7, he took care to define his complaints and to respectfully, but forcefully find relief. Also in March, Mr. Ferguson was expected to fire Mr. Jones, which he didn't, and so Mr. Jones was let go in violation of any policy in effect at the time.

From this point on, Dr. Cowley washed his hands of Mr. Ferguson, by allowing Drs. Kunert and Dwinnell to effectively demote him and to continue to criticize his actions, and to undermine his authority with the staff.

> b.    The workplace was objectively hostile.

A workplace is objectively offensive when a reasonable person would find it hostile or abusive considering all of the circumstances. *Rogers,* 320 F3d at 752; *Hostetler,* 218 F3d at 807. The consideration of all the circumstances in this case requires a reading of Mr. Ferguson's Proposed Findings of Fact, and indeed, of all the

purported facts, in the light most favorable to the non-movant, Mr. Ferguson. Ultimately, Mr. Ferguson hopes this Court will find that the instant Motion was improvidently brought -- and grant a trial to Mr. Ferguson.

   c. Even if no tangible employment actions were taken, MCW has no right to an affirmative defense.

When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . *Murray v. Chi. Transit Auth.* 252 F3d 880, (7th Cir. 2001)  Arguably, many of the actions taken by Dr. Kunert , as well as the many "complaints" made about Mr. Ferguson by the white women, did not result in "tangible employment actions" until Mr. Ferguson was fired.  However, all of the African American men became ill with severe migraines.  Mr. Ferguson tried to resolve staff problems, including those of the African-Americans, by following the rules and by genuine concern for fairness.  At every turn, he was thwarted by complaints from the white women who would run and complain to Dr. Kunert.  This alone, suffices for tangible employment action against him, because the unsubstantiated complaints that were countenanced-and always believed- by Dr. Kunert, cost Mr. Ferguson his job.  If the defendant wishes to argue otherwise, they can show no adherence to any of their own policies and procedures about maintaining diversity, maintaining a non racially harassing environment, or following any of the personnel policies and procedures.  Dr. Kunert played by her own rules:  she let some staff, like Kriegel and Kathryn Privett, use "comp time," even

though MCW has no comp time.  When Mr. Ferguson advised Dr. Kunert that Mr.

Jones was absent in March due to hospitalization, she expressed ignorance of that fact-

and let him be fired over Mr. Ferguson's head-even though it was Mr. Ferguson's job to

decided if the facts warranted firing.  When he disagreed, they did it anyway: they fired

Mr. Jones.  Without any evidence of knowledge of nor application of policies and

procedures that control here, MCW cannot claim an affirmative defense.

> d.    No affirmative defense is available as there was
>        tangible employment action

MCW cannot claim an affirmative defense because their harassment culminated

in Mr. Ferguson's termination.  When the supervisor's harassment culminates in a

tangible employment action such as discharge, demotion, or undesirable reassignment,

no affirmative defense is available.  *Murray v. Chi. Transit  Auth.* 252 F3d 880, (7th Cir.

2001).

In the case of termination, which is tangible employment action, actions taken by

the supervisor become, for purposes of Title VII (and Sec. 1981), the actions of the

employer.  *Ezell v. Potter,* 400 F. 3d 1041, 1046 (7th Cir. 2005).  The many facts of this case

are serious, each one.  However, perhaps the most outrageous acts of harassment are

those which Dr. Kunert, and indeed, Dr. Cowley and MCW's "30 (b)(6)" deponent,

Gwynne Dilday, acknowledge without remorse, apology or regret:  the "lists" made or

kept byu Kriegel and Labecki and other white subordinates of Mr. Ferguson, against

him (and Mr. Jones and Mr. Brill).  Thes "lists" can never have been kept against any

superior without swift and sure discipline: firing. And yet, to keep these lists against Mr. Ferguson, all Ms. Kriegel was told: next time, keep them locked up.

Such was the environment managed by Dr. Kunert (and Dwinell), and supported by Dr. Cowley and MCW. If a reasonable person cannot find that such actions as these and all the rest violated every known principle of procedure against racial harassment and other forms of discrimination, then Mr. Ferguson has no case. This court is asked to apply the view of a reasonably objective person and find otherwise.

## IV. THE PLAINTIFF'S RETALIATION CLAIMS MAY BE DISMISSED.

The Plaintiff concedes that his retaliation claims may be dismissed. These claims were brought in good faith based on extant authority that a retaliation cause of action was available under 42 U.S.C. § 1981 and that claims not expressly pled in an administrative EEOC charge of discrimination may be, under some circumstances, included in the lawsuit that arises out of it, *Jenkins v. Blue Cross Mutual Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976) (*en banc*), but the Plaintiff has chosen not to press these claims based in large measure on the relatively recent decision of the Seventh Circuit in *Hart v. Transit Management Of Racine, Inc.*, 02-4291 (7th Cir. August 17, 2005).

## V. THE PLAINTIFF DOES NOT ASSERT NEGLIGENCE CLAIMS INDEPENDENT OF HIS TITLE VII CLAIMS.

Negligence can be relevant to a racial harassment claim, but it is not the Plaintiff's intent to press any independent negligence claim on state-law grounds.

## VI.     THE PLAINTIFF'S DEFAMATION CLAIMS MAY BE DISMISSED.

The Plaintiff concedes that Wisconsin state courts have held that defamation claims like the one he advances are barred by workers' compensation exclusivity. Although the Plaintiff believes these decisions are wrong, see, e.g., ***Nassa v. Hook-Superx,*** 790 A.2d 368 (R.I. 2002)(quoting 6 A. Larson & L. Larson, Larson's Workers' Compensation Law, § 104.04 at 104-16-17 (2001) to the effect that "[i]t is generally held that an action for libel or slander does not come within the [workers' compensation] exclusive remedy provision. * * * [Because] the real gist of slander is not personal injury."), he chooses not to press the issue in this case.

## VII.     THE PLAINTIFF'S INVASION OF PRIVACY CLAIM MAY BE DISMISSED.

The Plaintiff concedes that Wisconsin state courts have held that invasion of privacy claims like the one he advances are barred by workers' compensation exclusivity.  Although the Plaintiff believes these decisions are wrong, *see*, e.g., ***Wilson v. Ibp, Inc.,*** 558 N.W.2d 132, 137 (Iowa 1996)("where no adequate remedy is provided by the Iowa workers' compensation act, then an injured worker's claim falls outside of the exclusivity provision."); ***Jones v. Colonial BancGroup***, 735 So.2d 1163, 1166 (Ala. Civ. App. 1998)(Crawley,J., concurring: "the Workers' Compensation Act d[id] not bar [the bank employee]'s tort claims of outrage and invasion of privacy."), he chooses no to press these claims here.

## CONCLUSION

The defendant's motion for summary judgment should be denied as to Mr.

Ferguson's claims under Title VII and § 1981 that he was unlawfully harassed because

of his race and that he was unlawfully terminated because of his race.

Dated this 3rd day of January, 2005.

Respectfully submitted,
DARRIN L. FERGUSON,

Plaintiff,

By

LARRAINE MCNAMARA-MCGRAW, SC
Larraine McNamara-McGraw
State Bar Number 1003970
1319 N. Dr. Martin Luther King, Jr. Dr
(In Bucketworks)
Milwaukee, WI 53212
phone: 414-273-4036
email: Lmacmac@execpc.com

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 W. Wilson St., Suite 1200
Madison, WI  53703
Phone          608 283 6001
Fax              608 283 0945
e-mail jsolson@scofflaw.com

/s/ Larraine McNamara-McGraw_____
 Larraine McNamara-McGraw

ATTORNEYS FOR PLAINTIFF