# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

DARRIN L. FERGUSON,

        **Plaintiff,**

v.                                      **Case No. 04-C-181**

MEDICAL COLLEGE OF WISCONSIN,

        **Defendant.**

---

# DECISION AND ORDER

---

        Plaintiff Darrin L. Ferguson ("Ferguson"), was employed as the manager of the "PhysGen" laboratory at the defendant Medical College of Wisconsin ("Medical College") from December 2001 until June 7, 2002, when the Medical College terminated his employment. By his first amended complaint, Ferguson alleges claims of harassment, hostile work environment, and retaliation due to his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") (First Cause of Action); discrimination in the termination of his employment due to his race in violation of Title VII (Second Cause of Action); and, discrimination against him in the performance, modification, enjoyment of benefits, terms and conditions and termination of his contractual relationship in violation of § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1991. (Third Cause of Action). Ferguson also alleges supplemental claims of defamation under

1

Wisconsin law (Fourth Cause of Action) and invasion of privacy under Wis. Stat. § 895.50 (Sixth Cause of Action). Ferguson also claims negligent supervision in failing to supervise Ferguson's superiors in the prevention of race discrimination in violation of Title VII and § 1981 (Fifth Cause of Action).

Subject matter jurisdiction over Ferguson's federal claims is afforded by 28 U.S.C. § 1331 and supplemental jurisdiction over Ferguson's state law claims is afforded by 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) as the events giving rise to this complaint took place in this judicial district.

Several motions are pending. They will now be addressed.

### MOTIONS TO STRIKE

Pursuant to Federal Rule of Federal Civil Procedure 56(e) and *Friedel v. City of Madison*, 832 F.2d 965, 971 n.4 (7th Cir. 1987), the Medical College seeks an order striking specific inadmissable, incompetent, and/or irrelevant evidence from the record. (Docket No. 119.) The Medical College's motion sets forth a three and a half page table listing the challenged evidence, the proposed finding or response which cites the evidence followed by the Medical College's corresponding response or rebuttal to the proposed finding, and the basis for the Medical College's objection. The Medical College also requests that the Court strike the Ferguson declaration and the affidavit of Austin Brill ("Brill") "in light of the rampant deficiencies" in those documents "which extend well beyond the portions actually cited" by Ferguson. (Def.'s Mot. Strike 8.)

2

Ferguson filed a motion to strike the Medical College's motion to strike. (Docket No. 133.) Ferguson objects to the motion to strike contending the motion presents arguments that should properly have been presented in the Medical College's reply and that by filing a separate motion to strike the Medical College is evading time and space restrictions on its reply submissions. The Medical College opposes the motion to strike contending that its motion to strike merely reiterates and condenses objections made in its rebuttal to Ferguson's response to the Medical College's proposed findings of fact and in the Medical College's responses to Ferguson's proposed findings of fact in response to the Medical College's motion for summary judgment. (Def.'s Resp. Pl.'s Mot. Strike Def.'s Mot. Strike 2.) The Medical College requests an award of costs and fees in responding to Ferguson's motion.

*Friedel*, 832 F.2d at 971, acknowledges that court's prior holdings:

> that where a party fails to move to strike a defective affidavit or particular portions thereof, the party has waived any objections based on its defects and the court may consider the affidavit. *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir. 1986); *Klingman v. National Indemnity Co.*, 317 F.2d 850, 854 (7th Cir. 1963); *accord Williamson v. United States Department of Agriculture*, 815 F.2d 368, 383 (5th Cir. 1987).

Thus, *Friedel* provides support for the Medical College's filing of a separate motion to strike. Additionally, in general, the Medical College's motion to strike aggregates its prior objections.[1]

---

[1] There are exceptions. For example, the Medical College responded to paragraph 148 of Ferguson's proposed finding stating it was "not disputed." (Def.'s Resp. to Pl.'s Proposed Findings of Fact ("PFOF") ¶ 148.) But, the Medical College subsequently moved to strike portions of the Brill deposition upon which it is based on the ground that the testimony is "conclusory" and contains "stray remarks." (Def's Mot. Strike 7.) The problem is further discussed in footnote 42 of this decision.

3

In light of the foregoing, Ferguson's motion to strike the Medical College's motion to strike is denied.

With respect to the Medical College's motion to strike, Rule 56(e) of the Federal Rules of Civil Procedure sets forth the requirements for the types of evidence which may be presented in conjunction with a motion for summary judgment. Rule 56(e) provides that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "Statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (citing *Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir.1985)). Proposed findings which do not meet the evidentiary standard of Rule 56(e) have not been included.

Furthermore, in determining the material and undisputed facts, the Court has disregarded those proposed findings of fact and responses that constituted legal conclusions, were argumentative or irrelevant, were not supported by the cited evidence,[2] or were not supported by citations specific enough to alert the Court to the source for the proposal, *see* Pl.'s Resp. DPOF ¶ 322 (citing Ferguson Decl.).

---

[2]For example, paragraph 151 of Ferguson's proposed findings of fact states: "Harassing 'posters' were repeatedly left on Ferguson's desk by Kevin Wollenzien. (Kunert Exs. 77, 78, 79.)." The Medical College objects to the proposed finding and moves to strike the deposition exhibits as lacking foundation and authentication. Ferguson has cited the "posters," but has not provided any evidentiary support for his assertion that they were left on his desk or that Kevin Wollenzien ("Wollenzien"), a laboratory staff member, left them there. Moreover, at her deposition, Mary Pat Kunert, Ph.D., ("Kunert"), testified that she had never seen exhibit numbers 77, 78 or 79. (Kunert Dep. at 41.) The documents cited by Ferguson do not support the proffered factual proposition and, therefore, Ferguson's proposed finding of fact has not been included in the statement of relevant facts. The Medical College's request to strike the cited exhibits is granted.

4

However, the Medical College's sweeping characterization of the entire Ferguson declaration and the entire Brill affidavit, without analysis, does not provide a basis to strike those documents. Therefore, the Medical College's motion to strike those documents is denied.

Many of the objections raised by the Medical College's motion are most meaningfully discussed in the context of the particular finding. Therefore, those objections are addressed in footnotes in the relevant facts section. Any objection raised by the motion to strike but not specifically discussed has been considered by the Court and resolved in accordance with the general principles applicable to evidence which may be considered on summary judgment.

### MEDICAL COLLEGE'S MOTION FOR SUMMARY JUDGMENT

The Medical College seeks summary judgment dismissing Ferguson's complaint in its entirety. (Docket No. 64.) Ferguson opposes summary judgment on his Title VII and § 1981 claims that his employment was terminated based on his race, and his § 1981 claim that he was subjected to harassment based on his race. However, Ferguson states that his federal retaliation claims may be dismissed. (Pl.'s Br. Opp'n Def.'s Mot. S.J. 34.) He also concedes that the Wisconsin courts have held that defamation and invasion of privacy claims such as he asserts in this action are barred by worker's compensation exclusivity, and although he disagrees with the holding he will not press the issue in this action. (*Id.* at 35.) Ferguson further states that he does not assert negligence claims independent of his Title VII claims. (*Id.* at 34.)

Since Ferguson does not contest their dismissal, his federal retaliation claim and his state law defamation and invasion of privacy claims are dismissed. Furthermore, any state

negligence claim is dismissed. The Court will address Ferguson's harassment and termination of employment claims.

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Failure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party. *See Cunningham*, 30 F.3d at 883. "A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (citations omitted).

### Relevant Facts[3]

#### The Parties

The Medical College is a private academic institution, whose primary campus is located in Milwaukee, Wisconsin. In terms of money awarded by the National Institutes of Health ("NIH") to medical school graduate school programs, the Medical College's Physiology Department is the number one ranked program in the United States.[4]

Before the NIH may award a grant, the applicant must certify that it has filed an Assurance of Compliance form with the United States Department of Health and Human Services pertaining to four non-discrimination requirements. The Medical College has made significant efforts to attract minority employees. The Medical College's Office of Human Resources "Equal Employment Opportunity & Affirmative Action" policy requires an "aggressive outreach and recruitment program . . . [to] assure that qualified and potentially

---

[3]Unless otherwise stated the relevant facts are taken from the Defendant's Proposed Findings of Fact ("Def.'s PFOF") and the Plaintiff's Proposed Finding of Fact ("Pl.'s PFOF") to the extent they are undisputed. Civil L.R. 52.2 (E.D. Wis.) However, citations to all quoted excerpts are included, even if undisputed. The Medical College submitted 365 proposed findings of fact. Ferguson submitted 554 proposed findings of fact. Irrelevant and/or inadmissible "facts" have not been included.

[4]The Medical College's annual NIH awards are several million dollars greater than the number two ranked medical school graduate school program.

qualified minorities be given . . . the ample opportunities to become employed and be able to advance." (Dilday Dep., Ex. 4. )

Ferguson, an African-American male resident of Racine County, Wisconsin, is a former Medical College employee. His employment with the Medical College began in December 2001 and ended on June 7, 2002.

### The Medical College's PhysGen Project

In 2000, the National Heart, Lung, and Blood Institute – part of the NIH – began funding a group of Programs for Genomic Applications ("PGAs") across the nation to study the link between genes, function, and disease. One of these PGAs – the Physiogenomics of Stressors in Derived Consomic[5] Rats (the "PhysGen Project") is based at the Medical College.

The PhysGen project, funded in four-year cycles, initially was the largest research program in the Medical College's Physiology Department. From 2000 to 2004, the annual funding for the project was about $2.2 million.

The PhysGen Project has six components: Genomics, Phenotyping, Research Services, Bioinformatics, Education, and Administration. The phenotyping[6] component performs experiments on genetically altered rats to measure the response of genetic materials to various environmental stressors. At relevant times, the phenotyping component was engaged in several different research protocols, including the lung, cardiac, vascular, renal, respiratory,

---

[5]Consomic strains or chromosome substitution strains ("CSS") are strains in which a single, full length chromosome from one inbred strain, the donor, has been transferred onto the genetic background of a second strain, the host, by repeated backcrossing. A complete panel of CSS consists of 21 strains, each derived from the same donor and host but having a different chromosome (Chr 1-19, X or Y) of the host replaced by its counterpart from the donor. *See http://jaxmice.jax.org/info/consomic.html* (last visited Nov. 1, 2006).

[6]A "phenotype" is a physiological trait.

biochemistry, and histology protocols. The resultant data is used to study the link between the 22 rat chromosomes and cardiovascular, pulmonary, renal, and blood function in three inbred strains of rats. The phenotyping component is designed to obtain and provide rapid, high throughput (volume), precise, and detailed phenotypic measurements on an industrial scale.

The data obtained from the phenotypic component is posted on the Medical College's website and can be accessed and used by scientists throughout the nation. The project is designed to provide a new infrastructure for those studying the relationship between genes in complex function and disease.

Allen W. Cowley, Jr., Ph.D., ("Cowley"), a Caucasian who has been employed at the Medical College for about 25 years, is the Chairman of the Physiology Department and is very busy. The Physiology Department has over 300 employees. Cowley has more than 119 NIH-funded grants. At all relevant times, Cowley was the director of the phenotyping component.

Work on the phenotyping component takes place partly in the phenotyping laboratory ("PGA"). At all relevant times, the supervisors[7] in the PGA laboratory were Kunert, a Caucasian, and Melinda Dwinell, Ph.D., ("Dwinell"), a Caucasian. Ferguson was the laboratory manager and reported to Kunert and Dwinell. Kunert and Dwinell reported to Cowley.

---

[7]There is a genuine factual dispute as to the title of Kunert and Dwinell's supervisory positions. The Medical College asserts that they were laboratory supervisors. (*See* Def.'s PFOF ¶¶ 23-24, 26.) Ferguson asserts that they were project supervisors. (*See* Pl.'s Resp. Def.'s PFOF ¶¶ 23-24, 26.) This dispute is not material.

At the time the Medical College started the PhysGen project, Kunert was a tenured faculty member at Marquette University ("Marquette") in Milwaukee, Wisconsin. During the fall of 2001, Cowley brought Kunert in to work on the PhysGen project. Effective as of April 1, 2001, Kunert officially became a supervisor and the Medical College entered into a subcontracting agreement with Marquette pursuant to which the Medical College provided salary support to Kunert. Effective September 1, 2001, Kunert received a faculty appointment as an Assistant Adjunct Professor at the Medical College.

At her deposition in this case, Kunert recalled that, when she started, the PGA phenotyping staff members were Jennifer Labecki ("Labecki"), Alison Kriegel ("Kriegel"), William Hutchins ("Hutchins"), Candace Jones ("C. Jones"),[8] Jessia Powlas ("Powlas"), Mike Bregantini ("Bregantini"), Larry Crowley ("Crowley"), or some similar name, and others whom she could not recall. Before Ferguson was hired, Kunert was Kriegel's supervisor. Kriegel went to Kunert's office only if she had a problem such as one with her data or the laboratory equipment. Kriegel states that after Ferguson was hired, she went to Kunert's office no more often than she had before he was hired. Kriegel never made any complaints about Kunert or any other supervisor, except Ferguson.

Dwinell joined the PhysGen project in May 2001 and received a faculty appointment as an assistant professor effective as of May 1, 2001.

Cowley believes that all of the staff and technicians in the PGA program, most of whom had just graduated from college, should be encouraged on a routine basis to better

---

[8]The designation C. Jones is used because another individual with the surname "Jones" is also discussed in the relevant facts.

themselves, and move onward and upward to graduate or medical school or to higher better paying positions. Cowley perceives that there was a large turnover in the positions because those employees were taking advantage of opportunities for advancement.

Cowley views the hiring of qualified women and minorities as part of compliance with federal civil rights law. He is aware of the Medical College's responsibilities in terms of civil rights for federal support of its grants.

*The Medical College's Decision to Hire Ferguson*
*as the Laboratory Manager of the PGA Laboratory*

By November and December 2000, the PGA laboratory had been set up so Kunert had only been involved in unpacking equipment and helping set up protocol stages. In January 2001, the PGA laboratory started getting the subject animals – rats – and began conducting experiments. According to Kunert, as of January 2001, the laboratory technologists had been hired and had been practicing techniques, such as inserting catheters in rats, upstairs in the physiology department laboratories.

The experiments in the PGA laboratory were conducted by laboratory and research technologists — non-supervisory staff who reported to the supervisors. As the technologists performed the experiments on individual rats, some data was automatically collected on a data acquisition computer.[9] The technologists then downloaded the data from the data acquisition program and summarized it on an Excel spreadsheet referred to as the "phenotype list." Kunert and Dwinell reviewed and analyzed the data, and performed

---

[9]There is a factual dispute as to how much data was collected automatically. (*Compare* Def.'s PFOF ¶ 32 and Pl.'s Resp. Def.'s PFOF ¶ 32.)

mathematical computations to determine whether it was acceptable for posting. After they determined that the data was correct, Kunert or Dwinell met with Cowley and other laboratory personnel. If Cowley approved posting the data, Kunert and Dwinell would officially certify it for posting on the website.

Initially, Kunert and Dwinell were also responsible for hiring, firing and dealing with personnel issues of laboratory staff. Additionally, Kunert and Dwinell had teaching and research responsibilities that were unrelated to the PGA laboratory.

The PGA lab was designed as a high throughput laboratory. Kunert had no experience with a high throughput lab and had never been a laboratory supervisor before her job in the PGA laboratory. Kunert's only prior supervisory experience was supervising nursing assistants.

The issue of hiring a laboratory manager must have arisen in late January or in February of 2001. One of the reasons that Cowley sought to hire a manager was that the PhysGen laboratory was falling behind in 2001. Another reason was that Kunert and Dwinell would be unable to handle all the incoming data on their own. Additionally, the efficiency of the laboratory was not as high as intended because the technical staff was experiencing lower than expected success rates in performing the laboratory protocols.

The PGA laboratory had not previously had a laboratory manager. Cowley and Howard Jacob, Ph.D. ("Jacob"), the director of the genomics component of the PhysGen project, decided to hire a laboratory manager for the PGA laboratory to alleviate the pressures on Kunert and Dwinell.

The Medical College expected that the laboratory manager would act as the "point person" at the work bench where the experiments are conducted to help the technologists with problem solving. The Medical College wanted someone who could learn the protocols and work closely with the technologists. As initially envisioned by the Medical College, the laboratory manager also would handle personnel issues with the PGA laboratory staff. The purpose for the laboratory manger was stated in the position description as follows:

> To manage the day-to-day activities of the phenotyping laboratory of the Program for Genomic Applicaations [sic] (PGA). This position places the responsibility for the organizational aspects of the laboratory in one person. This person will be responsible for the technical staff and organization of lab jobs, e.g. radiation monitor, ordering of supplies.

(Kunert Dep., Ex. 1,1.) Cowley never intended that the laboratory manager would be the "sole boss" in the PGA laboratory. Rather, the doctorate level supervisors would need to retain some oversight particularly with respect to the scientific work.

According to Kunert, they were not looking for a Ph.D. scientist. They wanted someone who had a scientific background, some experience working with laboratory animals, and some success with experiments.

The Medical College posted the job opening on its web site. Ferguson saw an advertisement for the position in the early summer of 2001. The Medical College interviewed three candidates for the position, including Ferguson – the only African-American candidate. In his job application, Ferguson represented to the Medical College that he had a number of years of experience in research and project management.

13

Initially, Ferguson interviewed with Kunert and Dwinell, with whom he had a good discussion. Ferguson also interviewed with Julie Messinger ("Messinger") the program coordinator for the PhysGen project. After those interviews, Ferguson was invited back to the Medical College for an interview with Cowley.

After the interviews, Cowley meet with Dwinell, Kunert and Messinger and he received a unanimous recommendation to hire Ferguson. Cowley adopted the recommendation and hired Ferguson in December 2001. Cowley signed and sent Ferguson a letter of appointment, and told Ferguson that he would be reporting to Kunert and Dwinell and the faculty co-investigators on the PhysGen project. When Cowley hired Ferguson, Cowley thought he was a very pleasant, well-spoken, well-mannered individual with experience that suggested he could succeed as the laboratory manager.

Cowley did not make the decision to hire Ferguson based on Ferguson's scientific bench expertise. Cowley was concerned that initially Ferguson was going to be giving directives to technicians who knew more about the protocols and had more experience running them than Ferguson. Cowley believed that for Ferguson to assess how the technicians were doing, to gain their confidence and to provide help and mentoring to them, Ferguson had to familiarize himself with the protocols at the "hands on" level by actually performing each one.

At his deposition in this case, Cowley testified that:

> [I]t was important that he knew how to run those protocols as well as the techs ultimately so he knew what the expectations could and should be. If you haven't run it yourself, if you don't know how to do it, you don't know how much to expect from your personnel. And that's why I felt very strongly that

> Darrin should go in there and spend time with each
> one of these protocols one-by-one as he could and
> learn them as well as he could, not so he could run
> them everyday, but so that he could appreciate what
> the expectations were.

(Cowley Dep. 199.)

Ferguson began his employment as laboratory manager on December 17, 2001. Ferguson did not have a faculty appointment at the Medical College and he does not have a graduate level degree.

During Ferguson's early days on the job, Cowley observed him to be polite and non-confrontational. Cowley believed that Ferguson was not actually hired to do the protocols.

When Ferguson was first hired, Ferguson thought he reported to Cowley. Cowley maintained an open-door policy with Ferguson until he realized he did not have time to address all the details Ferguson brought to him.

When Ferguson started his employment, he understood that Kunert and Dwinell would retain some supervisory authority over the science conducted at the laboratory. Ferguson believed that Kunert's only supervisory role over him at that time arose from the fact that she supervised several of the protocols.

*Ferguson's Introduction to the Laboratory*

On Ferguson's first day of work, Messinger introduced him to the people employed in the front office of the Medical College's Department of Physiology, including the

15

Department Administrator, Jane Brennan Nelson ("Brennan Nelson"),[10] who takes the lead on personnel matters in the Physiology Department.

Messinger showed Ferguson the locations of the offices of the principal investigators on the research protocols for the PhysGen project. Kunert then took Ferguson through the PGA laboratory and "introduced him to the laboratory staff that was there."[11]

During the first couple of weeks of his employment, Ferguson attended an educational series on different components of the PhysGen project. The series, led by the principal investigators for the project, was presented for all of the laboratory staff. At that time, Ferguson had the opportunity to meet the principal investigators.

At all relevant times, the PGA laboratory had one glass fronted office located in the corner of the laboratory. When Ferguson began his employment, Kunert and Dwinell had their desks in that office. The Medical College did not have a dedicated desk and computer

---

[10]The Medical College's proposed findings of fact refer to Brennan Nelson as "Brennan-Nelson." But, her declaration and an attached letter bearing her signature refer to her as Brennan Nelson. (Brennan Nelson Decl. & Ex. C.) Therefore, throughout this decision, the Court has referred to her as "Brennan Nelson."

[11]Paragraph 58 of the Medical College's proposed finding of fact states that "Kunert. . . introduced [Ferguson] to the lab staff as the new lab manager." (*See* Def.'s PFOF ¶ 58 (citing Ferguson Dep. 281).) Ferguson denies the finding and cites paragraph five of his declaration. (*See* Pl.'s Resp. Def.'s PFOF ¶ 58.) The Medical College objects to Ferguson's response indicating that he cannot contradict his deposition testimony with a "sham affidavit" and reiterates the objection in its motion to strike.

Review of the cited deposition testimony discloses that Ferguson answered, "Yes" when asked if "[w]hen Dr. Kunert walked you through the lab, did she introduce you to the technicians **that were there**?" (Ferguson Dep. 281) (emphasis added). The Court has revised the factual statement to be consistent with Ferguson's deposition.

Ferguson avers: "On my first day, Dr. Kunert took me through the PGA Lab and introduced me to some of the Lab staff as the new Lab Manager." (Ferguson Decl. ¶ 5.) Paragraph five of Ferguson's declaration does not contradict his response to the deposition question. Thus, this portion of Ferguson's declaration does not run afoul of the "well-settled rule" that "a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition, *see Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994), and, in turn, defeat a defendant's motion for summary judgment. *See Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 379 (7th Cir. 1995); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)." *Piscione v. Ernst & Young, L.L.P*, 171 F.3d 527, 532-33 (7th Cir. 1999). As such, the Medical College's motion to strike as to paragraph five of the Ferguson declaration is denied.

ready for Ferguson on his first day of work. There was other desk space that Ferguson could use.[12] During this time, Ferguson's superiors expected him to use the computers of others in the laboratory. During Ferguson's early days in the laboratory, Cowley approved Ferguson's efforts to set up his desk and computer.

Early in his employment, Ferguson discussed with Kunert, Dwinell and Cowley questions concerning when Kunert and Dwinell would move out of the laboratory and whether he could have an office outside the laboratory. Ferguson was advised that he needed to be located in the laboratory. Within one month of when Ferguson started working, he was provided with a desk.

After starting, Ferguson worked with Greg McQuestion ("McQuestion") to determine Ferguson's computer and software needs. Within five to six weeks of Ferguson's starting date, Ferguson received a computer which was satisfactory to him and most of the software which he requested. The only software that Ferguson requested but did not receive – the software used to analyze data – was available on other computers in the PGA laboratory. Ferguson could not use those computers when they were being used by others but could work

_____

[12]Paragraph 64 of the Medical College's proposed findings of fact states that there were other desks and computers that Ferguson could use. (Def.'s PFOF ¶ 64.) Ferguson denies the finding, citing paragraph six of his declaration. (Pl.'s Resp. Def.'s PFOF ¶ 64.) Paragraph six of Ferguson's declaration does not address the issue; but, Ferguson has made a typographical error. Paragraph seven of his declaration discusses computers and creates a dispute of fact regarding the availability of **other computers** for use by Ferguson. Ferguson avers: "When I began work the only computers available for my use were in the analysis room, each of which was specifically being used by a different technician, and was available to me only when not being used by him or her. Also switching from one computer to another caused problems including changes in my Microsoft Outlook schedule." (Ferguson Decl. ¶ 7.) Because there is a dispute about the availability of computers for Ferguson to use, the Court has not included that portion of the Medical College's proposed finding of fact in its statement of relevant facts.

Ferguson's response to the Medical College's proposed findings of fact contains additional typographical errors where he cites a particular paragraph – but the following or preceding paragraph contains the relevant factual material. While the Court does **not** examine the record for factual disputes, because Ferguson has mis-cited his declaration due to obvious typographic errors, the Court has considered the relevant content of those adjacent paragraphs.

around the problem.[13]  Ferguson also requested and received a HP iPaq – which is a type of

personal data assistant or PDA.  Ferguson was the only person in the laboratory who had a

PDA.[14]  (Dwinell Decl. ¶ 19.)  Ferguson understood that the computer and the PDA were the

property of the Medical College.  Ferguson purchased his own 64 megabyte memory card for

the PDA.  (Ferguson Decl. ¶ 11.)[15]

      When Dwinell began working at the Medical College, Kunert and Messinger

occupied the office in the PDA laboratory.  Initially, Dwinell did not have a desk or computer

and she did not obtain either for several weeks.  Dwinell used the other computers in the

laboratory, as needed, until she received her own computer.  Cowley testified that it is not at all

unusual at the Medical College to have such a delay in obtaining equipment and "this is the way

everybody starts . . . It [getting set up] takes a month."  (Cowley Dep. 215.)

---

[13]In his declaration, Ferguson states that he had no meaningful access to the computers.  (Ferguson Decl. ¶ 9.) The Medical College objects and moves to strike Ferguson's statement. Because Ferguson's statement is conclusory the request is granted.  *See Lucus v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

[14]Paragraph 74 of the Medical College's proposed findings of fact states that "no one else in the laboratory had a PDA, not even the Lab Supervisors or the Director." (Def.'s PFOF ¶ 74 (citing Dwinell Decl. ¶ 19).) Ferguson denies the proposed finding relying upon paragraph 11 of his declaration. (Pl.'s Resp. Def.'s PFOF ¶ 74.) Again, Ferguson has made a typographical error – the topic is addressed in paragraph ten of his declaration which states he "saw other lab personnel with PDA's."  (Ferguson Decl. ¶ 10.)

    The Medical College objects and moves to strike Ferguson's statement asserting that  Ferguson's averment is vague and conclusory.  Ferguson's statement is conclusory, but so is Dwinell's upon which the finding is based. Dwinell avers that "Ferguson was the only one in the lab to have a PDA." (Dwinell Decl. ¶ 19.) In rebuttal, the Medical College also relies upon Cowley's deposition testimony that neither Kunert, Dwinell or he had a PDA.  (Def.'s Rebuttal to Pl.'s Resp. Def.'s PFOF ¶ 74.)  The Medical College states that Ferguson's response is vague and conclusory and is refuted by Cowley's deposition testimony.  Cowley's testimony only addresses three people. It does not refute Ferguson's statement. However, Ferguson does not provide the names of laboratory personnel  whom he observed with a PDA or the dates he observed them.  Thus, Ferguson has not created a factual dispute.  *See Lucus*, 367 F.3d at 726; *Drake*, 134 F.3d at 887.

[15]Ferguson's response to the Medical College's proposed finding of fact cites paragraph 12 of his declaration – the correct paragraph is paragraph 11.

*The Medical College's Expectations of Ferguson as Laboratory Manager*

When Ferguson was hired he understood that the PDA lab had experienced high staff turnover and that the Medical College wanted the laboratory manager to address that issue and to improve the productivity and efficiency of the laboratory. Ferguson also recognized that as laboratory manager, he "certainly" was the "go to" person for the laboratory technologists and technicians and that he was to handle the "actual running of the lab." (Ferguson Dep. 267, 271.) Cowley testified that he wanted Ferguson to be available "eight hours a day for the staff people if they needed help in supervision and guidance and that it was [Ferguson's] responsibility to see that things ran smoothly." (Cowley Dep. 164.) Similarly, Kunert expected that Ferguson would be working with the individual technologists at the bench. At her March 10, 2005, deposition in this matter, Kunert indicated, that in retrospect, the job description was not clear about Ferguson having to work at the bench with all the protocols and that the job description was not written clearly.

Ferguson had not performed the specific protocols carried out in the PhysGen laboratory before he came to the Medical College. The protocols in the phenotyping component involved measuring the physiological effects of environmental stressors on rats, often by dissecting dead rats, performing surgical operations on living rats, or drawing blood from living or dead rats.

Ferguson recognized that to address problems in the laboratory he needed to understand the protocols. From a team-building perspective, Ferguson acknowledged the value in talking to the technicians about what they did and in doing what they did. Ferguson

understood at the time he started working for the Medical College that one of the priorities was to learn the protocols.  Ferguson remembers the "suggestion" from Kunert and others that he actually do the protocols to become familiar with them and that such an activity would be a "benefit."

Cowley asked Ferguson to learn to do all the protocols at least once.  Kunert testified that to carry out the functions of the laboratory manager, she expected that Ferguson would need to do the protocols once or twice to see what they entailed and to identify problems.

According to Kunert, Ferguson was given an assignment to determine the efficiency of each protocol, and to identify barriers to increasing the number of successes that they obtained through the initial or secondary runs.  In other words, for some protocols there were a lot of failures requiring that the groups be repeated.

Kunert was a member of the "PhysGen Phenotype Component Efficiency Task Force," along with Dwinell, Ferguson, Messinger and McQuestion.  The members of the task force collaborated as a group to make decisions that affected the laboratory.  There were periods, particularly in the beginning of program, when the PGA laboratory went through long periods of time when there was a fair amount of failure.  Such failures did not occur in every protocol, but in some more than others.  The mechanism the laboratory implemented to determine the cause of these failures was to ask each technologist to maintain a file called "bench notes."

*Ferguson's Early Performance as Laboratory Manager*

During the early weeks of his employment Ferguson took an inventory of the PhysGen laboratory. As a result, he determined that some supply items had been purchased redundantly. Ferguson decided to reorganize the laboratory so that staff could more easily ascertain the quantity of various supplies on hand that were used for more than one protocol. This avoided the ordering of supplies in small quantities and the need for expedited ordering – both of which are costly.

Kriegel and Labecki, technicians in the PhysGen laboratory, "grumbled about" the laboratory reorganization. (Ferguson Decl. ¶ 47.) Bypassing Ferguson, they complained to Kunert and Dwinell who then confronted Ferguson with Kriegel and Labecki's complaints. Ferguson explained his thinking and Kunert and Dwinell seemed to accept it.[16]

Neither Kunert nor Dwinell saw Ferguson spending a significant amount of time doing the protocols in the early part of his employment. Cowley did not see a "serious effort" on Ferguson's part to learn the protocols and to convince Cowley that he could do them.

---

[16]The Medical College objects to paragraphs 160 and 163, and part of paragraph 162 of Ferguson's proposed findings of fact and moves to strike paragraph 47 of Ferguson's declaration. (Def.'s Resp. Pl.'s PFOF ¶¶ 160, 162; Def.'s Mot. Strike 6.) While the Medical College's motion to strike addresses paragraph 47 of Ferguson's declaration without limitation, the Medical College does not object to other proposed findings of fact which are based upon the same paragraph. (*See e.g.*, Def.'s Resp. Pl.'s PFOF ¶¶ 158-59, 161.)

The Court construes the motion as seeking to strike **only** those portions of paragraph 47 of the Ferguson declaration which relate to the challenged findings: (1) that it is standard practice in laboratories that supplies used by more than one worker or team are kept in a common area accessible to all of them rather than in several different areas discrete to each worker or team; (2) that Kunert and Dwinell seemed to accept Ferguson's explanation of his rationale and "also continued to countenance the penchant of Ms. Kriegel and Ms. Labecki to circumvent [him] by taking concerns over [his] head directly to them, often without even discussing them with [him] first;" and, (3) "[t]here are many examples of matters that had first been brought up in this fashion in Ms. Kriegel's handwritten complaints about [him]." (Ferguson Decl. ¶ 47.) (The statements are contained in sentences five and six of paragraph 47.)

Ferguson's statement regarding standard practice in laboratories is conclusory and is not supported by facts, therefore it is struck. *See Lucas*, 367 F.3d at 726; *Drake*, 134 F.3d at 887. Ferguson's statements, about Kunert and Dwinell allowing Kreigel and Labecki to circumvent Ferguson with their concerns and about "many examples" of concerns brought up in that manner being on Kriegel's list, are also conclusory and therefore are struck. *See Id.*

(Cowley Dep. 285.)  In his interactions with Ferguson, Cowley found him indirect and evasive in responding to his questions.[17]  For example, Ferguson could not provide specific numbers or details with respect to a problem.

In the first couple weeks of his employment and before he had done any of the protocols, Ferguson looked at ways to reorganize equipment and material in the laboratory, including moving a printer from one wall to another to make space for Ferguson to have a place to sit in the laboratory.  Cowley thought Ferguson's plans were premature because Ferguson did not know enough about the laboratory activities and that Ferguson was anxious to assert his authority.[18]  Cowley understood that Ferguson's actions upset the laboratory staff.  Ferguson recalled that the technicians who were doing the protocols "may have" expressed concerns about his reorganization efforts.  (Ferguson Dep. 459.)

In one of Ferguson's early conversations with Cowley, Ferguson told Cowley that he had some ideas on how to rearrange the laboratory.  Cowley listened politely and told

---

[17]The Medical College objects to Ferguson's response to paragraph 98 of its proposed findings of fact and paragraph 122 of Ferguson's proposed findings of fact which are based on paragraph 15 of Ferguson's declaration and moves to strike paragraph 15 of Ferguson's declaration. (*See* Def.'s Rebuttal Pl.'s Resp. Def.'s PFOF ¶ 98; Def.'s Resp. Pl.'s PFOF ¶ 122; Def.'s Mot. Strike 5.)  Paragraph 15 of Ferguson's declaration states that Ferguson was not indirect or evasive in responding to Cowley and that no reasonable person could find him to be so.  Paragraph 15 of Ferguson's declaration is self serving and conclusory and does not create a dispute of fact as to **Cowley's opinion**.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 932-33 (7th Cir. 2001) ("A party will be successful in opposing summary judgment only when it presents "definite, competent evidence to rebut the motion." (citation omitted)).  Ferguson also lacks personal knowledge as to whether a reasonable person would find him to be indirect or evasive.  Therefore, the Medical College's request to strike paragraph 15 of Ferguson's declaration is granted.  The Court's statement of relevant facts does not include Ferguson's response to paragraph 98 of the Medical College's proposed findings of fact or paragraph 122 of Ferguson's proposed findings of fact.

[18]The Medical College objects to and moves to strike paragraph 16 of Ferguson's declaration which states that Cowley never told him that he thought these plans were premature and that he thought Ferguson was anxious to assert his authority.  (See Def.'s Rebuttal to Pl.'s Resp. Def's PFOF ¶ 100.)  Paragraph 16 of Ferguson's declaration is self serving and conclusory and does not create a dispute of fact as to what **Cowley** thought.  *See Albiero*, 246 F.3d at 932-33.  Thus, the Medical College's request to strike paragraph 16 of Ferguson's declaration is granted.  Ferguson's proposed finding of fact paragraph 166 relies upon such paragraph, and although the Medical College only objected to paragraph 100, paragraph 166 is also not included in the relevant facts.

22

Ferguson that they would discuss these things later and make changes needed to increase efficiency if and when they were appropriate. Kunert and laboratory workers began complaining to Cowley very early in Ferguson's employment about the changes Ferguson was making in the laboratory.

An increase in productivity in the laboratory would not automatically translate into increased compensation for the technologists, as the Medical College and the PGA grant have specific policies and requirements governing compensation within the project.[19]

*Early Complaints About Ferguson and the Laboratory Management's Response*

On January 9, 2002, several of the laboratory technologists made complaints with the Human Resources office against Ferguson for alleged inappropriate conduct. Andrea Trevett ("Trevett"), a white co-worker, Kriegel, and Kathryn Privett ("Privett") separately complained that Ferguson had changed his clothes in front of them in the lunch/work room where some lockers were located.[20] Both men and women went into the lunch/work room which was located off of the data analysis room.

Kriegel states that she was "pretty creeped out" when she saw Ferguson changing because she saw "his underwear and chest and stuff, and that was kind of gross in a, female

---

[19]There is a factual dispute regarding whether Ferguson made comments to the technologists that if they increased productivity there would be money left over for raises. (*See* Def.'s Rebuttal Pl.'s Resp. Def.'s PFOF ¶¶ 103, 105.)

[20]Ferguson's proposed finding of fact paragraph 167 states that Trevett, a white co-worker, organized employees to try to get Ferguson fired within the first two weeks that he was at the Medical College by accusing him of changing in the locker room. Ferguson's proposed finding relies upon paragraph 14 of Brill's affidavit. (Brill Dep., Ex. 1 ¶ 14.) The Medical College opposes the statement asserting that Brill's statement that Trevett "organized" employees is conclusory and self serving and should be struck. (See Def.'s Rebuttal Pl.'s Resp. Def.'s PFOF ¶ 167, Def's Mot. Strike 6.) Consistent with *Stagman*, 176 F.3d at 995, Brill's conclusory statement is stricken.

uncomfortability sort of way." (Kriegel Dep. 113).[21]  Kriegel states that she saw Ferguson "partially naked and that's – that was just weird." (Kreigel Dep. 123.)  She also testified that she saw Ferguson's bare chest, stomach, and lower torso.[22]  Kriegel states that when Ferguson was changing his clothes, he was facing the wall, not her and she does not remember anyone else being in the room.  Kriegel states that she reported Ferguson's clothes changing to Kunert or Dwinell.

Kunert remembers being told about Ferguson's alleged "undressing" by one of the laboratory technologists who saw him undress, she guesses.  (Kunert Dep. 158).  She does not remember who told her, or how many women spoke to her and said that Ferguson was undressing, or whether there was more than one person.  Kunert does not remember that she received a direct complaint about Ferguson's alleged undressing.  She does not recall being

---

[21]This statement is based on Ferguson's proposed finding of fact paragraph 171, which is undisputed.  Ferguson's proposed finding mistakenly cites page 114 of Kriegel's deposition; the cited testimony is on page 113 of her deposition.  The Court has corrected the error.

[22]Ferguson denies paragraph 111 of the Medical College's proposed findings of fact, upon which this statement is based, relying upon paragraph 18 of his declaration, which describes what he wore in the laboratory and how he changed.  The Medical College opposes the objection and moves to strike  paragraph 18 of Ferguson's declaration asserting it violates the "sham affidavit" rule.  *See, e.g., Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) ("Parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions. . . If such contradictions were permitted, . . . 'the very purpose of the summary judgment motion - to weed out unfounded claims, specious denials, and sham defenses - would be severely undercut.'") (internal citations omitted) (collecting authority).  The Medical College maintains that Ferguson is contesting that Kriegel **saw** Ferguson changing which conflicts with his prior deposition testimony, when he was asked if he disputed that on some occasion a female employee saw him changing, and he  responded  that since he faced his locker when he changed, he could "not see what people behind me do or do not see."  (Def.'s Rebuttal to Pl.'s Resp. Def.'s. PFOF ¶ 111.)  Ferguson is not attempting to controvert that Kriegel saw him changing – he is controverting what she may have seen based on his version of how he changed clothing.  The objection is overruled and the motion to strike is denied as to paragraph 18 of Ferguson's declaration.

talked to about it.  Kunert does not recall talking to the complainants or Ferguson about the alleged undressing.[23]

Kunert was told that Ferguson undressed in the locker room off the computer room.  Kunert has no idea of the extent to which Ferguson undressed.  She did not see it.  Kunert and Dwinell told Ferguson that the complaints were not serious and would not appear in his personnel file.

Ferguson wore a scrub top in the laboratory and changed into the scrub top in the work/lunch room.  Ferguson claims that he always wore an undershirt or T-shirt under his scrub top.[24]

Kunert and Dwinell spoke to Ferguson concerning the complaints presented to the Human Resources office.  Ferguson gave his account of how he changed into clothes to which Kunert responded, "Oh, my God. That's what they're complaining about." (Brill Dep. 228.)  Kunert did not understand that the technologists were claiming that Ferguson was making any kind of sexual overtures.[25]

Ferguson indicated that he was considering leaving, but Kunert and Dwinell encouraged him to stay.

---

[23]The statement in this paragraph are based upon paragraphs 176 through 180 of Ferguson's proposed findings of fact which are undisputed.  The internal contradictions reflect Kunert's conflicting statements on the subject during her March 10, 2005, deposition.  (*See* Kunert Dep. 158-60.)

[24]There is a dispute of fact regarding whether Ferguson wore a T-shirt under his scrub top.  However, the dispute is not material.

[25]This statement is based on Kunert's understanding prior to reading the Human Resource's complaints at her March 10, 2005, deposition.  (Def.'s Rebuttal Pl.'s Resp. Def.'s PFOF ¶ 114.)

25

Kunert claims she never saw the complaints, including Kreigel's claims that "Darrin was told by [Kunert] to stop . . . a couple of times prior to changing in front of her. [Kriegel] feels uncomfortable around Darrin now." (Kunert Dep., Ex. 2.) Kunert does not recall telling Kriegel that she would speak to Darrin about undressing. Kunert does not recall if Kriegel spoke to her before going to the Human Resources office. (Kriegel told Human Resources that she had done so).

Cowley became aware of the staff complaints about Ferguson undressing when Kunert told him that a number of female employees were quite upset because Ferguson had been changing clothes with the door open in the locker room. Cowley was also verbally informed by Dwinell about these complaints. (Kunert and Dwinell were Cowley's primary source of input about what was happening in the PhysGen laboratory while Ferguson worked there.) In January 2002, Cowley saw the complaints that had been filed with the Human Resources office about Ferguson changing his clothes in the presence of females.

Ferguson spoke to Cowley regarding the complaints. Cowley understood that the women in the laboratory were complaining that Ferguson was changing his clothes without appropriate discretion. From Cowley's perspective, changing into scrubs from street clothes was not unusual in laboratory and hospital environments. Cowley told Ferguson that the complaints were a non-issue. Cowley did not see the undressing complaints as raising a serious issue, having worked in a laboratory for a long time, changing his clothes in them, and appreciating the scarcity of private areas common in such facilities. Cowley was not upset by the allegations made against Ferguson and did not think the complaints reflected badly on

Ferguson or his managerial competence. Ferguson was never disciplined in connection with these complaints.

Cowley saw the clothes changing complaint as "overblown'" and hoped that "the whole thing would go away very quickly" because he did not want the incident to reduce Ferguson's ability to function in his job. (Cowley Dep. 234.) However, ultimately, Cowley believes the clothes changing complaint "was just one of the things that diminished the [staff's] respect" for Ferguson. (*Id*. at 235.)

Cowley subsequently had a meeting with all the PhysGen laboratory staff to discuss the complaints and the manner in which they were made. During the meeting Cowley was angry that the complainants had not initially discussed their concerns with Kunert or Dwinell, Messinger, or him before proceeding to the Human Resources office. Ferguson believes that the laboratory technicians took Cowley's remarks during the meeting as a rebuke. Kunert subsequently sent an e-mail to the staff which Ferguson believed reinforced his view that the technicians needed to address personnel questions to him and obey him.

*L-NAME Incident*

The drug L-NAME[26] is given to the rats for a specified number of days to precondition them for use in protocols. In late January 2002, Kunert specifically requested that Ferguson administer L-NAME to a group of rats. The practice was to start the rats on L-NAME on Friday.

_____

[26]Kunert testified that L-NAME is an inhibitor of nitric oxide synthase which causes a decrease in the production of nitric oxide synthase. (Kunert Dep. 153.) Such decrease causes vasoconstriction which increases blood pressure. (*Id*.)

Late on the Friday afternoon in question, Kunert reminded Ferguson that he needed to administer the L-NAME to the rats and pointed out that the lights in the rat housing area went off at 6:00 p.m. Ferguson assured Kunert he would accomplish the task.

But, some rats got regular drinking water, instead of water containing L-NAME. On Monday, February 4, 2002, Kunert spent a significant part of the day with Ferguson during which Ferguson did not mention any issues with the L-NAME task. However, the preceding day, Sunday, February 3, 2002, Ferguson sent a one page e-mail to Cowley reporting observations that he made on Saturday and Sunday which lead him to believe that regular water might have been substituted for the water containing L-NAME that the rats were supposed to be given.

On Tuesday, February 5, 2002, Kunert received a report that Ferguson had given the wrong drinking water to the rats and had then switched the drinking water.[27] At his deposition in this case, when asked if he gave L-NAME to the wrong rats, Ferguson responded "[n]ot to my recollection," and "not to my knowledge." (Ferguson Dep. 329.)[28] At his

_____

[27]Relying upon paragraph 20 of his declaration, Ferguson opposes paragraph 134 of the Medical College's proposed finding of fact upon which this statement is based. The Medical College asserts that Ferguson's objection is based on inadmissible hearsay evidence and moves to strike paragraph 20 of Ferguson's declaration. That paragraph states "On Tuesday, February 5, 2002, Sherry Hahn told me that one of the [Animal Resource Center ("ARC")] staff had told her that the staff person had observed over the weekend that water had leaked into one rat box and so had moved the rats to a new box with new water. Hahn told me that she had reported this to . . . Kunert." (Ferguson Decl. ¶ 20.) The Medical College's objection is well-founded. Ferguson's report of what Hahn told him that she had told Kunert, that she (Hahn) had been told by an unidentified ARC staff member, contains multiple levels of hearsay and is inadmissible. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) ("[H]earsay statements are not competent evidence that may be used to oppose a motion for summary judgment.") That aspect of the Medical College's motion to strike paragraph 20 of Ferguson's declaration is granted.

[28]Ferguson opposes paragraph 135 of the Medical College's proposed findings of fact upon which this statement is based. Ferguson relies upon paragraph 21 of his declaration, which states "I did not give L-NAME to the wrong rats." The Medical College's rebuttal asserts that Ferguson's objection violates the "sham affidavit" rule and his conflicting recollection does not create a dispute of fact. A party may not create a genuine issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart."

deposition, Brill, a PhysGen senior research technician, testified that Ferguson "scrambled to fix whatever problems, and he was always scrambling. So he made sure what ever the problem was . . . fixed. And I began to take responsibility of the task and making the water for him. The L-NAME water had to be prepared." (Brill Dep. 216.)

Based on her belief about what happened, Kunert told Ferguson that he had no integrity and that she had concerns about his work. Kunert claims that when she confronted Ferguson about not immediately disclosing the L-NAME miswatering to her on the Monday after it had occurred, Ferguson explained that he did not have the time because that day he had gone with C. Jones to the security department to discuss some harassing e-mails C. Jones was receiving. Kunert admits that C. Jones "was obviously having some problem with somebody," and that it was Ferguson's duty to address it in the manner he deemed appropriate. (Kunert Dep. 188.) Kunert testified that there was no reason for Ferguson not to tell her since he was with her all afternoon except for a few hours and that "he had plenty of time to tell me." (*Id*.)

Kunert brought the incident to Cowley's attention, indicating that her primary concern was that Ferguson was not forthright in reporting what had occurred and she felt she could not trust him. Kunert claims that she changed her mind about Ferguson being qualified for the job, when early in February 2002, she "found out from one of the laboratory technologists that . . . Ferguson had given the wrong group of rats the L-NAME and that when he found out that, then he switched the drinking water, from the rats that he had given [it] to

---

*Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993) (quoting *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir.1988)). Ferguson has provided no explanation for his ability to recall in his declaration that which he previously was unable to recall at his deposition. The objection is sustained and paragraph 21 of Ferguson's declaration is struck. *See, e.g., Bank of Ill.*, 75 F.3d at 1168-69.

originally, to the right rats." (*Id.* at 154-55.)  Kunert claims she  was not angry about the mistake, because mistakes happen all the time.  Kunert was "angry, furious, and still is furious, that she was not told about it."  (*Id.* at 155.)  Kunert believes that Sherri Hahn ("Hahn"), a technologist, told her about what Ferguson had done.  Hahn did not provide a written report.

Kunert did not write a report.  She went and talked to Cowley.  Kunert did not investigate the facts before speaking to Cowley.  Kunert does not know why she did not investigate the incident and acknowledges that maybe she should have done so.

Ferguson reported the problem to Cowley in detail in an e-mail.  Cowley responded with a "terse" e-mail to Ferguson, stating that the problem had probably been a foul-up by the ARC staff.  Cowley was trying to communicate that he was not blaming the mistake on Ferguson.  Cowley perceived the L-NAME incident as a "very routine problem that occurs periodically in the laboratory."  (Cowley Dep. 254.)  There were similar problems in looking after the welfare of the animals and changing drugs in the ARC on the weekends.

Cowley considered Ferguson's e-mail to him reporting on the L-NAME difficulty as providing an explanation of what happened.  To the extent that Cowley faulted Ferguson at all, it was for not taking more responsibility in the matter.  Cowley did not believe that Ferguson had falsely reported the facts.  The L-NAME incident was not a huge incident from Cowley's perspective, but it was a huge incident from Kunert's perspective.  Kunert accused Ferguson of fabricating his version of the L-NAME incident to defend himself.  After this incident, Cowley told Ferguson that was how Kunert was, that it was typical and it was one of the reasons there had been problems in the laboratory.

Case 2:04-cv-00181-RTR   Filed 01/09/07   Page 30 of 78   Document 147

In a meeting between Ferguson, Dwinell and Kunert, on March 2, or 3, 2002, Cowley perceived tension between Ferguson, who appeared to want to work more independently and who claimed to feel undermined with the staff, and Kunert and Dwinell who communicated to Cowley that Ferguson lacked the familiarity with the protocols necessary to operate without their close oversight.

Cowley agreed that Ferguson was not ready to operate independently and he emphasized again the need for Ferguson to familiarize himself on a hands-on level with the protocols. Cowley made a number of notes to himself at that time:

> Darrin is not working out very well for a number of reasons, but the biggest problem is the lack of any real effort to engage himself seriously in the daily activities of the experimental work. He is by no means ready to take charge after 2 months and it is unlikely he will be ready in another 4-8 weeks. This had made him angry and made it difficult for [Kunert] and [Dwinell].

(Cowley Decl., Ex. A.)

At his deposition Ferguson testified that "in a number of meetings I had critical commentary made about me," starting "easily" within the first month of his employment. (Ferguson Dep. 605.) Ferguson concedes that there were at least some legitimate criticisms made of him during that time period.

Sometime in March 2002, Kunert asked Brill to keep an eye on Ferguson and to report to her anything out of the ordinary that he witnessed Ferguson doing.

*Ferguson's Handling of the Thyroid Study*

In addition to the work on the PhysGen Project, the PGA Lab also had several collaborative projects with institutions outside the Medical College. One project involved collecting blood samples for a thyroid study at the University of Chicago. At the beginning of his employment, Ferguson was assigned the responsibility for collecting and forwarding these samples. Cowley concurred with the assignment "because it was the simplest thing [he] could ask him to do." (Cowley Dep. 311-12.) Cowley thought that Ferguson needed to train on the simple tasks before moving on to the more complex tasks. (*Id.*)

The first set of samples for the thyroid study were not collected the week of January 14, 2002, as scheduled and, as a result, Messinger had to schedule more rats. Another set of samples was scheduled to be collected the week of February 25, 2002. Those samples were not collected until the following week.

In regard to that sample collection, Kunert received a report that Ferguson had asked Maurice Jones ("M. Jones"), a laboratory technologist who worked on the vascular protocol, and Brill to help him with the blood draws for the thyroid study.[29] Kunert understood from her role in analyzing and vetting the data on the PhysGen project that M. Jones was more than a month behind in his data management on the vascular protocol at the time he assisted

---

[29]There is a factual dispute regarding whether Brill and M. Jones were asked by Ferguson to help or whether they offered to help him. (*Compare* Def.'s PFOF ¶¶ 160-161 with Pl.'s Resp. Def.'s PFOF ¶¶ 160-161.)

Ferguson.[30]  Moreover, he provided her with data that was scientifically invalid.  In Kunert's

opinion, Brill also should have been working on other matters.

On Thursday, March 2, 2002, without asking Ferguson what had happened,

Kunert sent Ferguson an e-mail which she copied to Cowley, Dwinell and others in the project.

The e-mail states:

> Mr. Ferguson, I have to tell you that I was not happy
> to hear that you managed to pull Mr. [Maurice]
> Jones from his protocol to help you with *your*
> thyroid protocol.  Maurice is more than a month
> behind in his data management.  He did not need to
> be fooling around with stuff you should have
> completed *last week*.  I also understood that you had
> to have Austin Brill assisting you.  Since when do
> we need three people drawing blood from a few
> rats[?]  I just wanted to register my complaint with
> you in writing. [T]his is not a sign of very good or
> thoughtful management skills.
> Mary Pat.

(Kunert Dep., Ex. 24.)  Cowley was not critical of the tone of the e-mail.  Cowley understood

from Kunert's e-mail – which he characterized as "very direct" and "not subtle" – that Kunert

felt Ferguson had interrupted the regular schedule to do a very menial task.  (Cowley Dep. 167.)

---

[30]Ferguson denies paragraph 162 of the Medical College's proposed findings of fact which is the basis for such statement and the following statement, relying upon paragraph 27 of his declaration. Invoking the "sham affidavit" rule, the Medical College opposes the objection and moves to strike paragraph 27 of Ferguson's declaration.  Ferguson's declaration states that he verified that M. Jones was not more than a month behind after Kunert objected to M. Jones's assistance on the thyroid study.  That statement is not consistent with his prior deposition testimony that " he did not check on that specific day.  But . . . that wasn't my responsibility. . . . Kunert is the one whom the data would have been sent to, and so she's the one who could have most properly asserted that [M. Jones's data] was there or not there." (Ferguson Dep. 345.)  "[P]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions"  *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) (citations omitted.) Paragraph 27 of Ferguson's declaration is struck.

Cowley describes Kunert as a "very brusque, very direct, no-nonsense individual, very competent [and] skilled." (*Id*. at 169.)

At this point, Cowley was beginning to conclude that Ferguson did not have a lot of laboratory skills. Cowley considers drawing blood to be a basic task that does not require assistance. It was Cowley's perception that the sort of tasks that Kunert had criticized Ferguson for not performing alone were menial tasks that Kunert could do virtually with her eyes closed.[31] Cowley also believed that Ferguson should have known that M. Jones was behind in his work.

Ferguson responded to Kunert's e-mail late on March 7, 2002, copying the same people she had. In his e-mail, Ferguson stated that he was unaware that M. Jones was behind in his data collection and that he was "somewhat dismayed" that Kunert had not said anything about the overdue data. (Ferguson Dep., Ex. 6.) (However, in his deposition, Ferguson indicated he had some responsibility for monitoring whether M. Jones was inputting his data on a timely basis.)

In the e-mail, Ferguson also disclaimed "ownership" of the thyroid protocol, while also indicating that he was responsible for carrying it out. (*Id*.) Ferguson described Kunert's conduct as "sophomoric and unprofessional." He also facetiously wrote, "[t]hank you for

---

[31]Ferguson disputes paragraph 168 of the Medical College's proposed findings of fact upon which such statement is based. Ferguson relies upon paragraph 29 of his declaration which states that the blood draws that spurred Kunert's March 7, 2002, e-mail were not blood draws from rats that would survive process, but were terminal blood draws. Ferguson avers that such blood draws require weighing the rats and observing them to calibrate the anaesthetic dosage which are not simple and quick procedures for anyone including Kunert.

The Medical College objects and moves to strike Ferguson's averment that terminal blood draws were not easy for anyone including Kunert to perform, maintaining the statement is conclusory, lacks foundation, and Ferguson lacks personal knowledge regarding if they were easy for Kunert to perform. The Medical College's proposed finding relates to Cowley's understanding of the basis for Kunert's concerns, to which Ferguson does not respond. Ferguson has not raised an issue as to the proposed finding. Therefore, the Court has include the Medical College's proposed finding and denies, as moot, the Medical College's request to strike paragraph 29 of Ferguson's affidavit.

clearly demonstrating that possession of an advanced degree is not necessarily correlated with being 'educated.'" (*Id*.) The e-mail makes no reference to race and Ferguson did not consider the e-mail as being a race discrimination complaint. At his deposition, Ferguson testified that he "simply would not have said race or whatever." (Ferguson Dep. 176.)

Cowley chose to believe the version of the events reported by Kunert. Ferguson spoke to Cowley about the problems he was having in the laboratory with Kunert. Cowley saw the contentious situation that had developed between Ferguson, and Kunert and Dwinell as emblematic of Ferguson's resentment at having to report to them.

*Ferguson's March 7, 2002, Complaint about Kunert*

On March 7, 2002, Ferguson also e-mailed a formal written "complaint of harassment against Dr. Kunert" to Cowley. (*Id*. at 166, Ex.7.) Ferguson made no express mention of race.

At his deposition, Ferguson testified that the instances of harassment leading up to the March 7, 2002, complaint were the reports made by the laboratory technologists to the Human Resources office about Ferguson undressing, Kunert's remark to Ferguson that he had no integrity and the examples set forth in his March 7, 2002, complaint. The March 2, 2002, complaint includes the example of an interchange between Ferguson and Kunert in which Ferguson asked, "What do we mean by 'tabulate'[?]" and Kunert responded, "Tabulate. It means to count." (*Id*.) The complaint also relates that during the same meeting, after a reference to a histogram, Dwinell said to Ferguson, "that's a chart with bars on it." (*Id*.)

Ferguson also complained about disparaging remarks about his job performance and instances in which Dwinell and Kunert "bypassed" him in going to laboratory staff. (*Id.*)

Cowley responded to Ferguson's within two hours and indicated he would attempt to resolve the matter. Ferguson's March 7, 2002, complaint did not cause Cowley to have any concerns that race discrimination might be occurring in the PhysGen laboratory because he knew Kunert and Dwinell, and Ferguson never previously complained about race discrimination.

On March 13, 2002, Cowley, along with department administrator Brennan Nelson, met with Ferguson about his complaint. In the meeting, Ferguson apologized for having made personal comments about Kunert. Ferguson asked for clarification on where the lines of authority were drawn in the laboratory. Cowley stated that he would have Kunert, Dwinell and Messinger outline their responsibilities along with those of Ferguson. Cowley again asked Ferguson to make a personal effort to learn the protocols to gain the confidence of, and credibility with the laboratory staff.

Cowley indicated to Ferguson that from that point forward Brennan Nelson would take the lead on those types of issues.[32] With respect to Kunert, Cowley coached her regarding the need to use appropriate language in interacting with people.

---

[32]Ferguson responded to this proposed finding of fact with an incomplete statement indicating that it is admitted "as to the proposition that Brennan Nelson was not a party to whom the policy stated harassment complaints were properly made, so Ferguson understood this directive to mean his harassment complaints would not be." (Pl.'s Resp. Def.'s PFOF ¶ 194.) Ferguson's incomplete statement does not inform the Court of his objection. Therefore, the statement is deemed admitted.

By letter dated March 22, 2002, Cowley stated that he had investigated Ferguson's concerns and taken appropriate action, and that if Ferguson had any further concerns Ferguson should contact him.

On March 22, 2002, Ferguson met with Kunert and Dwinell. Kunert and Dwinell presented Ferguson with a document entitled "Addendum to the MCW Position Description, PhysGen Phenotyping Lab Manager Responsibilities" which listed the six essential functions contained in the original position description, and provided additional detail under each of the essential functions. The Addendum stated that "[f]or the manager's own training needs – work with each protocol[']s technologists long enough to learn them to the point of understanding what they do, what challenges there are in each protocol and where there are efficiency opportunities. This includes the data manipulation with each protocol." (Ferguson Dep., Ex. 24.) The Addendum also stated that the manager needed to "[e]nsure that recruiting is initiated and pursued as soon as the manager is aware there will be a staff member, leaving, following communication with [the] project supervisor(s). Proactively manage the hiring process." (*Id*.)

Kunert and Dwinell explained to Ferguson that the Addendum's purpose was to provide clear direction as to their expectations of him. Ferguson also received a summary of the laboratory supervisors' responsibilities (applicable to Kunert and Dwinell), a summary of the program coordinator's job (Messinger's position), and an organizational chart outlining the reporting lines at and above the level of Ferguson for the PhysGen project from that time forward. The chart does not show reporting lines below Ferguson.

Ferguson was told to concentrate on the vascular protocol in the week following the March 22, 2006, meeting. The second priority given to Ferguson in the March 22, 2002, meeting was to focus on laboratory staffing issues. Dwinell sent Ferguson an e-mail regarding their discussion, in which she reiterated Ferguson's priorities for the upcoming week and stated, "[w]e are committed to helping you be successful in your role as the lab manager and ensuring the success of the lab as a whole." (Ferguson Dep., Ex. 26.) Thereafter, Ferguson had weekly meetings with Dwinell and Brennan Nelson. (Ferguson Dep. 484.)

*Ferguson's Performance from March 22, through April 19, 2002,*

In the weeks following the March 22, 2002, meeting, Ferguson met with Dwinell, Kunert and Messinger on a weekly basis to discuss his activities. Between March 22, and April 19, 2002, Ferguson understood that his supervisors were not happy with his performance in various respects.

With respect to learning protocols, Ferguson spent one week after the March 22, 2002, meeting working on the vascular protocol, but after that week he scaled back his work on that protocol. Ferguson did not perform any of the other protocols between the March 22, 2002, meeting and April 19, 2002. (Ferguson Dep. 559-60.)

In the weeks immediately following the March 22, 2002, meeting, Kunert and Dwinell asked Ferguson for updates on his hiring activities. Ferguson understood that because of the production schedules for the PhysGen Project, and the need to post data on the web site on a regular basis, the laboratory needed to be fully staffed.

Kriegel had advised management that she intended to attend graduate school in the fall - that development was flagged for Ferguson on March 20, 2002. In February 2002, another technologist developed an allergy to rats. By March 22, 2002, Ferguson knew that the technologist, "Andrea" was leaving the laboratory. (Ferguson Dep. 470-72.)[33] On March 25, 2002, Kunert wrote Ferguson an e-mail regarding filling the vacant positions which stated "the faster we move the better." (Kunert Decl. ¶ 6, Ex. A.) Starting March 18, 2002, M. Jones, a PhysGen laboratory technician, was absent and the Medical College had no indication of whether he would return or when he would return. By early April 2002, M. Jones's employment had been terminated and Hahn had given notice of her resignation. In the first part of April 2002, Ferguson understood that he was supposed to be looking for applicants and bringing candidates in for interviews. These events left three vacancies in the laboratory, and Kriegel was scheduled to leave in a few months. As of April 17, 2002, Ferguson had brought in one person for an interview, no job offers had been extended and the Medical College was nowhere near extending a job offer.

The PGA program had a lower success rate inserting catheters into rats than other laboratories at the Medical College but Cowley did not attribute this problem to Ferguson. Between March and April 2002, issues arose concerning a change in catheters used in some of the experiments. The change was accompanied by confusion about who would make the catheters and how the catheters would be made. The confusion resulted in complaints from the technologists. Ferguson accepts some responsibility for the confusion.

_____

[33]There is a factual dispute about when Andrea left, but that dispute is not material. No last name is provided for "Andrea."

During the process of switching from one type of catheter to an Australian or "new" catheter, Ferguson went into the surgical room to inquire how things were proceeding and one of the technicians asked whether they should be using the new catheters. Ferguson said they should be, but if they felt uncomfortable they could use the old ones since they had not practiced with the new ones. Privett left the room during the discussion. Ferguson completed his discussion with the rest of the technicians. Upon returning to the laboratory, Ferguson saw Privett in Kunert and Dwinell's office having a very animated conversation with Kunert. Immediately after Privett exited that office, Kunert came out and accused Ferguson of not having the new catheters ready in time for the technicians to practice with them and of not having made enough catheters.

Kunert and Dwinell became involved with the issue, which they ultimately resolved by deciding to go back to the "previous catheter system . . . . So there was no change." (Ferguson Dep. 563.) Cowley agrees that Ferguson was doing his job in bringing the catheter problem to Cowley's attention and had no problem with Ferguson's actions in this regard. Cowley thought that Ferguson was never blamed for the catheter problem.

During March to April 2002, Ferguson did not have a good working relationship with a number of the laboratory technologists, all of whom were white women. Ferguson does not contend that he did not have a good relationship with those white women because he asserts they are all racists. Ferguson agrees that at least some of the concerns the technologists expressed about him were valid and did not stem from racial bias.

On April 12, 2002, Ferguson met with Kunert, Dwinell along with Labecki and Kriegel, two of the laboratory technologists with whom Ferguson did not have a good working relationship. During the meeting, Kriegel tried to express her concerns about Ferguson but she became very upset and started to cry. In Ferguson's presence and without him voicing any objections, Kunert asked Kriegel to write down her concerns so that they could discuss them.

Kriegel created a list which included, among others, complaints about Ferguson's undressing in the locker room, his attempts to re-organize the laboratory when he had minimal understanding of the experimental procedures, his promise to lobby for pay raises, and his "dismissive mode" of interacting with Kriegel. (Def.'s PFOF ¶ 238.)

After the meeting, Ferguson took the list to Brennan Nelson, who had not been at the meeting and expressed concerns about the list.[34]

Brennan Nelson discussed the issue with Dwinell, who explained the circumstances leading to the list's creation. Subsequently, Dwinell advised Kriegel that she should keep such a document in a secure place and not circulate it among the technologists.

Between March and April 2002, Ferguson was also confronted with a conflict between the technicians on two different protocols which related to scheduling issues. As of mid-April 2002, Ferguson had not resolved the issue and he could not make any headway without Dwinell's involvement.

---

[34]There is a factual dispute about where Ferguson obtained the list. At his deposition, Ferguson testified that he "walked by [the list] and it was sitting in the common analysis room, and it was sitting right beside a machine. . . Face up." (Ferguson Dep. 511.) At her deposition, Kriegel testified that the list was by her work station and she was upset that Ferguson took it. (Kriegel Dep. 145.)

Early in his employment, Ferguson was asked to handle the harvesting of spleens several times for another collaborative project with an outside institution. By mid-April 2002, Ferguson had harvested spleens several times. Nonetheless, in April 2002, while Kunert was in the middle of giving a rare tour of the laboratory to a group of nursing students, Ferguson interrupted her to ask a simple question about how to complete the protocol.

Between March and April 2002, "[f]or the most part," Ferguson provided requested updates on a timely basis to Messinger. (Ferguson Dep. 577.) During that time frame, Ferguson did not give Dwinell a report of his activities that he had said he would provide by April 15, 2002.

Beginning in March 2002 through at least May 2002, the "PhysGen Phenotype Component Efficiency Task Force" met from time-to-time and kept a log of their proceedings. On March 20, 2002, the group looked at a bench notes timeline Ferguson had made for the respiratory protocol and agreed that it was a good visualization of the failures being experienced in that protocol.

*Ferguson's April 19, 2002, Final Written Warning*

On April 17, 2002, Ferguson had a meeting with Dwinell and Brennan Nelson during which Dwinell and Brennan Nelson expressed their dissatisfaction with him on his hiring activities and his efforts to learn the protocols. Ferguson understood that his supervisors were unhappy with certain aspects of his performance at that time. Dwinell, Kunert, and Brennan Nelson reviewed Ferguson's recent performance and discussed their observations with Cowley.

42

After consultation with Human Resources, the group agreed that they needed to give Ferguson a formal disciplinary action.

Dwinell and Brennan Nelson met with Ferguson on April 19, 2002, and gave him a final written warning in lieu of a suspension. The warning letter details three primary responsibilities upon which Ferguson was asked to focus at the March 22, 2002, meeting: (1) the vascular protocol, (2) to initiate employee recruitment and interviewing, and (3) to follow-up on catheter issues for the respiratory and renal protocols. (Ferguson Dep. Ex. 35.) The warning states: "An improvement in the fulfillment of your job responsibilities must occur immediately. Failure to make immediate and sustained improvement in your job performance may result in further disciplinary action, up to and including termination from employment without further notice." (*Id*. at 2.) The warning did not result in a pay cut or any change in Ferguson's job responsibilities or job title.

On May 6, 2002, Ferguson submitted a written rebuttal to his final written warning stating that he was "in disagreement with your allegation that I have not met most of the expectations of my position." (Ferguson Dep., Ex. 36.)

*Ferguson's Continued Performance*

After Ferguson's final written warning, "the situation remained unchanged." (Ferguson Dep. 259.) Kunert and Dwinell attended a conference from April 20 through April 24, 2002. Upon their return, Dwinell discovered that two groups of rats did not receive

conditioning scheduled for that week.[35] As a result, the production schedule had to be changed.

On April 25, 2002, Kunert sent out a notice reminding Ferguson and the rest of the laboratory staff that she needed all outstanding data by May 30, 2002, to meet a June 7, 2002, deadline for releasing the data on the website. After sending out the notice, Kunert repeatedly asked Ferguson about missing data on the protocols.[36] Despite prompting by Kunert, as of late April 2002, Ferguson had not summarized all data he collected from vascular experiments which he had performed. When confronted about the missing data, Ferguson did not deny he was behind. He blamed the delay on his hiring activities and Kriegel's complaints.

In late April 2002, Kunert asked Ferguson whether he had certain catheters ready for use. Ferguson advised Kunert that they were not ready and he had no excuse for the situation. Ferguson intended his comment as "irony" because he "did not regard it as [his] fault that personnel were not comfortable with the changeover." (Ferguson Decl. ¶ 38.)

Ferguson's difficulties with the staff appeared to continue, as reflected by an April 29, 2002, e-mail in which Ferguson parenthetically indicated that some technologists had refused to provide him with certain information. Kunert responded to Ferguson that it was "definitely unacceptable" and that she or Dwinell would speak to the technologists. (Kunert Decl. ¶ 18, Ex. E.) Ferguson replied to Kunert, writing "I'd prefer to handle it myself. In general, I don't have a problem being more assertive or giving clear direction. I've simply

---

[35]Ferguson's declaration that he cannot recall the incident does not give rise to a factual dispute. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735-36 (7th Cir. 2002).

[36] There is a factual dispute whether Ferguson collected the data for one week in late March or whether he did the experiments in March and April. (See Def.'s Rebuttal to Pl.'s Resp. to Def.'s PFOF ¶ 264.)

44

found that the typical result in these situations is that they find their way to your office to complain that I said or did something to offend their sensibilities." (*Id.*)

Dwinell continued to prompt Ferguson for updates on the hiring process. When the laboratory "finally" hired new technologists in May 2002, Ferguson missed the payroll deadline for submitting the recruiting paperwork which would delay their paychecks. (Def.'s PFOF ¶ 273; Pl.'s Resp. Def.'s PFOF ¶ 273.) Weeks earlier, Brennan Nelson had advised Ferguson of the need to submit the paperwork. Ferguson blamed the delay on his absence from the office for three days. Brennan Nelson responded, "you had known this for almost 3 weeks that these individuals would be starting – being sick the last 3 days is not an adequate excuse for not providing the information I needed to process their paperwork." (Brennan Nelson Decl. ¶ 13, Ex. B.)

Ferguson was late to or absent from work on a number of days, which resulted in a written reminder from Dwinell on May 13, 2002, that Ferguson needed to keep regular hours starting at 8:30 a.m.

Dwinell provided Ferguson with meeting summaries on May 13, 2002, and May 28, 2002, which set forth the detailed directions provided to him in those meetings. In an e-mail dated May 31, 2002, Dwinell requested update on a server "crash," the status of certain cards for rat cages, and the need for a group e-mail concerning certain personnel policies.[37] (Dwinell

---

[37]There is a dispute regarding the reason for this e-mail. (*See* Def.'s Rebuttal Pl.'s Resp. Def.'s PFOF ¶ 278.) The Medical College indicates that Dwinell had to follow-up on a number of issues identified in her May 28, 2002, e-mail. (Dwinell Decl. ¶ 64.) Ferguson indicates that all the issues addressed in Dwinell's May 28, 2002, e-mail were being taken care of. (Ferguson Decl. ¶ 40.)

Decl. ¶ 65, Ex. F.)  Ferguson's responses reflected that he had not completed such tasks at the time of his response.

Although Ferguson's final written warning referenced the need for back-up plans, Kunert and Dwinell repeatedly reminded Ferguson that he needed to have a back-up plan in the event he was absent.  In May 2002, Bregantini, a laboratory technologist, reported to Kunert that a group of rats ran out of water over the weekend and stated that he had given advance notice that he was going to be absent on the days in question so that someone else could give the rats water.  Bregantini had made arrangements for someone to cover his responsibilities.  (Ferguson Decl. ¶ 41.)

On May 30, 2002, Messinger received an e-mail from Roy Weiss ("Weiss"), their contact at the University of Chicago regarding the thyroid protocol.  The e-mail stated  that the blood samples they had obtained to date were not reliable and that he had communicated  the issue to Ferguson.  Weiss also wrote "Darrin was supposed to replace these samples but this did not happen.  Perhaps we could come to Wisconsin on a mutually agreeable day and bleed the rats ourselves to ensure a good sample." (Messinger Decl., Ex. A.)  But, in April 2002, Ferguson had informed Messinger that he was addressing the issues with the thyroid samples and that the samples he obtained at that time were "fine." (*Id.* ¶ 12, Ex. B.)  Ferguson also sent Messinger a copy of an April 2, 2002, e-mail regarding his discussion with Dr. Retetoff of the University of Chicago about the problematic quality of thyroid blood samples collected the preceding week and ways to solve the problem.  (*Id.*)   Dwinell had asked Ferguson multiple times to send a group e-mail to the laboratory staff about certain policies, but he did not do so.

In late May 2002, Messinger asked Ferguson to provide her with a production summary for the previous week.

In early June 2002, Dwinell gave instructions to Brill, the senior research technician regarding where to obtain Heparin, a drug necessary for experiments in the laboratory. (Dwinell Decl. ¶ 67.) Dwinell determined that the company where Ferguson had suggested Brill obtain the drug no longer carried it and that Ferguson had indicated the company name was "Caligar" but it was "Caligor." (Dwinell Decl. ¶ 67, Ex. G.)

*The Decision to Terminate Ferguson's Employment*

On May 8, 2002, Kunert sent Cowley a written notice of resignation from the PGA project supervisor position which stated:

> As I know you are well aware, the position of the laboratory manager was instituted to assist Dr. Dwinell and myself to operate the laboratory more efficiently and to give her and myself more time to engage in our own research. For the last five months life in the laboratory has been nothing but an emotional roller coaster due to the incompetence of our laboratory manager. I need to get off that ride now in the interest of my health and my scientific career which at this point is going nowhere.

(Cowley Decl., Ex. C.)

Following Ferguson's final written warning, Dwinell, Kunert, and Brennan Nelson had kept Cowley informed of Ferguson's activities. In late May 2002, Cowley discussed Ferguson's status with Dwinell and Kunert. Dwinell and Kunert communicated to Cowley their belief that Ferguson could not proactively manage the laboratory, that he seemed to lack basic understanding of the activities of the laboratory, and that he required constant close supervision.

47

Cowley also spoke to Messinger regarding her perceptions of Ferguson's performance. Messinger advised Cowley that, in her view, Ferguson had failed to meet his responsibility for providing the laboratory staff with the appropriate information to schedule their experiments and he seemed incapable of understanding the production schedule. She cited additional performance issues with Ferguson's failure to perform the protocols unless required to do so, his handling of cage cards used to label the rat cages, his failure to resolve issues with the thyroid study, and his failure to provide information on a recent computer "crash." (Cowley Decl. ¶ 32.) Messinger also noted that Ferguson did not communicate well with his supervisors and that he required repeated prompting to provide requested information. In Messinger's opinion, Ferguson was incapable of multitasking.

From Cowley's perspective:

> This was a multimillion dollar program. We had very definite time lines. The federal government was expecting the results. We had a grant renewal coming up with millions of dollars at stake for the medical center and all the employees whose jobs were at stake with that renewal. And so I had to be - - I had to make some difficult decisions to keep this program running. And when it wasn't running, I had to try and find people that could run it and keep it up to speed, and it wasn't happening with Darrin in charge down there.

(Cowley Dep. 288.) Cowley faulted Ferguson for not learning the protocols or putting himself in a position where he could relieve the burden on Kunert and Dwinell. An additional factor was that the laboratory staff did not like Ferguson. Based on the input of Kunert, Dwinell and Messinger, Cowley's own understanding of Ferguson's performance, and the needs of the

48

PhysGen project, Cowley decided that Ferguson's employment needed to be terminated. Cowley made the decision with Kunert and Dwinell.

On June 7, 2002, Ferguson was summoned to a room where he encountered Dwinell, and an in-house attorney for the Medical College. Messinger may also have been present. Ferguson was informed that his employment was being terminated effective immediately. Ferguson said that the termination of his employment had been inevitable for some time and that he believed that it was because of his ethnicity.

The Medical College did not hire another laboratory manager to replace Ferguson. Cowley was not present when Ferguson's employment was terminated and he was not apprised of the details of the procedure by which it was terminated.

### Ferguson's Federal Court Complaint

On March 24, 2003, Ferguson filed an employment discrimination complaint with the Wisconsin Equal Rights Division ("ERD"), which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC"). In his administrative complaint, Ferguson alleged that he had been discriminated against on the basis of race when his employment was terminated. Ferguson did not check the boxes for retaliation or harassment.

The September 15, 2003, Initial Determination by the ERD dismissing Ferguson's administrative complaint, only made findings on claims of race/color discrimination and in the terms and conditions of employment. The EEOC adopted the totality of the ERD's findings and issued a Right to Sue letter on November 21, 2003.

Ferguson commenced this action 91-days later by filing a complaint in this Court on February 20, 2004. In his amended complaint, filed on September 10, 2004, Ferguson asserts claims of racial harassment, racial discrimination, retaliation and negligent supervision pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c through 2000e-17. Ferguson further asserts a race discrimination claim pursuant to 42 U.S.C. § 1981.

*Additional Facts Relating to Ferguson's Race Discrimination Claims*

Ferguson, through his counsel, stipulated that "there is no smoking gun in this case." (Ferguson Dep. 65, 72.) Ferguson does not know anything about performance issues that other managers at the Medical College may have had or performance issues similar to his.

Ferguson's amended complaint makes allegations concerning other African - Americans working in the PGA laboratory. Historically, the PGA laboratory has had a high level of staff turnover – only three of 40 technologists and technicians hired to work in the laboratory remained with the project as of November 18, 2005.[38] From June 2001, through December 31, 2002, 15 staff members left the laboratory. Four of these individuals, Hutchins, C. Jones, M. Jones and Brill were African-American. (Brill is also of Sicilian heritage.)

Cowley did not have enough interaction with the technicians in the PhysGen laboratory to form his own judgements about their performance. The people who made decisions based on the individual productivity of particular staff people were their immediate supervisors. Cowley's information was that neither Brill nor M. Jones were very successful or productive in the PhysGen laboratory. Cowley also understood that both Hutchins and C. Jones

---

[38] November 18, 2005, is the date of Dwinell's Declaration upon which this fact is based.

were excellent workers. Cowley did not pay attention to the departures of either M. Jones or Brill. It never occurred to Cowley that the fact that neither Brill nor M. Jones nor Ferguson met with success in the PhysGen laboratory might have been based on race discrimination.

Hutchins worked in the laboratory as a technologist from approximately September 2002 until October 2001 when he resigned from his position to accept another position at the Medical College. Hutchins was one of the first employees hired by the PGA program in 2000. In her August 2001, review of Hutchins, Kunert stated:

> William is and has been one of our outstanding employees whom I trust to complete a job precisely as asked to do and with creative approaches to problem solving. I can count on William and appreciate that very much. In addition his maturity is a valuable addition to the mix of personnel working in the laboratory.

(Kunert Decl., Ex. F.) Cowley considers Hutchins to be a "wonderful guy" who was hard working, conscientious, technically very skilled, and reliable. (Cowley Dep. 124.) At his deposition, Hutchins testified that he has a good relationship with Cowley and considers him his mentor. Cowley encouraged Hutchins to apply to the Department of Physiology's graduate program.

As of March 2005, Hutchins was working for the Department of Physiology in John Baker's ("Baker) laboratory around the corner from the PhysGen laboratory. Cowley understood that Hutchins had left the PhysGen laboratory for the position in Baker's laboratory because it paid better and offered more diverse duties.

Case 2:04-cv-00181-RTR   Filed 01/09/07   Page 51 of 78   Document 147

Hutchins had left the PGA laboratory prior to Ferguson's arrival. Ferguson became acquainted with Hutchins because of the proximity of the Baker laboratory to the PGA laboratory and because Hutchins was one of the few African-American men engaged in scientific research that Ferguson met while he was employed at the Medical College.

C. Jones was hired by the Medical College in October 2000. She worked in the PGA laboratory as a technologist until she resigned effective on July 12, 2002. C. Jones was responsible for plasma and biochemical analyses. Her notice of resignation states: "I will be getting married and moving to another state thus cannot maintain the position." (Kunert Decl. ¶ 31, Ex. H.) C. Jones was the only African-American woman hired by the PhysGen program.

In C. Jones's December 28, 2001, performance evaluation Kunert stated:

> Probably the most important overall statement I can make is that if I had to I would hire Candace all over again. She is a delight to work with and above all I can trust that the work she has done is good . . . Candace is a valuable member of our laboratory team. I have enjoyed working with her. She is consistently trustworthy and dependable.

(Kunert Decl., Ex. G.) Cowley characterized C. Jones as a "terrific" worker, who was "very conscientious, very productive, very interactive, kept up with the schedules, was on time, very reliable, and a very personable person in the sense that she got along well with everybody." (Cowley Dep. 118.) She also was "very careful, very precise, kept good data books" and "you could rely on what she did." (Id. at 119.)

M. Jones, who had a degree in pharmacology, worked in the ARC.[39]  M. Jones was hired by Kunert and Dwinell to work in the laboratory as a laboratory technologist in November 2001, and worked there until March 2002.  M. Jones was required to quit the ARC and not work for a week, and then he was hired upstairs at the PGA laboratory for the vascular protocol.  M. Jones was paid just under $20,000 per year.

M. Jones heard racially direct comments such as Wollenzien referring to one or more African-American employees in the PGA laboratory as being "mutts."  At first, just Brill was the direct target of these comments.  M. Jones also heard Wollenzien refer to Ferguson as "Carlton."  Wollenzien often called M. Jones "boy." (M. Jones Feb. 18, 2005 Dep. (M. Jones. Dep. I) 55.)  Once Wollenzien learned that M. Jones was part Samoan, Native-American and African-American, Wollenzien called him "mutt" and a "pineapple totin' spearchucker." (*Id.* at 55-56.)

Kunert denies that M. Jones ever complained to her that Labecki would not work with him because of his color.  Cowley never heard of any complaints made by M. Jones or Brill of racial mistreatment and Cowley would have wanted to know if such reports were made.

M. Jones had one or two weeks of training from Kriegel.  At far as he knew, he was doing fine at work.  M. Jones's work involved use of the tissue force analyzer – a box which monitors the tension of the aorta rings which were removed from rats.  M. Jones's tissue

---

[39]While he worked in the ARC, M. Jones received three hate notes: one referred to him as an Alabama porch monkey; another was a swastika drawn on a post-it note; and, the third and final note said "your days are numbered her, you might as well quit."  He complained to his immediate supervisor and "got no satisfaction."  Then M. Jones presented the hate notes to the head of the ARC, Dennis Miller ("Miller").  Miller told M. Jones that nobody was trying to fire him and the note was probably a joke.  M. Jones also complained about racism in the ARC to Human Resources's John Zubiena ("Zubiena").  M. Jones's experiences in the ARC are not relevant to Ferguson's claims in this action.

force analyzers continuously froze and were often off-line.  According to the mechanical engineer, Kevin,[40] the same problem occurred before M. Jones was employed in the PGA laboratory.

Once or twice, M. Jones talked to Kunert about data management and why the data part of their efforts was moving so slowly.  M. Jones explained that the computer was not allowing him to pull up the data he required for his work.  Later, a few times after coming back from breaks, M. Jones found Labecki and Wollenzien together at his computer.  M. Jones had no idea what they were doing.  After seeing Labecki and Wollenzien, M. Jones sent an e-mail to Ferguson reporting data missing and a protocol sheet missing from inside his desk.  M. Jones told Ferguson that he was being intentionally sabotaged.  Kunert denies that M. Jones came to her with a complaint that his computer was being sabotaged.

M. Jones had never been told directly that he was allegedly behind in his data, as Kunert claimed in her March 7, 2002, e-mail to Ferguson.

On March 18, 2002, Kunert sent an e-mail to Ferguson with copies to Cowley, Julian Lombard ("Lombard"),[41] Messinger and Dwinell regarding M. Jones.  The e-mail states:

> I am very concerned about [M.] Jones' job performance.  I had discussions with [M. Jones] on Thursday March 14th about his absences and his lack of following through on general instructions for proper data management and perhaps the protocol as well.  I told him I want him to be caught up with his data recording by the time I returned.  His files are still incomplete and where complete are inaccurate.

---

[40]Neither Ferguson's proposed findings of fact paragraph 478 nor the underlying cited deposition transcript page provide the engineer's family name.

[41]The parties' proposed findings of fact do not include any information regarding Lombard.

I informed him during our Thursday meeting that I might consider dismissing him if his performance did not improve. He is not here today and I understand he did not call in until 9 AM this morning. I want you to handle this personnel issue from this point forward. He needs to be supervised very closely and carefully. His probation ends May 7th, 2002. I consider my conversion with him on the 14th to be a verbal warning. If you need guidance in this matter, please discuss this issue with [Brennan Nelson] to be sure you are following proper, just and legal procedures. This poor to mediocre performance by [M. Jones] cannot be allowed to continue any further. For his benefit as well as the laboratories [sic]. All conversations with him should be documented and dated. All followup with him should be documented and dated. Any questions just ask please . . . Dr. Kunert.

(M. Jones Dep. I, Ex. 3.)

In March 2002, M. Jones missed a number of days of work because of headaches. M. Jones's only absences prior were one absence due to the death of his father and one day to attend the funeral of his uncle. Until M. Jones worked at the Medical College, he did not have headaches and he thinks they were stress-related.

On March 20, 2002, Ferguson e-mailed Kunert and Dwinell, with copies to Brennan Jones and Cowley, indicating that M. Jones was in the emergency room with a headache that he had for the preceding three days and that M. Jones did not think that he could come to work that day.

Kunert claims that she was not aware that M. Jones was experiencing serious headaches.

During the time he was off work, M. Jones received a voice mail from Brennan Nelson requesting that he come and pick up his belongings at security.

On March 25, 2002, Ferguson sent an e-mail to Kunert, Dwinell, Cowley, Messinger, Brennan Nelson and McQuestion, stating:

> I was informed by Austin Brill that he was contacted by Maurice who asked him to collect his personal items. Although I have not been informed by Maurice directly, it appears he will not be returning. My understanding is that I will need to: (1) attempt to contact Maurice to obtain his MCW ID card and keys, (2) notify security, (3) notify RSC/IS, and (4) prepare a termination letter. Thereafter I will notify the staff and make arrangements to cover the workload. If there are any other activities that also need to occur, please let me know.

(Dwinell Decl., Ex. H.)

Kunert responded to Ferguson's e-mail the same day, by an e-mail stating: "Thanks Darrin, Sounds good. I spoke with Mindy this morning and I understand that you have the hiring process started. My understanding is that now we have three positions to fill as soon as possible – Maurice's, Andrea's and Allison's. So the faster we move the better." (Kunert Decl., Ex. A.)

On March 28, 2002, Ferguson provided Brennan Nelson with a summary of his notations concerning M. Jones's absence. This summary reflected that M. Jones had been a no call/no show on March 21, 22, 26 and 27, 2002. Ferguson further conveyed that M. Jones had left him a voice mail on March 28, 2002, in which he stated that "he understood that he probably wasn't employed here and indicated that he would like to arrange to get his

possessions at a time during which the other technicians would not be around." (Ferguson Dep., Ex. 21.) On April 2, 2002, the Medical College sent M. Jones a notice, signed by Brennan Nelson, stating that it understood from his actions that he had voluntarily resigned from his position. Cowley did not have a role in the termination of M. Jones's employment and did not know whether M. Jones left voluntarily or whether his employment was terminated.

Brill was hired by Kunert and Dwinell to work as a senior research technician. Brill worked in the laboratory from October 26, 2001, until July 14, 2002. Throughout Ferguson's employment at the Medical College, Ferguson was Brill's immediate supervisor. On June 11, 2002, after the termination of Ferguson's employment, Brill was called into Kunert and Dwinell's office, and they asked him "what was going on" and whether he felt he was being treated "unfairly." (Brill Dep., Ex. 1 ¶ 44.) Brill showed them recent abusive e-mails from Wollenzien. Kunert and Dwinell expressed regret about Brill's situation in the laboratory. They said it would "stop" and they would personally handle it and that they would make certain that one of them was in the laboratory at all times to intervene if the problems continued to arise.

On June 12, 2002, while Brill was on a break, Lisa Gottschalk ("Gottschalk"), approached Brill, red faced and angry. It was clear to Brill that Kunert and Dwinell must have told her about their conversation with him. Gottschalk told him that his face made her want to be a Lesbian and that he had a figure like a woman. Brill's visible physical distress due to Gottschalk's remarks was witnessed by Steven Fowlkes ("Fowlkes"), an African-American co-worker from radiation safety, who was sitting with Brill.

On Friday, June 21, 2002, Brill was doing timed blood gases on a machine which he could not leave unattended. Neither Kunert nor Dwinell were in the laboratory. Wollenzien claimed to have an "anxiety" condition that could give him a heart attack. After being unable to shake Wollenzien and being fearful of his behavior, Brill logged onto his computer and let Wollenzien compose and mail the e-mail that he insisted Brill send. Subsequently, Brill sought out Kunert and Dwinell and Brennan Nelson and told them what had happened.

Close to the date that Brill left the Medical College, he talked to Kunert and Dwinell about racial harassment. Kunert did not write down Brill's complaints, she told him to report it to Human Resources. Kunert was unaware of the Medical College policy on discriminatory harassment, and did not recall seeing it. On July 15, 2002, the Medical College notified Brill that it understood that he had voluntarily terminated his position when he failed to call in or report for work on July 11, 12 and 15, 2002.

Kunert thought Brill stopped coming to work. Cowley believed that Brill had effectively resigned – just not shown up for work one day.

During her time as a laboratory supervisor, Kunert gave a final written warning to a Caucasian technologist for poor performance and terminated another Caucasian technologist for performance related reasons.

Ferguson claims that one of the laboratory technologists called him "Carlton." Carlton was an African-American character from the television program "The Fresh Prince of Bel Air," who was "a stereotypical country club-type black guy that listens to Barry Manilow."

(Brill Dep. 26.)  Ferguson does not know if he was present when the "Carlton" comment was made.

Brill heard Wollenzien make the "Carlton" comment about Ferguson.  Brill felt offended by Wollenzien's comment and expressed his offense to Wollenzien by informing Wollenzien that it was a racist comment and that Brill did not want to ever hear anything like that again out of Wollenzien's mouth.  Wollenzien did not cease his harassing comments about Ferguson.  Wollenzien referred to Ferguson as "that fucking idiot" or that "fucker Darrin."[42] (Brill Dep. 27.)  In June 2001, Brill also reported the Carlton comment to Dwinell.

Privett voiced her opinion about Ferguson to Brill shortly after Ferguson began working at the Medical College.  While Privett was completing an application for Ferguson's laboratory manager position, Brill asked her why she was applying for a position that was no longer available.  Privett stated that Ferguson was a "fucking idiot" and she could do a better job than Ferguson.  (Brill Dep. 191-92.)[43]

---

[42]In its response to paragraph 148 of Ferguson's proposed findings of fact, the Medical College did not dispute this statement or the preceding statement.  (*See* Def.'s Resp. PFOF ¶ 148.) However, subsequently, the Medical College moved to strike asserting the underlying evidence was "conclusory" and included "stray remarks."  (Def.'s Mot. Strike 7.)

The Medical College has asserted that its motion to strike simply collects its objections in one place.  Thus, it could be deemed have waived any objection to paragraph 148.  Moreover, the conclusory statement that Wollenzien continued his harassing remarks about Ferguson is expanded upon by the particular statements which Brill attributes to him.  The remarks are at least arguably relevant to Ferguson's hostile work environment claim and, therefore, have been included.

[43]The Medical College did not dispute this statement, but indicated it was immaterial because it was the stray remark of a non-decision maker.  (*See* Def.'s Resp. PFOF ¶ 150.)  Subsequently, the Medical College moved to strike the cited portion of the Brill deposition on the ground that the remarks were stray remarks of a non-decision maker. (Def.'s Mot. Strike 7.)  The proposed finding is arguably relevant to Ferguson's hostile work environment claim and, therefore, has been included.

Kreigel says that Ferguson was a fairly kind person and she thinks he tried to help her. As an example, she explained that she went to a graduate school interview and an interviewer was "hard on her" and it upset her. (Kreigel Dep. 133.) Ferguson told her "oh, don't worry, the lady that was hardest on my wife recommended her highest to get into medical school." (*Id*.)

After Hutchins, M. Jones, Ferguson, and Brill left the PGA laboratory there were no more African-American men working there.

### Analysis

#### Employment Termination

The Medical College seeks summary judgment dismissing Ferguson's Title VII and § 1981 claims discriminatory discharge claims. The Court will not separately consider Ferguson's termination claim under 42 U.S.C. § 1981, because both Title VII and § 1981 employ the same analysis. *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 641 n.5 (7th Cir. 2006).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove intentional discrimination under Title VII through direct or circumstantial evidence (direct method) or resort to the familiar indirect burden-shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Dandy v. United Parcel Service*, 388 F.3d 263, 272 (7th Cir. 2004). Direct evidence can take two forms. *Davis v. Con-Way Transp. Cent.*

*Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004). The first is an outright admission by the decisionmaker that the challenged action was undertaken because of the plaintiff's race. *See Id.* (citations omitted). The second consists of a "convincing mosaic of circumstantial evidence. . . that point[s] directly to a discriminatory reason for the employer's action." *Id.*

Ferguson does not contend that he can prove his case by direct evidence. (*See* Pl.'s Br. Opp'n Defs.' Mot. S. J. 40.) Although he recites case law regarding "a mosaic" of circumstantial evidence (*id.*), he does not present any arguments under that theory. *See Davis*, 368 F.3d at 783. Thus, Ferguson must proceed under the indirect burden-shifting method of proof. Under this approach, Ferguson must first establish a *prima facie* case of race discrimination. To do that, he "must demonstrate that: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated others not in his protected class received more favorable treatment." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

If Ferguson succeeds in establishing a *prima facie* case of race discrimination, the burden of production shifts to the Medical College to offer a legitimate and non-discriminatory reason for the alleged discrimination. *Id.* If the Medical College meets this production burden, Ferguson may then rebut that evidence by showing that the Medical College's reasons are a pretext for discrimination. *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (citations

omitted).  A pretext is a deliberate falsehood.  *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).  "An honest mistake, however dumb, is not, and if there is no doubt that it is the real reason it blocks the case at the summary-judgment stage."  *Id*.

The Medical College maintains that Ferguson cannot establish a *prima facie* case of race discrimination because his performance did not meet the Medical College's legitimate expectations and he has not identified any similarly situated white employee who was treated more favorably than he was treated.  The Medical College also contends that even if Ferguson could establish a *prima facie* case, his claim would fail because he lacks evidence of pretext.

With respect to the first and third prongs of a *prima facie* case, it is undisputed that Ferguson is a member of a protected class and that he suffered an adverse employment action when his employment with the Medical College was terminated.  In asserting that Ferguson was not performing in accordance with the Medical College's legitimate job expectations (the second prong of a *prima facie* case), the Medical College relies upon Ferguson's inability to perform multiple aspects of the position of laboratory manager.  The Medical College asserts that Ferguson did not learn the laboratory protocols, he was not forthright about the L-NAME mix-up, he did not promptly fill vacant positions in the laboratory, and he was not adept at handling personnel issues in the laboratory.  The Medical College also maintains that Ferguson was unable to oversee operations in the laboratory, and that his supervisors met with him on March 22, 2002, to provide him with a detailed description of his position.  The provision of the more detailed job description was followed by a written warning.

Even after the April 19, 2002, written warning, Ferguson did not follow through on assigned tasks.

In opposing the Medical College's contentions, Ferguson maintains that because the Medical College is relying upon the same evidence to argue that he was not meeting its expectations, as it does to articulate its reason for terminating his employment, and as it does to show the reasons were not pretexual, the issue becomes whether a jury could reasonably believe that the employer's stated criticisms were really its actual reasons for the termination of the employment. Ferguson relies upon *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 and n.9 (7th Cir. 2001).

*Gordon* involved overlapping reasons for the defendant airline's termination of plaintiff Gordon's employment based on the probationary airline attendant's failure to meet the airline's legitimate job expectations and the proffered reason for the termination. *Id*. at 886. However, *Gordon* does not support Ferguson's contention that the Court should change the method of its analysis due to that overlap.

In *Gordon*, the appeals court first examined the record regarding Gordon's job performance and concluded that there was a genuine issue of material fact as to whether Gordon had deviated at all from the permissible patterns of flight attendant behavior. *Id*. at 886-87. After also addressing the fourth prong of the *prima facie* case, the appellate court assumed that the airline had stated a legitimate reason for Gordon's discharge and then examined Gordon's claim that the justification for firing him was a pretext. *Id*. at 888-89. The issue of whether a reasonable jury could believe that the employer's stated justification was untrue was considered

when the appellate court addressed the issue of pretext. *See Id.* at 892-93. Despite the overlapping evidence, the appeals court analyzed the case in conformity with, and without deviation from, the sequential steps of the indirect method of proof of a discrimination claim. This Court will do the same.

In considering whether Ferguson has established that he was meeting the Medical College's legitimate expectations at the time of his discharge, the factual record before the Court establishes that one of the responsibilities of the laboratory manager was to improve the efficiency of the laboratory, which involved learning the PhysGen protocols. The Medical College also expected the laboratory manager to work closely with the technologists to solve problems with the protocols. Ferguson did not do so. He was asked on more than one occasion to work on learning the protocols. But, Ferguson did not assume supervisory responsibilities for the protocols. Over four months after he was hired, Ferguson was still being urged to make learning the protocols his top priority. Even after the March 22, 2002, meeting, when one of his three priorities was to focus on the vascular protocols, Ferguson did so for only one week.

Ferguson also demonstrated a lack of proficiency in performing the thyroid protocol to obtain blood samples for the University of Chicago. After two failed attempts, the researchers from that academic institution offered to come to Milwaukee to do the blood draws personally.

Another of Ferguson's responsibilities was handling personnel issues of the laboratory staff. The record reflects that Ferguson assisted C. Jones with a personnel matter — the inappropriate e-mails. But, Ferguson's poor relationships with some of the female

laboratory staff undermined his ability to function effectively to resolve personnel issues. Additionally, Ferguson unwittingly became the source of personnel issues because he developed conflicts with laboratory personnel. Ferguson admitted that during March and April 2002, he did not have good relationships with a number of the laboratory technicians.

Furthermore, Ferguson did not give the priority to recruiting laboratory staff necessary to run the PhysGen laboratory. The PhysGen laboratory had a large federal grant and need to be fully staffed to run the protocols. One of the three priorities given to Ferguson during the March 22, 2002, meeting was initiating a recruitment program for the laboratory and bringing in candidates for interviews. Ferguson did not act promptly to fill open positions within the laboratory. Nearly one month later, only one person had been interviewed and the laboratory was not close to filling any of the three job openings, with a fourth opening in the offing.

Although Ferguson was supposed to oversee the laboratory, Ferguson was not aware that M. Jones was one month behind in his data reporting. In late April 2002, when Kunert and Dwinell were attending an out-of-town conference, Ferguson failed to ensure that two groups of rats received the conditioning scheduled for that week.

Ferguson's March 7, 2002, complaint about Kunert's treatment of him resulted in the March 22, 2002, meeting regarding Ferguson's job responsibilities. That meeting lead to a more detailed job description and a list of priorities. About a month after that meeting, on April 19, 2002, Ferguson was given a written warning because his job performance had not improved. Ferguson has proffered M. Jones's opinion that Ferguson was well-spoken and was

always quick to respond to problems that were reported to him, and that M. Jones was pleased to have him as a manager. (*See* Pl.'s Br. Opp'n Defs.' Mot. S. J. 43.) However, general statements by co-workers that a plaintiff's job performance is satisfactory, are insufficient to create a material issue of fact as to whether an employee is meeting his employer's legitimate job expectations. *See Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 329 (7th Cir. 2002).

There are minor factual disputes on a variety of job performance issues. The parties focus on some aspects of Ferguson's performance – the clothes changing complaints, the L-NAME incident, and the catheter problems. The problems with Ferguson's job performance started early in his employment and did not improve. Despite construing the evidence in the light most favorable to Ferguson, the evidence is such that a reasonable jury could not find that Ferguson was performing according to the legitimate expectations of the Medical College. Thus, Ferguson has not met his burden of showing that he was performing according to the Medical College's legitimate expectations. As has been bluntly stated, if a plaintiff is dependant upon the indirect method of proof, he is "out of luck" if he cannot show that he was meeting his employer's legitimate expectations. *Id.* at 328. (Citation omitted).

Ferguson has also not presented evidence indicating that the Medical College treated similarly situated individuals who were not in the protected class differently. Ferguson states that he was the only laboratory manager in the PGA laboratory so it is impossible for him to identify any employees who were precisely similarly situated to him. (See Pl.'s Br. Opp'n Def.'s Mot. S. J. 49.) Ferguson does not know anything about performance issues that other managers at the Medical College may have had or performance issues similar to his. Ferguson

does not suggest how the Court should proceed in his situation. He merely cites a Illinois state appeals court decision indicating that the *McDonnell-Douglas* test is flexible. *Id*. (citing *Pioneer Life Ins. Co v. Woodward*, 504 N.E.2d 230, 235 (Ill. App. Ct. 1987).)

To be similarly situated to another employee, the plaintiff must show that the employee is directly comparable in all material respects. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004). Ferguson's failure to identify a similarly situated employee also precludes him from establishing a *prima facie* case of discrimination. *Id*. Thus, Ferguson's claims of discrimination in the termination of his employment are subject to dismissal upon summary judgment.

Even if Ferguson could establish a *prima facie* case, his claims of discriminatory termination fail because the Medical College has presented non-discriminatory reasons for Ferguson's firing. The decision to terminate Ferguson's employment was made by Cowley, Kunert and Dwinell. Messinger also was asked to provide her opinion of Ferguson's performance. Ferguson did not meet the Medical College's expectations for the manager of the PhysGen laboratory. Ferguson did not learn the protocols which was necessary to provide guidance to the laboratory technologists and improve the efficiency of their performance. He did not proceed apace with attempts to hire replacement technologists. He also was unable to function effectively with respect to laboratory personnel matters.

Ferguson has submitted facts which he suggests show that Kunert was prejudiced against African-Americans. For example, Ferguson has proposed findings of fact stating that Kunert has never written a letter of recommendation for an African-American and she has never

had an African-American man as a student. These facts, which are undisputed, are irrelevant. (*See* Def.'s Resp. Pl.'s PFOF Resp. Def.'s Mot. S.J. ¶¶ 36-37.) There is no indication that these facts are linked with any bias on Kunert's part.

For example, Kunert and Dwinell recommended that Cowley hire Ferguson. Kunert's December 2001 performance evaluation of C. Jones – an African-American – was effusive and glowing. Kunert gushed, "I would hire Candace all over again. She is a delight to work with." In August 2001, Kunert also gave a highly complementary review of Hutchins's job performance and contributions to the laboratory. Ferguson's attempt to paint Kunert and, to a lesser extent, Dwinell as racists does not square with the facts or the reasonable inferences that can be drawn from those facts despite viewing them in the manner most favorable to Ferguson.

Moreover, even if Kunert or Dwinell demonstrated some bigotry – "[b]igotry *per se*, is not actionable . . . [T]here must be a real link between the bigotry and an adverse employment action." *Adams v. Wal-Mart Stores*, 324 F.3d 935, 939 (7th Cir. 2003) (citation omitted). To the extent that Kunert or Dwinell may have been biased against African-Americans, there is no indication that this infected the decision-making process. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066-67 (7th Cir. 2003). There is no indication that Cowley or Messinger, who also was consulted, harbored any biases against African-Americans. There is also no indication that the information provided by Kunert or Dwinell was false or that they concealed relevant information. *See Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto., Inc.*,

Case 2:04-cv-00181-RTR   Filed 01/09/07   Page 68 of 78   Document 147

210 F.3d 750, 754 (7th Cir. 2000); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997).

Messinger's evaluation of Ferguson was that he did not provide adequate information for the technicians to schedule experiments and that he appeared unable to understand the production schedule. Messinger also complained of Ferguson's failure to perform the protocols unless he was required to do so, handle the rat cage labeling cards, and deal with the problems with the thyroid study. Messinger also noted Ferguson's inability to communicate with his supervisors, the need to prompt him for information and his failure to provide information about a recent computer malfunction. As reflected by his early March 2002, note to himself, Cowley also independently concluded that Ferguson seemed unable or unwilling to master the protocols which he had been hired to better orchestrate and to oversee. Cowley also legitimately considered the problems with the PhysGen laboratory in the context of the entire federal project which was a multi-million dollar program for the Medical College and had definite time lines.

The burden then shifts to Ferguson to show that these reasons were not the true reason for the termination of his employment. *Adams*, 324 F.3d at 940. Because the Medical College has presented multiple reasons for terminating Ferguson's employment, Ferguson would have to address each of the reasons relied upon by the Medical College as its basis for terminating Ferguson's employment. *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Ferguson has not done so. Ferguson has not shown that he learned the protocols, actively recruited employees to assure the PhysGen laboratory was fully staffed, and was able

to handle laboratory personnel matters. Despite construing the facts and the reasonable inferences that may be drawn from those facts in the light most favorable to Ferguson, there is no indication that the Medical College's reasons for terminating Ferguson's employment was a deliberate falsehood. *See Forrester*, 453 F.3d at 419.

Ferguson also relies upon facts regarding other African-American employees in the PhysGen laboratory which he states support the inference of race discrimination. He indicates that from the fall of 2001 to the fall of 2002, all five black employees were "either terminated directly or left under suspicious circumstances." (Pl.'s Br. Opp'n Def.'s Mot. S.J. 25.) Hutchins, an African-American, who was highly regarded by Cowley, left the PhysGen laboratory because he got another laboratory position with higher pay and more diverse duties. C. Jones left to the laboratory because she was getting married and moving out of state. The departures of Hutchins and C. Jones were not due to termination of their employment nor were the circumstances suspicious. There is also nothing suspicious in the termination of the employment of M. Jones and Brill. Both were terminated for their unexcused absences from work. Thus, Ferguson's claims of discrimination in the termination of his employment will be dismissed on summary judgment.

### Racial Harassment

The Medical College also seeks dismissal of Ferguson's racial hostile work environment claims, maintaining that his Title VII claim is untimely because he did not file a complaint with the Equal Employment Opportunities Commission within 300 days after the alleged employment practice occurred, and even if his claim is timely he cannot establish such

a claim. Ferguson indicates that the statute of limitations of § 1981 claims is four-years, a reasonable jury could find that Ferguson has alleged each element of a racial harassment claim, and the Medical College is vicariously liable for the actionable hostile environment that resulted in the termination of his employment.

*Claim under Title VII*

As applicable to this case, Title VII provides that a charge of racially discriminatory employment practices shall be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005) (citing *Martinez v. United Autoworkers, Aerospace & Agricultural Implement Workers of America, Local 1373*, 772 F.2d 348, 350 (7th Cir. 1985)). A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if his allegations fall within the scope of the charges contained in the EEOC complaint. *Harper v. Godfrey Co.*, 45 F.3d 143, 147-48 (7th Cir. 1995).

Ferguson presents no argument in response to the Medical College's contention that he did not file a timely complaint with the EEOC. Rather, he only states that the statute of limitations for a § 1981 claim is four-years.

This Court does not make arguments on behalf of parties. Thus, Ferguson's Title VII harassment claim is dismissed as untimely.

71

*Claim under § 1981*

Ferguson is correct in his attribution of the four-year statute of limitations to his § 1981 harassment claim. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). (Hostile work environment, wrongful termination, and failure-to-transfer claims "ar[ose] under" the 1991 Act in the sense that petitioners' causes of action were made possible by that Act and therefore were subject to four-year statute of limitations of 28 U.S.C. § 1658 which prescribes a four-year statute of limitations for "civil action[s] arising under an Act of Congress enacted after" December 1, 1990.); *See also Dandy*, 388 F.3d at 269. Therefore, the Court considers the Medical College's contention that Ferguson lacks the necessary proof of his § 1981 racial harassment claim.

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). An actionable hostile environment claim requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998)). Under the objective hostility analysis, courts may consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance;" and (4)

whether it unreasonably interferes with the employee's ability to complete his assigned duties. *Dandy*, 388 F.3d at 271 (quoting *Harris*, 510 U.S. at 23).

While harassment need not be explicitly racial in order to be probative of a hostile environment, not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority. *Beamon*, 411 F.3d at 863. The alleged harassment must be "sufficiently connected to race" before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race. *Id.* at 864.

In opposing the Medical College's summary judgment motion on his harassment claim, Ferguson states that the first overt act of hostility was Kriegel's alleged oral complaints to Kunert and Dwinell about Ferguson changing his clothes. This was followed by written complaints about the problem which were submitted to the Medical College's Human Resources office. Ferguson also relies upon Kunert's statement that he had no integrity and her insistence that he do the protocols. Additionally, Ferguson relies on the list "kept" by Kriegel and the firing of M. Jones.[44]

Despite construing the facts in the light most favorable to Ferguson, the acts of which he complains do not show objectively "severe or pervasive" conduct. Kriegel complained of the state of Ferguson's undress in the locker room. The written complaints about his changing were filed on January 9, 2002. There is no indication that race was involved

_____

[44]In his brief opposing summary judgment, Ferguson does not mention the discussion of the meaning of tabulate or a histogram of which he complained on March 7, 2002, to Cowley.

in those complaints. Moreover, after discussing the complaint with Ferguson and learning that he was considering leaving because of it, Kunert (as well as Dwinell) urged Ferguson to stay. Cowley also told Ferguson the complaints were a non-issue. Thus, the severity of the undressing complaints was mitigated by the response of Ferguson's superiors who wanted him to remain with the laboratory and did not consider them significant.

The next incident upon which Ferguson relies occurred almost a month later on February 4, 2002. In relying upon Kunert's statement that Ferguson did not have integrity, Ferguson strips the statement of context. The statement arose because Ferguson did not disclose to Kunert that rats, who were slated to receive L-NAME, did not. (Kunert's fury may have been misplaced since Ferguson had disclosed the problem to Cowley in a timely manner.) The comment, regardless of its validity, related to Kunert's perception of Ferguson's scientific integrity. The comment was not physically threatening or humiliating. There is also no indication that there was any nexus between the L-NAME incident and race.

Ferguson also relies upon the requirement that he perform the protocols as playing into the hostile work environment. Ferguson asserts that by performing laboratory protocols for Kunert he was "demoted, in effect, to laboratory technologist." However, Cowley and Dwinell also believed that Ferguson needed to run the protocols. While Kunert conceded that the requirement may not have been entirely clear, it was a requirement which was integral to the laboratory manager position.

Cowley stated that the reason that Ferguson was required to run the protocols was so that he could appreciate what was expected from the protocols. This was the sole purpose

for having him run the protocols. Ferguson also understood from the time he began working at the Medical College that one of the priorities was to learn the protocols. The need to learn the protocols was not conjured up by Kunert nor was it related to race – it was required by the managerial position for which Ferguson was hired. The requirement that Ferguson perform the protocols was a recurrent subject but it was neither severe nor physically threatening or humiliating. It also cannot be reasonably deemed to "unreasonably interfere" with Ferguson's ability to complete his assigned duties – it was one of Ferguson's assigned duties.

Ferguson also maintains that Kriegel's list contributed to the hostile work environment. The genesis of the list "kept" by Kriegel was the April 12, 2002, meeting between Ferguson, Kunert, and Dwinell, and Labecki and Kriegel – two female laboratory technologists with whom Ferguson did not have a good working relationship. Kriegel wrote the list, at Kunert's suggestion which was made in Ferguson's presence. Kunert made the suggestion because Kriegel began crying when asked to verbally convey her concerns about Ferguson. Ferguson did not object. The list was not physically threatening or humiliating. There is no indication that the creation of Kriegel's list was related to Ferguson's race.

Ferguson also relies upon the firing of M. Jones as harassment indicating that he was expected to fire M. Jones but did not. And, then M. Jones was fired. The fact that M. Jones was fired by Brennan Nelson, despite Kunert's March 18, 2002, instruction that she wanted Ferguson to handle the M. Jones personnel matter is confusing and can reasonably be seen as undermining Ferguson's managerial role. But, the firing of M. Jones cannot reasonably be

viewed as physically threatening or humiliating.  There is no indication that Ferguson's race played a role in the action or that Kunert directed Brennan Nelson to fire M. Jones.

Cowley characterized Kunert as a very brusque, direct, no-nonsense individual.  Clearly, Kunert and Ferguson clashed on some matters – the L-NAME incident and M. Jones's assistance of Ferguson on the thyroid protocol.  A contentious situation developed between Ferguson and Kunert (and, to a lesser extent,  Dwinell), which Cowley viewed as attributable to Ferguson's resentment at having to report to them.  There were problems between Kunert and Ferguson, but there is no evidence that Ferguson's difficulties with Kunert were based on his race.

The facts also include arguably racist remarks by Wollenzien.  Wollenzien referred to Ferguson as "Carlton."  He also made other remarks that did not involve Ferguson and that Ferguson did not hear.  Such "second-hand" harassment, although relevant, is less objectionable than harassment directed at the plaintiff.  *See, e.g., McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir.2004).  Wollenzien's behavior was inappropriate, and it likely impacted adversely on the work environment in the PhysGen laboratory and would have made a reasonable employee uncomfortable. Nonetheless, Wollenzien's stray comments of a racist nature, as opposed to serious or threatening comments, simply do not rise to the level of harassment which is actionable.  *Moser v. Indiana Dept. of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (citing e.g., *Faragher v. City of Boca Raton*, 524 U.S. 775, 788(1998) (noting that Title VII is not a code of general civility and simple teasing, offhand comments and isolated incidents that are not extremely serious do not amount to actionable harassment)). When all the harassing

conduct of which Ferguson complains is considered in the aggregate and in the light most favorable to him, viewed objectively it is not sufficiently severe or pervasive to constitute conduct which altered the conditions of Ferguson's employment.

Ferguson's § 1981 hostile environment claim is subject to dismissal on summary judgment because viewed in the light most favorable to him the evidence does not provide a basis upon which a reasonable jury could conclude that the work environment was objectively offensive, that the harassment was based on Ferguson's membership in a protected class, or that the conduct was severe or pervasive. Given the foregoing analysis of Ferguson's § 1981 harassment claim, the Court need not address whether there is a basis for the Medical College to be held liable on such a claim.

### *Summary*

Ferguson's federal retaliation claim, his state law defamation and invasion of privacy claims and any state negligence claim are dismissed based on his agreement. The Medical College's motion for summary judgment dismissing Ferguson's Title VII and § 1981 discrimination in the termination of his employment and harassment claims is granted.

### *OTHER MATTERS*

Also pending are Ferguson's Rule 37 motion to compel and for sanctions and discovery costs (Docket No. 127), which relates to disclosure of e-mail back-up tapes, and the Medical College's motion for leave to amend its answer to include an after-acquired evidence defense of wrongdoing (Docket No. 121). Given the Court's determination that the action should be dismissed upon summary judgment, the motions are denied as moot.

77

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

The Medical College's motion to strike (Docket No. 119) is **GRANTED IN PART AND DENIED IN PART AS STATED.**

Ferguson's motion to strike the Medical College's motion to strike (Docket No. 133) is **DENIED**.

The Medical College's motion for summary judgment (Docket No. 64) dismissing Ferguson's Title VII and § 1981 claims is **GRANTED**. Ferguson's federal retaliation claim, his state law defamation and invasion of privacy claims and any state negligence claim are dismissed based on his concession that such claims are subject to dismissal.

Ferguson's Rule 37 motion to compel and for sanctions and discovery costs (Docket No. 127) is **DENIED**.

The Medical College's motion for leave to amend its answer (Docket No. 121) is **DENIED**.

The Clerk of Court **SHALL** enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of January, 2007.

**BY THE COURT**

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**